```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF GEORGIA
 2                     VALDOSTA DIVISION

 3                 CASE NO. 7:14-CR-048

 4

 5

 6    UNITED STATES OF AMERICA

 7         Plaintiff,

 8    Vs.

 9    SARAH CARTER and
      KENYATTA DENARD MITCHELL
10    also known as KENYA MITCHELL

11         Defendants.

12

13                 ARRAIGNMENT/DETENTION

14

15
                BEFORE THE HONORABLE THOMAS Q. LANGSTAFF
16                 UNITED STATES MAGISTRATE JUDGE

17

18    DATE:                      DECEMBER 16, 2014

19    LOCATION:                  ALBANY, GEORGIA

20    COURT REPORTER:            AUDIO RECORDED

21

22    APPEARANCES:

23         FOR THE PLAINTIFF:       JULIA BOWEN

24         FOR DEFENDANT S. CARTER:   JOSE GUZMAN

25         FOR DEFENDANT K. MITCHELL  MARK BRIMBERRY
```

1                     I N D E X

2                      WITNESSES

3    ALL WITNESSES:                              PAGE:

4    For Government:

5      Stripling Luke:
          Direct Examination by Ms. Bowen       8:18
6          Cross-Examination by Mr. Guzman       64:9
          Cross-Examination by Mr. Brimberry     78:1
7          Redirect Examination by Ms. Bowen     93:5
          Recross-Examination by Mr. Guzman      104:7
8          Recross-Examination by Mr. Brimberry  107:5

9    For Defendant S. Carter:

10     Jimmy Lee Walker:
          Direct Examination by Mr. Guzman       119:11
11         Cross-Examination by Ms. Bowen         123:19

12     Barbara Walker:
          Direct Examination by Mr. Guzman       133:13
13         Cross-Examination by Ms. Bowen         138:22

14   For Defendant K. Mitchell:

15     Sheletha Mitchell:
          Direct Examination by Mr. Brimberry    147:14
16         Cross-Examination by Ms. Bowen         148:20

17                      EXHIBITS

18   NO.:      DESCRIPTION:                       PAGE:

19   For Government:

20   1 - 6     linesheets of phone calls:
               Received                           25:5
21
     1A - 6F   CD recordings of phone calls:
22             Received                           25:6

23   7         CD:
               Received                           44:4
24
     14 - 24   still photographs:
25             Received                           50:5

**R. Darlene Pino**
**United States Court Reporter**
**(229) 343-7550**

```
 1
      8 - 13    linesheets of phone calls:
 2                Received                                55:15

 3    8G - 13M  CD recordings of phone calls:
                 Received                                55:16
 4
      NO.:                                              PAGE:
 5    1         GOVERNMENT RESTS                        114:2
      2         DEFENDANT S. CARTER RESTS               146:24
 6    3         DEFENDANT K. MITCHELL RESTS             156:24
      4         DEFENDANT S. CARTER CLOSING ARGUMENT    157:11
 7    5         DEFENDANT K. MITCHELL CLOSING ARGUMENT  170:1
      6         GOVERNMENT'S CLOSING ARGUMENT           172:15
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Defendants present)
 2              THE COURT:  Ms. Sarah Carter.  Of course, the
 3      government advised you what was in the indictment when you
 4      were here last Friday.  Will you waive any further reading
 5      of the indictment for purposes of this arraignment?
 6              DEFENDANT CARTER:  I will waive any further
 7      reading.
 8              THE COURT:  You will?
 9              DEFENDANT CARTER:  I'll waive it.
10              MR. GUZMAN:  My understanding, she wants to
11      waive any further reading of the indictment.  She doesn't
12      want you to read it.
13              THE COURT:  Thank you.
14              MR. GUZMAN:  Is that correct?
15              DEFENDANT CARTER:  Yeah.
16              MR. GUZMAN:  Okay.
17              THE COURT:  All right.
18          And, Mr. Mitchell, same question for you.  At your
19      initial appearance the government advised you of the
20      allegations as they pertain to you will you waive any
21      further reading of the indictment this morning?
22              MR. BRIMBERRY:  We do, Your Honor.
23              THE COURT:  All right.
24          And, Ms. Bowen, since I do have Mr. Brimberry here
25      who was not here and Mr. Guzman actually was not -- had
```

1    not been appointed, I would ask the government as to each

2    of these two defendants to advise them again and counsel

3    of the potential penalty should they be convicted.

4           MS. BOWEN:  Yes, Your Honor.

5       As I previously stated, this is a 17 count with 13

6    defendant indictment which charges in Count 1 a conspiracy

7    to possess with intent to distribute cocaine and cocaine

8    base.  These two defendants did potentially and willfully

9    conspire with the 11 other defendants named in this

10   indictment to possess with intent to distribute exceeding

11   5 kilograms of cocaine and 280 grams of cocaine base which

12   is also known as crack cocaine in violation of Title 21,

13   United States Code, Section 846 in connection with 841

14   (a)(1) and 841(b)(1)(A)(iii).  The maximum penalty for

15   Count 1 is a mandatory minimum term of imprisonment of 10

16   years to a maximum term of imprisonment of life, a $2

17   million fine, or both, 5 years supervised release, and a

18   $100 mandatory assessment.

19      Ms. Sarah Carter is also charged in three substantive

20   counts.  They are enumerated in Counts 12, 13, and 14.

21   Count 12, possession with intent to distribute cocaine

22   base.  And it alleges on or about September 25th, 2014 --

23           THE COURT:  Just the penalties if you will.

24           MS. BOWEN:  Just the penalties.  Okay.

25      The maximum penalty of that count is 20 years

1     imprisonment, a $250,000 fine, 2 years supervised release,

2     and a $100 mandatory assessment.

3          The maximum penalty for the 924(c) charge in Count 13

4     is 5 year term of imprisonment consecutive to any other

5     term of imprisonment, 3 years supervised release, a

6     $250,000 fine, and a $100 mandatory assessment.

7          The maximum penalty for maintaining a drug involved

8     premises is 20 years imprisonment, a $500,000 fine, 3

9     years supervised release, and -- pardon me -- I believe

10    that's 5 years supervised release, and a $100 mandatory

11    assessment.

12              THE COURT:  All right.  I'm going to ask each of

13    you a couple of questions before I ask for your plea.

14         Mr. Mitchell, if you'll look at the indictment where

15    your name appears as the 13th defendant at the top, if

16    you'll tell the Court if your name is spelled correctly.

17    I'm not interested in what's after the aka.

18              DEFENDANT MITCHELL:  It's not right.  My name is

19    Kenya, not Kenyatta.

20              THE COURT:  All right.

21              DEFENDANT MITCHELL:  K-E-N-Y-A.

22              THE COURT:  I'm sorry.  It's just K-E-N-Y-A?

23              DEFENDANT MITCHELL:  Yes, sir.

24              THE COURT:  Thank you, Mr. Mitchell.  And Denard

25    and Mitchell are spelled correctly?

```
1              DEFENDANT MITCHELL:  Yes, sir.
2              THE COURT:  And, Mr. Mitchell, do you generally
3    understand, sir, what you've been charged with?
4              DEFENDANT MITCHELL:   I generally understand it.
5              THE COURT:  How do you plead to Count 1 of the
6    indictment?
7              DEFENDANT MITCHELL:  Not guilty.
8              THE COURT:  All right.  Mr. Brimberry will give
9    you a plea form where you can enter that not guilty plea.
10         Ms. Sarah Carter, do you generally understand, ma'am,
11   what you've been charged with?
12             DEFENDANT CARTER:  Yes, sir.
13             THE COURT:  And how do you plead to Count 1 of
14   the indictment?
15             DEFENDANT CARTER:  Not guilty.
16             THE COURT:  And to Counts 12 through 14 of the
17   indictment?
18             DEFENDANT CARTER:  Not guilty.
19             THE COURT:  All right.  Mr. Guzman will give you
20   a plea form where you can enter that not guilty plea.
21             MR. BRIMBERRY:  On behalf of Mr. Mitchell, Your
22   Honor, the plea has been entered.
23             MR. GUZMAN:  Your Honor, on behalf of Ms.
24   Carter, the plea has been entered.
25             THE COURT:  And the Court accepts both of those
```

1    not guilty pleas.  The Court will enter a standard

2    pretrial order as to those two defendants later today.

3    The case is assigned to Judge Lawson.  He'll set the trial

4    date.

5         All right.  Mr. Brimberry, are you ready to proceed

6    on a detention hearing as to Mr. Mitchell?

7              MR. BRIMBERRY:  Yes, sir, Your Honor.

8              THE COURT:  And, Mr. Guzman, is Ms. Carter ready

9    to proceed?

10             MR. GUZMAN:  Yes, sir.

11             THE COURT:  Ms. Bowman, the government ready?

12             MS. BOWEN:  We are.

13             THE COURT:  All right.  Everyone can return to

14   counsel table, and the government may call its first

15   witness.

16             MS. BOWEN:  The government calls Stripling Luke.

17             THE COURT:  Good morning, Agent Luke.

18        **STRIPLING LUKE, GOVERNMENT'S WITNESS, SWORN**

19                    **DIRECT EXAMINATION**

20   **BY MS. BOWEN:**

21   Q    Good morning, sir.

22             MS. BOWEN:  I'll give everyone a moment to get

23   settled.

24   Q    I believe the Court is familiar with you, but for

25   purposes of the record, will you please introduce

1    yourself?

2    A    Yes, ma'am.  My first name is Stripling,

3    S-T-R-I-P-L-I-N-G.  My last name is Luke, L-U-K-E.  I'm a

4    special agent with the Georgia Bureau of Investigation in

5    Sylvester, Georgia.

6    Q    And how long have you been so employed?

7    A    Approximately seven years.

8    Q    And will you please tell the Court a little bit about

9    your experiences relating to you investigating drug

10   trafficking organizations?

11   A    Yes, ma'am.  (Recording Unintelligible) both at the

12   Sylvester, Georgia, office and at a drug task force in

13   Baxley, Georgia.  I've been assigned to strictly drug

14   enforcement.  During the first part of my career I spent

15   it doing undercover transactions where I was actually

16   making purchases of controlled substances to include

17   cocaine, crack cocaine, marijuana, and pharmaceutical

18   medication.  Since that time, I have worked large scale

19   drug organizations that have been prosecuted in this Court

20   and most Superior Court in the State of Georgia.

21   Q    So you're familiar with drug trafficking from street

22   level all the way up to multi-kilogram organizations that

23   travel across state lines?

24   A    Yes, ma'am.

25   Q    All right.  Now, in this capacity, with this

1    knowledge, were you involved in the investigation of a

2    large scale, multi-year, multi-kilogram cocaine drug

3    trafficking organization that was based in and around

4    Tifton, Georgia?

5    A    Yes, ma'am.

6    Q    And this covered the years of the investigation of

7    the conspiracy of January 1st, 2013, through October 28th

8    of 2014?

9    A    Yes, ma'am.

10   Q    And at the center of this conspiracy was it comprised

11   of two families, that being the Carter and the Martinez

12   families?

13   A    Yes, ma'am.

14   Q    With, of course, additional individuals that we're

15   talking about the heart of this conspiracy?

16   A    Yes, ma'am.  That's correct.

17   Q    And is Sarah Carter, if you will, the matriarch of

18   the

19   Carter family?

20   A    She is the mother, yes.

21   Q    And are her two sons, Maurice Carter and Andrew

22   Carter?

23   A    And she has a third one, I believe Curtis Smith.

24   Q    Okay.  But he is not involved in this case?

25   A    No, ma'am.

1    Q    All right.  Now, Kenyatta Mitchell is a long time

2    associate and business relation within the context of drug

3    trafficking of the Carter family.

4              MR. BRIMBERRY:  Excuse me, Your Honor.

5    A    He has been for the last year.

6              MR. BRIMBERRY:  I would object to that being a

7    leading question.  She's telling him her opinion as to my

8    client's involvement and getting him to agree with her

9    opinion instead of asking an open ended question.

10             THE COURT:  But, of course, as you know, Mr.

11   Brimberry, and I know Ms. Bowen wants to tell me, the

12   Rules of Evidence do not apply in a detention hearing.

13             MR. BRIMBERRY:  Yes, sir.

14             THE COURT:  And, of course, leading questions,

15   that is, a rule of evidence.

16             MR. BRIMBERRY:  Yes, sir.

17             THE COURT:  However, having said that, this

18   Court has always exercised some discretion when we get

19   down to the lick log (phonetic), and preferred that

20   questions be the nonleading fashion.  And I think we are

21   getting to that point, Ms. Bowen, so, even though the

22   Rules of Evidence don't apply, after the preliminary

23   setting the stage, the Court does expect nonleading

24   questions.  So I will sustain that objection.

25             MS. BOWEN:  Yes, Your Honor.

1    BY MS. BOWEN, CONTINUED:

2    Q    Was Maurice Carter arrested in December of 2013?

3    A    Yes, ma'am.

4    Q    Will you, please, tell the Court about that?

5    A    Yes, ma'am.  Maurice Carter, who is the brother of

6    Andrew Carter, his full name is Maurice Todd Carter, who

7    resides at 1211 or 1215 CS Powell Road, Omega, Colquitt

8    County, Georgia, was arrested as a result of a traffic

9    stop in Tifton, Georgia.  A large quantity of methylone,

10   or also known as Molly on the streets -- It's a Schedule I

11   synthetic drug.  -- was recovered in his vehicle.

12   Q    And where was he incarcerated after his arrest?

13   A    The Tift County Sheriff's Office.

14   Q    And did he make use of the jail telephone?

15   A    He did.

16   Q    And is this telephone or are these telephones

17   recorded?

18   A    Yes, ma'am.  They are.

19   Q    Will you tell the Court about a telephone call that

20   was made on March 30th, 2014, between Maurice Carter and

21   his mother, Sarah Carter?

22   A    Yes, ma'am.  During this phone call, their

23   conversation consisted of Sarah Carter storing an amount

24   of currency for Maurice Todd Carter.  Sarah Carter

25   indicated she was going to give this currency to Andrew

1    Carter for safekeeping.

2    Q    And through your investigation, did you run checks

3    through the Department of Labor to determine whether or

4    not Maurice Carter had or had -- had had any lawful

5    employment?

6    A    We could not find any.

7    Q    Similarly were there a series of call between May 9th

8    and 10th, 2014, among Maurice Carter,  Andrew Carter,

9    Kayla Carter, and Sarah Carter regarding Kenyatta Mitchell

10   and cocaine?

11   A    Yes, ma'am.

12   Q    Will you tell the Court about those, please?

13   A    Of course the call initiated with Maurice Todd

14   Carter, and the -- the participators on the conversation

15   during these calls were Sarah Carter, Kayla Carter, Andrew

16   Carter.  Kayla Carter is Andrew Carter's sister and

17   daughter of Sarah Carter.  During these conversations it

18   was learned that Robert, I believe his last name was

19   Billings based on other phones is a relative of the

20   family, purchased an $8,000 quantity of cocaine.

21   Initially tried to purchase from Andrew Carter.  When

22   Andrew Carter would not complete the sale through him, he

23   purchased the cocaine from Chop, which I am aware is the

24   street name of Kenya Mitchell.

25        When he -- this is Robert -- sold it to his customer,

1   either the customer did not pay for the cocaine or was

2   robbed.  The jail phone calls were not clear.  However,

3   Robert Billings owed the money for that.  Robert Billings

4   went to Chop to obtain a firearm, to obtain -- Now, this

5   is all based on jail phone call.  -- obtain a firearm from

6   Chop and we don't know, I believe he did not get one, but

7   he was looking for a firearm to get his money back.

8   Andrew Carter indicates in these phone calls, or other

9   people, that the cocaine was initially supplied by Andrew

10  Carter to Kenyatta Mitchell or Kenya Mitchell.  I'm sorry.

11  Q     Thank you, Agent Luke.  Was there also a phone call

12  on June 2nd, 2014, also recorded on the jail phone call

13  between Maurice Carter and Sarah Carter that was

14  significant within the context of the Carter/Martinez drug

15  trafficking organization?

16  A     Yes, ma'am.

17  Q     Will you, please, tell the Court about that telephone

18  call?

19  A     On June 2nd, there was a recorded jail phone call

20  from Maurice Todd Carter in which it was to Sarah Carter.

21  Sarah Carter answered the phone, and at the time

22  surveillance noted that she was in her yard at 1569

23  Georgia Avenue, Omega, Tift County, Georgia.  There were

24  people stopping and coming in, and particularly there was

25  a black female who arrived at the residence that day.  She

1    give the phone to Kayla Carter, who the phone is signed to

2    Andrew Carter, inside.  You could overhear on the jail

3    phone calls a continuous beating sound.  This sound is

4    synonymous to me with the manufacturing of crack cocaine.

5    We will hear a video shortly that has been -- occurred in

6    this investigation that dictates this same exact sound you

7    hear on the jail phone calls.  But in my training and

8    experience is the manufacture of crack cocaine.

9         Sarah Carter comes inside the house and can be

10   overheard on the phone call stating -- stating something

11   to the effect of these people are outside waiting.  And

12   Andrew Carter states, "It will be 15 minutes.  Tell them

13   to come back."

14   Q    You just mentioned 1569 Georgia Avenue.  Is that the

15   residence of Ms. Sarah Carter and also Kayla Carter, her

16   daughter, and Diamond Carter, her granddaughter, and her

17   three-year-old great-grandson, who is the son of Kayla

18   Carter?

19   A    Yes, ma'am.

20   Q    And during the course of your investigation into the

21   Carter/Martinez drug trafficking organization, did you and

22   other law enforcement officers conduct surveillance on

23   locations used by members of this organizations to conduct

24   their drug trafficking business of which 1569 Georgia

25   Avenue was one?

1    A    Yes, ma'am.  We obtained the surveillance of 1569

2    Georgia Avenue.

3    Q    And what did this surveillance reveal about how that

4    address was used within the context of their drug

5    business?

6    A    Yes, ma'am.  During the course of our surveillance,

7    which occurred over a period of six to eight months, there

8    was constant foot traffic and vehicle traffic arriving at

9    this residence to include black males, white males, and

10   white females, who would either walk on foot or arrive in

11   a vehicle, get outside their vehicle, go to the side door,

12   knock on the door or screaming at the door, and walk

13   inside, stay for a short period of time, and then leave.

14   We also had observed Andrew Carter being with individuals

15   in this organization and we could observe at times

16   packages or items being exchanged between two parties, one

17   of them being Andrew Carter.

18   Q    Before we talk about the packages being exchanged by

19   Andrew Carter sometimes when Sarah Carter would be

20   present, sometimes not, the pattern of foot traffic that

21   you just described for the Court, individuals, all

22   different kinds of people coming and going during the day,

23   not staying for very long, what is that consistent with

24   based upon your training and experience in investigating

25   drug trafficking?

1    A    Yes, ma'am.  We believed it was street level drug

2    distribution, mainly cocaine.

3    Q    And during that six to eight month period, how would

4    you describe the frequency of this traffic to Sarah

5    Carter's house?

6    A    There was daily traffic.

7    Q    All right.  Now, let's talk about what you described

8    as transactions that would be conducted at Sarah Carter's

9    house by and with Andrew Carter.  Can you give the Court

10   some instances of specific transactions that took place?

11   A    Yes, ma'am.  Jose Martinez, which is Andrew Carter's

12   supplier of cocaine, has been observed at his house

13   meeting with Andrew Carter.  We were able to observe items

14   being exchanged between the vehicles.  Based on other

15   surveillance locations in this investigation where we have

16   observed Andrew Carter and Jose Martinez meeting it

17   appeared they were exchanging packages in the shape and

18   size of kilogram of cocaine for US currency.  At times we

19   could see counting motions where it looked like somebody

20   was bending over counting currency when items were being

21   exchanged.

22        We've also observed Andrew Carter meeting with other

23   individuals from Cook County and Tift County we believe

24   were conducting drug transactions.

25   Q    And have, in fact, some of these customers been

1    stopped or otherwise encounter and -- encountered with

2    cocaine?

3    A    Yes, ma'am.

4    Q    All right.  Now, let's talk about Kenya Mitchell.

5    Has he also conducted, made, interacted with drug activity

6    with Andrew Carter and Sarah Carter at that residence?

7    A    Yes, ma'am.

8    Q    Now, did you obtain a court order to monitor

9    telephone calls in this case?

10    A    Yes, ma'am, we did.

11    Q    And whose telephones did you monitor?

12    A    Andrew Carter and Lataris Waters.  Lataris Waters is

13    the mother of at least one of his children and his

14    girlfriend, for lack of a better term, is probably a wife,

15    but I don't think they're legally married.  They

16    cohabitate together.

17    Q    And we've already been discussing some of the

18    surveillance and other techniques that you and other law

19    enforcement officers employed, but in connection with

20    listening to phone calls, how much cocaine did you learn

21    that this organization was moving?

22    A    Yes, ma'am.  (Recording unintelligible) receive

23    anywhere from 5 to 15 kilograms ever week or every other

24    week during the period of September 2014.  September 2014,

25    for a 30 day time frame, was the period of intercept of

1    Andrew Carter and Lataris Waters' phones.  Prior to that,

2    based on other investigation techniques that we had

3    employed, whether it be cooperating sources, trash pulls,

4    or surveillance, we knew that Andrew Carter was dealing in

5    multiple kilograms of cocaine based on his own notes.

6            MS. BOWEN:  Your Honor, may I approach the

7    witness?

8            THE COURT:  You may.

9            MS. BOWEN:  And before I do that, I'm going to

10   show to defense counsel what I've marked for purposes of

11   identification Government's Exhibit 1 through 6 and

12   Government's Exhibit 1A through 6F.

13       (Discussion off record between counsel)

14   BY MS. BOWEN, CONTINUED:

15   Q    Agent Luke, do you recognize Government's Exhibits 1

16   through 6 and the disk which is enumerated 1A through 6F?

17   A    Yes, ma'am.

18   Q    And what are they?

19   A    Government's Exhibits 1 through 6 are linesheets or

20   transcripts of intercepted communication between Sarah

21   Carter and Andrew Carter.  Each linesheet is, one,

22   enumerated with a government exhibit stamp, but, two, it's

23   also dated in time and has a unique session number which

24   keeps them in chronological order of the intercepted

25   communications.  And the Government's Exhibits 1A, 6F is a

1    CDR that contains the linesheets or the recordings of the

2    audio intercepted.

3    Q    And are they true and accurate?

4    A    Yes, ma'am.

5         MS. BOWEN:  Your Honor, I'd like to move into

6    evidence now Government's Exhibit 1 through 6 and the disk

7    that is enumerated 1A through 6F, which are calls matching

8    the transcripts or linesheets.

9         THE COURT:  Mr. Guzman, any objection?

10        MR. GUZMAN:  Your Honor, I'm going to object to,

11   in particular, Government's Exhibit No. 6 and the other

12   exhibits because it appears that there is what I would

13   call editorial included within -- within these documents.

14   For example, Government's Exhibit No. 6 I just noticed it

15   has, like, a summary at the top and then it has what was

16   actually said.  And the summary at the top is what it

17   appears -- it actually appears to be in all of these

18   documents is, like, an editorial or a summarization of

19   what the individual, whoever prepared these transcripts,

20   thinks was actually said even though those words weren't

21   used.  For example, in Government -- Government's Exhibit

22   No. 6 there's a line that says, "I don't want to be

23   driving with all that stuff," with a parenthetical saying

24   "referring to cocaine" despite the fact that there was no

25   cocaine actually mentioned within the phone call itself.

1    So that is actually not an accurate depiction of what the

2    conversation is.  So I would object --

3              THE COURT:  Is that just 6 or is that 1 through

4    6 that are like --

5              MR. GUZMAN:  It's all of them have this

6    editorial or what I call editorial or summarization it

7    looks like at the top, and then it also has the actual

8    conversation below it and, like, a summary at the top.

9    And so I would object to all of them because it appears

10   that all of them has that summary at the top.  I don't

11   think there is an accurate portrayal of what was actually

12   said.

13             THE COURT:  All right.  Before I ask --before I

14   ask the government to respond, Mr. Brimberry, I'll also

15   ask you if you have any objections to the tendered

16   exhibits.

17             MR. BRIMBERRY:  I would join co-counsel's

18   objection, Your Honor.  I would adopt -- I would adopt and

19   submit to the Court.

20             THE COURT:  All right.  Ms. Bowen, would you

21   like to respond?

22             MS. BOWEN:  Yes, Your Honor, I would.

23       There is a synopsis provided by the monitor, but

24   there is also a line transcription of the call.  If I --

25   Your Honor would prefer we won't move 1 through 6 into

1    evidence.  It's just an aid to the Court.  The calls

2    themselves are 1A through 6F, so Mr. Guzman, Mr.

3    Brimberry, and the Court can hear exactly what was said.

4    So I just provided the transcripts as an aid for the

5    listener so you can follow along to what was said because

6    there is a synopsis; however, there is a line by line

7    transcription that follows.  Now, there's nothing better

8    than hearing it directly from the speaker, so I've go the

9    calls and then I have an aid for the Court so that you may

10   follow along and hear what they're saying.

11           THE COURT:  All right.  Let's do this.  In the

12   past I have found the aids helpful because of the --

13   sometimes the quality of the recording or the voices, and

14   that doesn't mean accepting what's in the transcript carte

15   blanche because obviously someone has transcribed that,

16   but defense counsel would be given that to and if

17   disagrees with what the recording actually says as

18   reflected in the transcript then you would have an

19   opportunity to make that objection and I'd consider that.

20           Long and short of it is 1A through 6F are admitted.

21   Those are the CDs, the actual evidence.  Certainly hear

22   those.  What I would like though is if we could copy over

23   the editorial comments at the top.  And I think the

24   transcript, if I'm going to listen to six tapes, would be

25   helpful to the Court.  So can we copy over or remove that

1    part?  Is it just at the top of each of the six exhibits?

2            MS. BOWEN:  There is a synopsis before the line

3    transcription on each of the six exhibits.  There are also

4    going to be some calls that are introduced where Mr.

5    Mitchell was intercepted as well.  If the Court wants to

6    adjourn so that I can do this for Your Honor; however, I

7    would say that Your Honor can judge if there -- the merits

8    of this.  If Mr. Guzman is concerned about some

9    editorializing, as he puts it, Your Honor can hear for

10   yourself, and I believe that any concern about that is

11   going to be vastly outweighed by hearing it and then

12   following along.  So I really think this is harmless if

13   anything, and would take a little bit of time, but if

14   that's what Your Honor wants, of course I'm happy to

15   oblige Your Honor.

16           THE COURT:  All right.  What we're going to do

17   is -- this is downstairs in making copies five minutes,

18   ten at the most?

19           MS. BOWEN:  Yes.  I'll figure out a way to do

20   it.

21           THE COURT:  All right.  I'll tell you what I

22   also want you to do, Ms. Bowen, while you're making --

23   copying over the editorials is call Mr. Gamble so that

24   before I leave the courtroom I have some idea as to when

25   we're going to do that other hearing.

1           MS. BOWEN:  Okay.

2           THE COURT:  So it is -- by that back wall clock,

3    it's 10:13.  Ms. Bowen is going to make a phone call, copy

4    over the editorial parts of those exhibits.  Let's recess

5    until 10:25.

6        (Recess)

7        (Defendants present)

8           THE COURT:  All right.  I think we're all back

9    and all ready to go again.  Let's see.  Ms. Bowen --

10          MS. BOWEN:  Yes, Your Honor.

11          THE COURT:  -- you may proceed.

12          MS. BOWEN:  Thank you, Your Honor.

13      I believe when we left off we had just introduced --

14   been admitted into evidence the six calls, 1A through 6F,

15   and the aids which Your Honor requested be redacted,

16   removing the synopsis are before Your Honor from Mr.

17   Lawrence.  That's Government's Exhibits 1 through 6, and I

18   would proceed with testimony from Agent Luke at this time.

19          THE COURT:  All right.  Are you going to

20   re-tender 1 and 6 now?

21          MS. BOWEN:  Yes, Your Honor.

22          MS. BOWEN:  I would like to tender 1 and 6 if

23   the Court would like.  They have removed the synopsis

24   which was -- which Mr. Guzman took issue with.

25          THE COURT:  All right.  Any further objection,

1    Mr. Guzman?

2              MR. GUZMAN:  Not from Ms. Carter, Your Honor.

3              THE COURT:  All right.  Mr. Brimberry?

4              MR. BRIMBERRY:  No, sir, Your Honor.

5              THE COURT:  All right 1 through 6 are admitted

6    alone and 1A and 6F were previously admitted.  All right.

7    you may proceed.

8              MS. BOWEN:  Thank you, Your Honor.

9    BY MS. BOWEN, CONTINUED:

10   Q    Agent Luke, what I'd like to do with these six phone

11   calls is I'd like to go through them one by one, and you

12   tell the Court the date, the time, and the session number,

13   the participants on the call, and provide them with a

14   little bit of what we're going to hear on this call, and

15   then we're going to listen to the call.  So let's go first

16   with Government's Exhibit 1.  If you would give the Court

17   that information.

18   A    Yes, ma'am.  Government's Exhibit 1, session number

19   639, the date 9/1/2014, the time of the call 12:29:47.

20   The participants of the call are Andrew Carter and Sarah

21   Carter, and this is Andrew Carter calling Sarah Carter.

22        (Audio recording played for the Court)

23   Q    Agent Luke, within the context of this investigation

24   and to your knowledge, who is Joe that Ms. Carter is

25   referring to?

1    A    Joe is reference to Jose Martinez.

2    Q    And Andrew makes reference, that being Andrew Carter,

3    to Joe being on a plane.  Again, based upon your knowledge

4    of this case, what significance does that have?

5    A    Yes, ma'am.  Jose Martinez flew to Texas to obtain

6    another source of supply of cocaine.  Their source of

7    supply for cocaine in Atlanta, Georgia, was having trouble

8    providing them with product, so he traveled to Texas via

9    an airplane to meet with another source.  When he was

10   meeting with the source, he had to provide I would refer

11   to it as identification data on his family, this is Jose

12   Martinez' family and also on Andrew Carter.  When Jose

13   Martinez returned from this trip from Texas he indicated

14   he destroyed his phone.  In fact, he did change his

15   telephone number after this because he did not want those

16   people knowing who he was.

17   Q    And is his providing of personal information to a

18   potential source of cocaine in Texas a form of security,

19   if you will, to solidify this business relationship?

20   A    Yes, ma'am.  In fact, Jose Martinez has had these

21   relationships in the past.  In 2004, Jose Martinez was

22   arrested in Lee County, Georgia, with 1 kilogram of

23   cocaine by the Lee County Sheriff's Office.  As a result

24   of his kidnapping -- I mean of his arrest, Jose Martinez's

25   sister, Aracley Rivera, was kidnapped from Omega, Georgia,

 1    by several Hispanic males who flew from Texas to south

 2    Georgia to conduct this kidnapping.  She was transported

 3    to Atlanta, Georgia, which she was ultimately recovered

 4    through the investigative efforts of law enforcement.

 5    Q    And the source that Joe was developing, Jose

 6    Martinez, on behalf of the Carter/Martinez DTO was going

 7    to be a multi-kilogram cocaine source, so large amounts of

 8    cocaine that they hoped to be able to get out to Georgia?

 9    A    Yes, ma'am.

10    Q    And Sarah Carter is demonstrating, not just by

11    Government's Exhibit 1 and 1A, the phone call, her

12    knowledge and awareness of this relationship and her

13    interaction with him is just a sampling of that knowledge?

14    A    Yes, ma'am.  This is a representative sample.  All

15    these calls are just a small sample of all the

16    interception, and I'll try to supply testimony to each

17    call to give reference.

18    Q    All right.  I'm going to ask you about Government

19    Exhibit 2.  If you would provide the same identifying

20    information for that call, which is 2B.

21    A    Yes, ma'am.  Session number 798, date September 2,

22    2014, time 11:18:13.  It's a conversation between Andrew

23    Carter and Sarah Carter where Andrew Carter contacts Sarah

24    Carter.

25         (Audio recording played for the Court)

1    Q    Before I ask you about Government's Exhibit 2B, was

2    the surveillance on Sarah Carter and Andrew Carter and

3    other members of the DTO on that date consistent with

4    Sarah Carter going out to Todd's house as requested by

5    Andrew Carter?

6    A    Yes, ma'am.  We did observe her vehicle arrive at

7    1211 or 1215 CS Powell Road after this call.

8    Q    Now, Andrew asked for that can and swiff.  Based upon

9    your training and experience will you tell the Court what

10   that is?

11   A    Yes, ma'am.  A swiff is a reference -- it's also

12   referred to as a beater, but it's nothing more than a cake

13   mixer.  It's a handheld mixer that any convenience store

14   or dollar store or Walmart, any kind of grocery store, and

15   a can is a vessel to manufacture crack cocaine.  You have

16   to have the swift or the stirrer to stir the crack cocaine

17   while you're manufacturing it.  And this is a reference to

18   Andrew Carter manufacturing crack cocaine at 1211 CS

19   Powell or 1215 CS Powell, and Sarah Carter asks if he's

20   going to make her anything, which is a reference to

21   providing her with any crack cocaine.

22   Q    All right.  So Government Exhibit 3 and 3C, which

23   will be the phone call, will you provide the identifying

24   data to the Court?

25   A    Yes, ma'am.  This is session number 1720, date

1    9/6/2014, time 8:33:40.  This is a conversation between

2    Andrew Carter and Sarah Carter where Sarah Carter contacts

3    Andrew Carter.

4         (Audio recording played for the Court)

5              MS. BOWEN:  I'm going to stop it there.  That's

6    where the transcription ends, Your Honor.

7    Q    There are several things I want to ask you about in

8    this call, Agent Luke.  There are several references to

9    numbers and monetary figures.  I believe that Sarah Carter

10   asks how much do you have to put in there, and Andrew

11   responds, "I don't know.  You at least need to put 11 or

12   12."  Goes on a little bit, and then Sarah Carter asks,

13   "How much does he charge for a 12."  What significance

14   does a 12 have in the context of this case and drug

15   trafficking?

16   A    Yes, ma'am.  In fact, further in the call they refer

17   to the 12 as 12 grams.  What you -- a standard measure of

18   an ounce, just an ounce of anything is 28.35 grams.

19   Typically when we refer to ounces, ounces of cocaine, from

20   people in this organization and other cases, they want to

21   sell an ounce of cocaine for 24 grams.  I believe it's a

22   relief on the tracking statutes in the State of Georgia

23   being anything over 28 grams at a time, and so they refer

24   an ounce of 24 grams.

25             This 12 is a reference to 12 grams of cocaine or half

1    an ounce.  And a typical figure or price of a half an

2    ounce of crack cocaine or cocaine is $500, which the 500

3    is a reference to.

4    Q    So we have a reference to calls half a quantity of, I

5    guess, a street ounce, 12 grams, an actual reference by

6    Andrew Carter to 12 grams when asked by Sarah Carter.

7         When Sarah Carter says, "I'm talking about making a

8    circle," based upon your training and experience in

9    investigating these kinds of cases and your knowledge of

10   this case, what is that a reference to?

11   A    Yes, ma'am.  When you (recording unintelligible)

12   manufacture a quantity of crack cocaine, the vessel that

13   you use to manufacture crack cocaine can be anything from

14   a coffee cup to a pot, and typically it -- the finished

15   product is a circular fashion, it's a circle.  It takes

16   the form of the bottom of whatever vessel you're cooking

17   it in.

18   Q    And later in the call Sarah Carter states to Andrew,

19   "All these folks coming by wanting something.  It done

20   starting -- started" -- excuse me -- "this morning."

21   Based upon, again, training, experience, your knowledge of

22   this case, what is she referring to?

23   A    Yes, ma'am.  And on surveillance on this date in

24   particular, we started seeing foot traffic starting to

25   arrive at her residence as I explained earlier.

```
1   Q    All right.  Let's move on to the linesheet Government
2   Exhibit 4 and the call, which would be 4D.  If you would,
3   please, identify it for the Court, and then we will play
4   it.
5   A    Yes, ma'am.  It's session number 4618, date
6   9/18/2014, time 13:13:35.  It's a conversation between
7   Andrew Carter and Sarah Carter where Sarah Carter contacts
8   Andrew Carter.
9        (Audio recording played for the Court)
10  Q    On this call Andrew Carter is asking for seal bags.
11  A    Yes, ma'am.  There was an audio malfunction where we
12  did not intercept Andrew Carter's portion of the phone
13  call, but based on Sarah Carter's response that's what I
14  believe he's asking for based on her statements.
15  Q    And what are seal bags used for by this drug
16  trafficking organization?
17  A    Yes, ma'am.  Members of this organization to include
18  Andrew Carter refer to a seal as a vacuum sealer or a food
19  processing sealer where it can be used to shrink wrap a
20  quantity of cocaine.  In fact, we recovered a vacuum
21  sealer from Andrew Carter's house and bags for that vacuum
22  sealer at his residence.
23  Q    All right.  I want to talk now about Government
24  Exhibit 5, which is the linesheet or transcription if you
25  will, and the call 5D, which also dovetails with 4 and 4D
```

1    which you have just testified about.  If you would,

2    please, identify that call for the Court.

3    A    Yes, ma'am.  Session number 4663, date 9/18/2014,

4    time 16:18:52.  It's a conversation between Andrew Carter

5    and Sarah Carter where Sarah Carter contacts Andrew

6    Carter.

7         (Audio recording played for the Court)

8    Q    I believe you had previously testified to it, but so

9    that it is clear, Sarah Carter makes a reference to Chop,

10   picking up bags and money from him for Andrew Carter.

11   Chop is Kenya Mitchell?

12   A    Yes, ma'am.

13   Q    And what was the context of this pick up of bags and

14   money?

15   A    Yes, ma'am.  I will note that Sarah Carter (recording

16   unintelligible) Exhibit 5 I believe -- or this is Exhibit

17   5.  Government Exhibit No. 4, the session number is 4618.

18   The session number on Government Exhibit No. 5 is 4663.

19   That would indicate there's multiple calls between these

20   two conversations.  Typically what we would intercept

21   would be Kenya Mitchell contacting Andrew Carter saying,

22   hey, I've got your money for the cocaine that you provided

23   me, or something to that extent, and Andrew Carter would

24   contact his mother.  There were other members of his

25   family (recording unintelligible) at 297 Carter Street,

 1    Tifton, Tift County, Georgia, to retrieve the items from

 2    Kenya Mitchell.  And this conversation is -- reflects that

 3    Sarah Carter has been to Kenya Mitchell's residence and

 4    obtained money from Kenyatta Mitchell or Kenya Mitchell.

 5    I apologize.

 6    Q    In that same vein of Sarah Carter assisting Andrew

 7    Carter with either a delivery or a pick up or money for

 8    drugs, let's talk about Government Exhibit No. 6 and 6F,

 9    the call that goes with that transcription.  Will you,

10    please, identify it for the Court, and then I'll play it?

11    A    Yes, ma'am.  This is session number 5592, date

12    9/24/2014, the time 9:37:55.  It's a conversation between

13    Andrew Carter and Sarah Carter where Andrew Carter

14    contacts Sarah Carter.

15         (Audio recording played for the Court)

16    Q    So Andrew Carter says, "I was willing to have to take

17    too much stuff, so I ain't wanting to be driving."  And

18    then Sarah says, "Okay.  Let me run in there -- here and

19    see."  And then he also says, "I just don't want to be

20    driving with all this stuff.  I would rather someone else

21    take me."  So based upon your training and experience and

22    your knowledge of this case, what is he talking about?

23    A    Yes, ma'am.  First, Andrew Carter was at 186

24    Crossland Lenox Road, Omega, Colquitt County, Georgia,

25    which is on the Tift/Colquitt County line.  It's

1    approximately 15 miles from Tifton, Georgia, where

2    Kenyatta Mitchell lives.  Andrew Carter also does not have

3    a driver's license.  Prior conversations to this

4    conversation consisted of an order of cocaine by Kenyatta

5    or Kenya Mitchell.  Andrew Carter contacts Sarah Carter in

6    which he's looking for somebody to drive him to deliver

7    this item.  Based on this conversation and others, we set

8    up surveillance at 2907 Carter Street in Tifton, Tift

9    County, Georgia, and observed Sarah Carter and Andrew

10   Carter -- Andrew being in the passenger seat and Sarah

11   Carter being the driver of Sarah Carter's white Tahoe.  --

12   arrive at Kenya Mitchell's house for a short period of

13   time and then leave.

14   Q    So the surveillance was consistent with the call?

15   A    Yes, ma'am.

16   Q    Before we move off these calls relating to Sarah

17   Carter, do these, 1 through 6, a transcription of the

18   calls, which are 1A through 6F, represent only a sampling

19   of numerous calls on which Sarah Carter was intercepted

20   talking to Andrew Carter and other members of the Carter

21   family about their drug distribution organization?

22   A    Yes, ma'am.  During the 28 days that we were actively

23   intercepting communications, I would say almost daily

24   communications between them two.

25   Q    Now, was there a search warrant executed at the

1    residence of Sarah Carter, 1569 Georgia Avenue, which you

2    have been testifying about in regards to meetings taking

3    place there and heavy foot traffic?

4    A    Yes, ma'am.

5    Q    And what items of evidentiary value were recovered

6    from her bedroom and other locations in that house?

7    A    Yes, ma'am.  On September 25th, 2014, (recording

8    unintelligible) series of search warrants in (recording

9    unintelligible) Cook conflict in Tift County at 1569

10   Georgia Avenue, we located the following items.  In Kayla

11   Carter's three year old child's room there was a Ruger 9

12   mm pistol wrapped in a pair of women's jeans.

13        In Kayla Carter's room there was a Glock .40 caliber

14   pistol that was stolen.  There was a Masterpiece Arms

15   pistol, 9 mm.  There was an Ascender magazine that

16   contained twenty-three 9 mm bullets.  There was an empty

17   rifle magazine for a .223 caliber weapon also commonly

18   referred to as a AR-15-type weapon.  And a .40 caliber

19   magazine.

20        In Sarah Carter's room there was a Marlin rifle, a

21   portion of a cookie of crack cocaine (recording

22   unintelligible)a blue cup containing several pieces of

23   cocaine.

24        In the living room there was packaging material for

25   distribution of controlled substance.

1    Q    And you mentioned the AR-15 magazine rifle.  I know

2    we're not talking about all the search warrants, we're

3    talking about those relevant to the two individuals before

4    the Court today; however, there was an AR-15 recovered

5    from Andrew Carter's residence as well?

6    A    He had two residences.  We did recover an AR-15

7    assault-type rifle from 6147 Futch Road, Hahira, Cook

8    County, Georgia, that we had observed him in the past

9    carrying.

10   Q    Did Ms. Carter provide you with a post-Miranda

11   statement?

12   A    She provided me with a statement several days later

13   at the Tift County Sheriff's Office.  It was not really

14   Miranda, but it was a voluntary statement.  She was free

15   to leave and did leave after the statement.

16   Q    All right.  During that statement did she make any

17   reference to the cocaine and crack cocaine that was

18   located in her bedroom?

19   A    Yes, ma'am.  She indicated she purchased it from a

20   black male on a bicycle named GiGi who sales or lives or

21   is in the area of the Carson Motel, which is a motel in

22   Tifton, Georgia, and she stated that the cocaine in her

23   residence was -- belonged to her.

24   Q    Her claim that this cocaine was obtained from a black

25   male on a bicycle named GiGi was it consistent with the

1    scope of your investigation?  And we've talked about

2    surveillance, the telephone conversations, trash pulls,

3    and other avenues of investigation, was it consistent?

4    A    No, ma'am.  She obtained her cocaine from Andrew

5    Carter and Maurice Todd Carter.

6    Q    Did she make any statement in regards to driving

7    Andrew Carter anywhere?]

8    A    Yes, ma'am.  During the course of this investigation,

9    and particularly in the course of the wire intercepts, we

10   observed Sarah Carter, among others, trans -- either

11   transport Andrew Carter or at Andrew Carter's direction

12   traveling to locations to include Kenya Mitchell's

13   residence to either pick up money or delivery narcotics.

14   When I asked her about this activity, if she had ever

15   driven Andrew Carter anywhere or been asked to pick up any

16   kind of package or deliver any kind of package she denied

17   it, any of those activities.

18   Q    Before we leave off talking about the calls with

19   Sarah Carter, do you recall a September 20th, 2014, call

20   between Andrew Carter and several members at Todd Carter's

21   house?

22   A    Yes, ma'am.

23   Q    And it regarded a delivery by Kayla Carter

24   (recording stopped and restarted) 14, was she in her home?

25   A    Yes, ma'am.

1    Q    And what items of evidentiary interest were also

2    located there?

3    A    Yes, ma'am.  In a room inside her residence the

4    officers who conducted the arrest located six televisions

5    that were on the floor, they weren't on the wall.  Three

6    of these televisions were stolen, three of the televisions

7    were confirmed to be stolen.

8    Q    And what is the significance of stolen TVs in the

9    context of drug trafficking?

10   A    Yes, ma'am.  We had already recovered a stolen

11   firearm from her residence and items of stolen property

12   are typically traded for crack cocaine or any other kind

13   of controlled substances.  Individuals who are end level

14   users of crack cocaine will burglarize individual's houses

15   and then trade these items they gained from the burglary

16   or shoplifted to people who are distributing crack cocaine

17   or any other kind of controlled substance as payment.

18   Q    When you say end level users are you referring to

19   foot traffic individuals who buy 20s of crack?

20   A    Yes, ma'am, I am.

21   Q    All right.  Now, you mentioned burglaries.  During

22   the course of this investigation wasn't Andrew Carter

23   either wanted for a burglary or he came up as suspect in a

24   burglary?

25   A    That's correct.

1    Q    And he was -- he was being searched for by the local

2    Sheriff's Office?

3    A    Yes, ma'am.  In early summer of 2014, based on our

4    surveillance, Andrew Carter was located at his residence

5    at the time, 6147 Futch Road, Hahira, Cook County,

6    Georgia, and he was out in the front yard working on a

7    white-in-color Jeep Cherokee.  You could tell that he was

8    doing some kind of engine work to it, and it appeared to

9    me that he was -- after he got through working on the car

10   he was going to test drive the car to see -- to determine

11   whatever was wrong with it.  When he returned to his

12   house, he returned at a high rate of speed and he was

13   followed by several Cook County Sheriff's Office deputies

14   with their blue lights flashing.  He pulled in behind his

15   residence, got out of his car, and fled on foot.  Based on

16   my conversation with the Cook County Sheriff's Office

17   during this time, they indicated a individual who lived in

18   the neighborhood of 6147 Futch Road had reported a

19   burglary to a residence, and when she arrived home, she

20   observed the white-in-color Jeep Cherokee in the area and

21   believed it to be associated with the burglary.

22        Now, based on my surveillance of Andrew Carter, I

23   don't think it was associated with the burglary.  However,

24   he didn't know why the law enforcement was chasing him.

25   He fled on foot.  Intercepted jail communications through

1    Maurice Todd Carter indicated that Sarah Carter and others

2    traveled to the area of 6147 Futch Road to retrieve her

3    son who was still hiding in the woods.

4    Q    So he was hiding from law enforcement and Sarah

5    Carter goes to pick him up?

6    A    Yes, ma'am.

7    Q    All right.  And, in fact, that Jeep that he was in,

8    didn't during the investigation you learned they, in fact,

9    painted that Jeep?

10   A    Yes, ma'am.  The Jeep was painted from white to blue.

11   Q    All right.  And during the course of the

12   investigation when you were listening to phone calls

13   didn't you hear Sarah Carter advise Andrew Carter and

14   others the location of law enforcement?

15   A    Yes, ma'am.  As the police officers (recording

16   unintelligible) Omega, Georgia, we would intercept calls,

17   Hey, Tim or the police officer -- Tim was the name of a

18   local police officer there.  -- is sitting on the road.

19   Q    And before we move on to some questions about Mr.

20   Kenya Mitchell as they are related, I recall one question

21   I did want to ask you about the murder of Tyler Johnson.

22   Was that a drug-related murder?

23   A    Yes, ma'am.  It appeared from the investigation that

24   some customers were trying to purchase cocaine from Tyler

25   Johnson and he would not sell them the cocaine, so they

1    returned, and when they came up to his door he was shot

2    through the door and they fled but were later apprehended.

3    Q    Thank you, Agent Luke.  Now, you've already testified

4    about Chop or Kenya Mitchell when we discussed

5    Government's Exhibits 4 and 4D and 5 and 5E, but are you

6    aware of additional investigation into his drug

7    trafficking activities which relate to this investigation?

8    A    Yes, ma'am.

9    Q    And can you provide the Court with some specific

10   examples of traffic stops or encounters with other

11   individuals where they had acquired fairly large amounts

12   of cocaine or crack cocaine from Mr. Kenya Mitchell?

13   A    Yes, ma'am.  In 2012 and part of the fall of 2011, I

14   was involved in an investigation that was -- part of the

15   targets were Kenya Mitchell and his distribution of

16   cocaine in the Tift -- Tift County, Georgia, area.  On May

17   23rd,  2014, we received information that an individual

18   was leaving one of Kenya Mitchell's trap locations.  And a

19   trap is a reference to a house that no one typically

20   resides in, but it's strictly used for the distribution of

21   controlled substance.  This individual was leaving this

22   location.  We obtained -- obtained a deputy to that truck

23   stop and identified the driver as Terrence Robinson.

24        Inside Terrence Robinson's vehicle was 500 grams of

25   crack cocaine.  During the traffic stop, Terrence Robinson

1    overpowered the deputies, the two deputies, got into one

2    of the deputy's vehicles and led law enforcement on a

3    chase in Tift County.  Ultimately he wrecked the patrol

4    car into another patrol car, and fled on foot, but he was

5    apprehended.

6    Q    And similarly on October 30th, 2012, was there

7    another purchase of crack cocaine and powder cocaine by an

8    individual from Mr. Kenya Mitchell?

9    A    Yes, ma'am.  I was responsible for organizing

10   controlled purchases of cocaine from Kenya Mitchell

11   through the use of a confidential source.  On October

12   30th, 2012, we purchased three cookies of crack cocaine,

13   approximately 58 grams, and 28 grams of powder cocaine

14   from 2907 Carter Street, Tifton, Tift County, Georgia,

15   from Kenya Mitchell.

16   Q    And on November 8th, 2012, was similarly a purchase

17   of $1300 of crack cocaine from Mr. Kenya Mitchell?

18   A    Yes, ma'am.  We purchased, again, November 8th, 2012,

19   two cookies.  A cookie is like, as testified, 1/2 an ounce

20   of crack cocaine from Kenya Mitchell from 2907 Carter

21   Street in Tifton, Tift County, Georgia.

22   Q    And was the confidential informant that you used in

23   this case equipped with audio and video surveillance

24   equipment?

25   A    Yes, ma'am, he was.

```
 1              MS. BOWEN:  Your Honor, may I approach the

 2   witness?

 3              THE COURT:  You may.

 4   (Ms. Bowen moves away from microphone and portions are not

 5   understandable)

 6   Q    Agent Luke, do you recognize that (recording

 7   unintelligible)?

 8   A    Yes, ma'am.  It's a portion of a video that details

 9   the purchase on November the 8th, 2012, of crack cocaine.

10   That also depicts the manufacture of crack cocaine by

11   Kenya Mitchell.

12   Q    And is it a fair and accurate capturing of a sale

13   (recording unintelligible) cocaine and manufacture of

14   crack cocaine by (recording unintelligible)?

15   A    Yes, ma'am.

16              MS. BOWEN:  Your Honor, we move into evidence

17   Government's Exhibit 7.

18              THE COURT:  Any objection, Mr. Brimberry?

19              MR. BRIMBERRY:  No objection, Your Honor,

20   although it's kind of awkward for me to object to

21   something I haven't yet heard.

22              THE COURT:  I understand.  Well, as we get into

23   it --

24              MR. BRIMBERRY:  Play it by ear then?

25              THE COURT:  Yes, sir.
```

1           MR. BRIMBERRY:  Thank you.

2           THE COURT:  Mr. Guzman?

3           MR. GUZMAN:  There's no objection, Your Honor.

4           THE COURT:  All right.  It's admitted.

5           MS. BOWEN:  Thank you, Your Honor.

6    BY MS. BOWEN, CONTINUED:

7    Q    Agent Luke, what I'd like to do, if you will, as I

8    play Government's Exhibit 7 if you will narrate to the

9    Court at relevant intervals what is taking place, and if

10   we need to stop, you can just let me know.

11   A    Yes, ma'am.  (Recording Unintelligible) dead area

12   from -- from the initial meeting of the confidential

13   source to the actual arrival and meeting with Kenya

14   Mitchell.  I believe 15:55 is an appropriate location to

15   start the video to not waste the Court's time.

16        16:55

17        (Recording played for the Court)

18           MS. BOWEN:  Your Honor, is the volume good or is

19   it too loud?

20           THE COURT:  If you can knock it down a little

21   bit, I'd appreciate it.

22           MS. BOWEN:  All right.

23        (Recording played for the Court)

24   BY MS. BOWEN, CONTINUED:

25   Q    Agent Luke, what does Mr. Mitchell have in his hands?

1    A    Yes, ma'am.  That is a powder cocaine.  It is

2    compressed.  Typically (recording unintelligible)

3    compressed into something that is (recording

4    unintelligible) kilogram of cocaine.  It can be either

5    fully compressed like that or very loose, and this is

6    fairly compressed.  He is fixing to place this cocaine on

7    the digital scale that you see right there beside the

8    microwave.  There's also Glad sandwich bags in the

9    background.  He has cocaine in a flip and fold sandwich

10   bag.  There's actually two items of cocaine in the

11   picture:  one on the counter and one in his hand.

12        (Recording played for the Court)

13   Q    So as you just testified, he's weighing the --

14   A    Yes, ma'am.

15   Q    -- cocaine at this point?

16        (Recording played for the Court)

17   Q    And is that a coffee cup?

18   A    Yes, ma'am.  We, in fact, have recovered a coffee cup

19   similar to this from this residence as you'll see in the

20   video.  We refer to it as a can.  It's a vessel to

21   manufacture crack cocaine.

22   Q    So when Andrew Carter called his mom, Sarah Carter, I

23   believe that was Government Exhibit 2 and 2B and asked

24   "Will you bring me that can and swiff," a coffee cup is a

25   can?

1    A    It could be.  Yes, ma'am.

2         (Recording played for the Court)

3    Q    What is Mr. Mitchell shaking into this can?

4    A    Yes, ma'am.  That's going to be baking soda?

5    Q    And what is the purpose of baking soda?

6    A    It's used in the process to manufacture crack

7    cocaine.

8         (Recording played for the Court)

9    Q    And are Mr. Mitchell and his customer, the

10   confidential informant, discussing the price of what's

11   being purchased, the crack cocaine?

12   A    We provided him with $1300 US currency, and

13   (recording unintelligible) 13, and Mr. Mitchell (recording

14   unintelligible) 12, representing $1200.  Coded language is

15   typically used, whether it's meeting in person or on the

16   telephone, and this is an example of that coded language.

17        (Recording played for the Court)

18   Q    Is Mr. Mitchell washing dishes or is he continuing to

19   manufacture crack cocaine?

20   A    Yes, ma'am.  If you observed the video, you saw him

21   retrieve something from the stove.  That was a coffee cup.

22   And he is taking cold water and flicking it over into the

23   coffee cup that's in the bottom of the sink that we'll see

24   here shortly.

25        (Recording played for the Court)

1   Q    That noise that we're hearing, you testified when we

2   were talking about the calls between Sarah Carter and

3   Andrew Carter to a beating noise that was heard, and I

4   believe that was Government's Exhibit 3.  Let me look to

5   be -- No.

6   A    I testified to a jail phone call --

7   Q    The jail phone call.  Thank you.

8   A    Yes, ma'am.

9   Q    To a beating noise in the background.

10  A    To a similar noise based on (recording

11  unintelligible).

12  Q    And that is the beater or the whisk going around and

13  around in the can or the bowl or coffee cup, whatever one

14  might be using?

15  A    Yes, ma'am.

16       (Recording played for the Court)

17  Q    What is Mr. Mitchell doing there?

18  A    Yes, ma'am.  He's back putting water on that bowl or

19  that coffee cup.  He's also put a small quantity of

20  cocaine on the scale.

21       (Recording played for the Court)

22            MS. BOWEN:  Your Honor, may I approach the

23  witness?

24            THE COURT:  You may.

25            MS. BOWEN:  I'm going to show some exhibits, 14

1     through 24, which have been marked for identification, to

2     Mr. Brimberry.

3     BY MS. BOWEN, CONTINUED:

4     Q    Agent Luke, do you recognize what I've marked for

5     identification as Government's Exhibits 14 through

6     (recording unintelligible)?

7     A    Yes, ma'am.

8     Q    And are they still shots taken from the video, a

9     portion of which we have just watched, Government's

10    Exhibit 7?

11    A    Yes, ma'am.  And I will note for the record that the

12    date on the recording device is incorrect.  The date is

13    actually November the 8th like I had previously testified,

14    not November the 9th.  But there is a clock on the bottom

15    that's a counter.  You can look at the video and match up

16    these photographs to the video.

17    Q    And are they fair and accurate (recording

18    unintelligible, speaking away from microphone) of the

19    video that we've just been watching?

20    A    Yes, ma'am.

21         MS. BOWEN:  Your Honor, I'd like ot move into

22    evidence Government's Exhibit 14 through (recording

23    unintelligible).

24    A    (Recording Unintelligible) 24.

25    Q    (Recording Unintelligible).  Was there a photograph

1    taken of the circle or cookie of crack cocaine that we

2    watched Mr. Mitchell manufacture (recording

3    unintelligible)?

4    A    Yes, ma'am.

5    Q    Is that what Government's Exhibit No. 24 represents?

6    A    That's correct.

7    Q    And is it a fair and accurate representation of that

8    cookie of crack cocaine Mr. Mitchell manufactured

9    (recording unintelligible)?

10   A    Yes, ma'am.

11              MS. BOWEN:  Your Honor, I'd like to move into

12   evidence now (recording unintelligible).

13              THE COURT:  Any objection?

14              MR. BRIMBERRY:  No objection; however, I did not

15   hear the last explanation from Agent Luke about Exhibit

16   24.  I just couldn't hear.

17              THE COURT:  It's a separate photograph.  14

18   through 23 were still photos taken from the video.  24 was

19   a separate photo taken.  I suppose we're going to hear

20   about agents coming in and they took a photograph of the

21   cocaine that has been manufactured on the video.  Have I

22   got that right?

23              MS. BOWEN:  Yes.

24              WITNESS LUKE:  After the purchase of the

25   cocaine, when it was brought back to my possession, this

1    is a representation of what we purchased I guess.

2            MR. BRIMBERRY:  Okay.  Thank you.

3            THE COURT:  All right.  14 through 24 are

4    admitted.

5            MS. BOWEN:  Mr. Lawrence, will you switch me

6    over to the ELMO, please?

7    BY MS. BOWEN, CONTINUED:

8    Q    I just want to ask you a couple of questions about

9    some of these exhibits.  Let's start with Government

10   Exhibit 14.

11           MS. BOWEN:  Your Honor, is it clear on your

12   screen?  It's not clear back here.

13   Q    Is this Mr. Mitchell?

14   A    Yes, ma'am.

15   Q    And what is he holding in his hand?

16   A    He's holding the coffee cup that he was beating with

17   a whisk or a beater or a swiff to manufacture crack

18   cocaine.

19   Q    In what residence did this take place at?

20   A    2907 Carter Street, Tifton, Tift County, Georgia.

21   Q    Government Exhibit No. 23.  What's he doing there?

22           MS. BOWEN:  This is not cooperating.

23           WITNESS LUKE:  It's a little (recording

24   unintelligible) at the end.  I can tell now.

25           MS. BOWEN:  There we go.

1    A    Yes, ma'am.  While we stopped the video, when we

2    played a portion of the manufacturing process, this is a

3    finality where the cookie of crack cocaine has been

4    manufactured, and it is being placed on the scale

5    depicting its weight.

6    Q    And you previously testified in reference to

7    Government's Exhibit 3 and 3C that Sarah Carter was

8    talking about making a circle or enough to make a circle.

9    Is this the kind of circle that she was talking about?

10   A    Yes, ma'am.

11   Q    Now, during this same time were search warrants

12   executed on this residence, 2907 Carter Street, and 2907

13   Wilton Avenue?

14   A    Depending on the location of the (recording

15   unintelligible) we did search warrants at those two

16   locations on that day.

17   Q    And were any items of evidentiary value recovered?

18   A    Yes, ma'am.  November the 9th, 2012, at 2907 Carter

19   Street we located four boxes, open boxes, of baking soda;

20   flip and fold sandwich bags; the digital scale; a

21   blue-in-color coffee cup with cocaine residue; and flip

22   and fold sandwich bags with the corners torn.

23   Q    And those are all items that we saw on that video and

24   in these pictures?

25   A    We didn't see any flip and fold sandwich bags that

1    were torn.  Typically when cocaine is packaged whether it

2    be crack or powder or any controlled substance, you take a

3    flip and fold bag, you place the item in the bag, in the

4    title bag in the corner, and then you tear the rest of the

5    bag off so you don't have a lot of waste or just a very

6    small.

7    Q    Any other items at 2907 Wilton Avenue?

8    A    Not that -- not that I can recall at this time.

9    Q    All right.  Have you also had the opportunity during

10   this investigation of the -- throughout 2012 and into the

11   current investigation with the Carter/Martinez DTO to talk

12   with individuals who have provided information about Mr.

13   Mitchell and his drug trafficking activities?

14   A    Yes, ma'am.  I interviewed several individuals that

15   have been prosecuted in the Middle District of Georgia who

16   have provided information.

17   Q    Please tell the Court about some of that information.

18   A    Lamar Patterson November 2012.  He was arrested, I

19   believe, in February of 2012.  Based on his interview,

20   three or four years -- a time period of three or four

21   years prior to his arrest he sold Kenyatta Mitchell a half

22   kilogram of cocaine approximately 50 times.

23   Q    And did you also speak with a Chester King?

24   A    Yes, ma'am.  Chester King, he is from the Fitzgerald,

25   Ocilla, Georgia, area.  Again, he indicated he has made

1    purchases of cocaine from Kenyatta Mitchell.  Purchased

2    anywhere from 4 ounces to 9-1/2 ounces.

3    Q    And did you also speak with a Gary Lockett about Mr.

4    Mitchell and his drug trafficking activities?

5    A    Yes, ma'am.  Gary Lockett was from Tifton, Georgia.

6    He was arrested in February 2011.  He indicated that

7    during the four month period prior to his arrest he was

8    supplying Kenyatta Mitchell with 9 ounces every other

9    week.

10    Q    Now, let's fast forward into 2014.  Mr. Mitchell has

11    continued his activities, manufacturing, distributing

12    cocaine/crack cocaine.  Was another search warrant

13    executed on his residence, that same one that we just that

14    video of him manufacturing cocaine, that 2907 Carter

15    Street, executed once again?

16    A    Yes, ma'am.

17    Q    Were items of evidentiary value recovered?

18    A    We located a scale with cocaine residue, a drug

19    ledger, and under the carport there was a cold -- I think

20    it was an alcoholic beverage, maybe a beer, which

21    indicated to us that somebody had fled prior to our

22    arrival because it was still cold when they arrived.

23    Q    And was Mr. Mitchell also recorded talking to Andrew

24    Carter about trafficking cocaine and crack cocaine?

25    A    Yes, ma'am.

1            MS. BOWEN:  Your Honor, may I approach the

2      witness?

3            THE COURT:  You may.

4        While she's approaching, Agent, what was the date of

5      that last search?

6            WITNESS LUKE:  September 25th, 2014, was the

7      last.

8      Q    Agent Luke, do you recognize Government's Exhibit 8

9      through 13 and 8G through 13 M?

10     A    Yes, ma'am.

11     Q    Let's talk first about 8 through 13.  What are they?

12     A    Yes, ma'am.  8 through 13 are linesheets that depict

13     -- display transcripts from the wire intercept of Andrew

14     Carter's phone.

15     Q    Other than the synopsis which has been redacted are

16     they fair and accurate and complete copies of those

17     linesheets?

18     A    Yes, ma'am.

19     Q    Now, Government's Exhibit 8G through 13M are those

20     the six phone calls, I believe, that are Kenya Mitchell

21     talking to Andrew Carter?

22     A    Yes, ma'am.

23     Q    And is that -- is those phone calls a fair, accurate,

24     and complete copy of those calls?

25     A    Yes, ma'am.

1            MS. BOWEN:  Your Honor, at this time, I'd like

2     to move into evidence Government's Exhibit 1 through 8 --

3     excuse me -- 8 through 13 and 8G through 13M.

4            THE COURT:  Any objection?

5            MR. BRIMBERRY:  On behalf of Mr. Mitchell, Your

6     Honor, no, sir.  No objection.  I'll note my Exhibit 9 is

7     cut off at the bottom I'm sure.

8            MR. GUZMAN:  There's no objection from Ms.

9     Carter.

10            MR. BRIMBERRY:  May I approach the US Attorney

11     to show her what I'm talking about?

12            THE COURT:  She's coming to you.

13            MS. BOWEN:  You can have my copy.

14            MR. BRIMBERRY:  Thank you.

15            THE COURT:  All right.  Those are admitted, 8

16     through 13 and 8G through 13M.

17            MS. BOWEN:  Your Honor, it will take a moment to

18     switch this.

19     BY MS. BOWEN, CONTINUED:

20     Q    Agent Luke, I'd like you to do the same as we did

21     with the calls capturing Sarah Carter talking to Andrew

22     Carter about drug trafficking.  I'd like you to identify

23     each call by its session number, date, and time.  So let

24     me make sure they are up, and then we will start with

25     Government Exhibit 8.  Will you, please, identify it for

1    the Court?

2    A    Yes, ma'am.  Session number 963, date September the

3    2nd, 2014, time 20:35:38.  It's a conversation between

4    Andrew Carter and Kenyatta Mitchell or Kenya Mitchell.

5    Q    All right.

6         MS. BOWEN:  I'll play call 8G for the Court now.

7         (Audio recording played for the Court)

8    Q    All right.  Based upon surveillance, knowledge of

9    this case, what is the context of this call where Andrew

10   identifies Kenya as Chop and Kenya says, basically, give

11   me a few more minutes, Andrew says that?

12   A    It depicts, one, Kenya Mitchell being identified as

13   Chop, and, two, a meeting between them.

14   Q    All right.  Government Exhibit 9, which is the

15   linesheet, and the call, which is 9H.  Would you identify

16   it for the Court?

17   A    Yes, ma'am.  Session number 1225, date 9/3/2014, time

18   19:39:27.  It's a conversation between Andrew Carter and

19   Kenyatta Mitchell.

20        (Audio recording played for the Court)

21   Q    All right.  Agent Luke, when Kenyatta or, excuse me,

22   Kenya Mitchell says, "1025, I ain't gonna" -- expletive --

23   "make shit boy.  I" -- expletive expletive -- "900 off 18

24   and then I be stuck with" -- expletive -- "3 more grams"

25   -- expletive -- "what that is?"  Andrew respond, "That's

1    gonna be like 1050."

2         Based upon your training and experience and knowledge

3    of this case, what are they negotiating?

4    A    Yes, ma'am.  During this time, during the wire

5    intercepts, Andrew Carter had received some cocaine of

6    poor quality, and because this cocaine was of poor

7    quality, Andrew Carter received some complaints from his

8    customers in reference to the quality.  Cocaine that is of

9    poor quality is -- it will have a different time of

10   manufacture into crack cocaine.  This is a reference to

11   Kenya Mitchell attempting to help Andrew Carter with

12   selling this bad cocaine, and they're negotiating a price.

13   Q    And does that negotiation continue throughout the

14   call back and forth between Andrew Carter and Kenya

15   Mitchell?

16   A    Yes, ma'am.

17   Q    And, in fact, Kenya Mitchell says, "Bring me about 5

18   of them" -- expletive -- "because people asking about

19   dope."

20   A    Yes, ma'am.  Based on the context of this call, I

21   believe it was a reference to 5 ounces.  He didn't want to

22   get stuck with too much of this poor quality cocaine to

23   make sure he could sell it all.  And they're bartering

24   where -- Ken -- Ken Mitchell is just trying to help move

25   this product for Andrew Carter and not provide Andrew

1    Carter with any profit because it was poor quality.

2    Q    And, in fact, the conversation continues with a

3    figure of 900 being introduced by Kenya Mitchell, so we

4    start with the 1025, we talk about the poor quality, can't

5    sell it, and then we end up at 900?

6    A    Yes, ma'am.

7    Q    All right.  Let's talk about Government Exhibit 10

8    and the call that goes with that.  If you would identify

9    it for the Court.

10   A    Yes, ma'am.  It's going to be session number 3505,

11   date 9/12/2014, time 20:15:02.  It's a conversation

12   between Andrew Carter and Kenya Mitchell.

13        (Audio recording played for the Court)

14   Q    We hear Kenya Mitchell say, "Let me count my money

15   right quick," and "What you want me to come out there."

16   Based upon your knowledge of this case, what's the context

17   of this conversation?

18   A    Yes, ma'am.  A prior conversation that we intercepted

19   had indicated that Kayla Carter was going to transport an

20   item of cocaine for Andrew Carter to Kenya Mitchell, and

21   Andrew Carter made the statement, they're going to be on

22   their way, you're going to have to leave your house and

23   come down a little ways, in reference to a drug

24   transaction.

25   Q    And, in fact, that dovetails with  Government's

1    Exhibit 11, and the attendant phone call.  If you'll

2    identify the call for the Court.

3    A    Yes, ma'am.  Session number 3899, date 9/14/2014,

4    time 20:25:37.  It's a conversation between Andrew Carter

5    and Kenya Mitchell.

6        (Audio recording played for the Court)

7    Q    So that is the delivery that you had previously

8    testified to?

9    A    Yes, ma'am.  And based on the intercept calls prior

10   to this we knew that Kayla Carter and Sarah Carter were in

11   the white-in-color Chevrolet Tahoe to make this delivery.

12   Q    In fact, Andrew Carter says, "Yeah, that my momma

13   truck," referring to Sarah Carter?

14   A    Yes, ma'am.

15   Q    And we know from the calls that we listened to on

16   Sarah Carter where she was intercepted, Government's

17   Exhibit 5, related call; Government's Exhibit 6, related

18   call, that she has picked up money and bags from Chop and

19   she also delivered some items out there in call 6, those

20   dates being September 18th and September 24th?

21   A    That sounds correct.  Yes, ma'am.

22   Q    All right.  Government's Exhibit 12 and the related

23   phone call, will you, please, identify it for the Court?

24   A    Yes, ma'am.  Session number 4451, date 9/17/2014,

25   time 16:56:09.  It's a conversation between Andrew Carter

1    and Kenya Mitchell.

2        (Audio recording played for the Court)

3    Q    All right.  On this conversation between Kenya

4    Mitchell and Andrew Carter, Kenya said, "I need get like

5    63 miles per hour plus 28 more.  I need to get that for

6    somebody."  Based upon your training and experience and

7    your knowledge of this case, what is he referring to?

8    A    Yes, ma'am.  It's coded language describing a

9    quantity of cocaine.

10   Q    And Mr. Mitchell does not always use coded language

11   because we have heard on prior exhibits that sometimes it

12   will be an explicit reference to grams and sometimes not?

13   A    Yes, ma'am.  Based on my interview of Andrew Carter

14   pursuant to his arrest, he indicated that when Mr.

15   Mitchell was getting a half a kilogram of cocaine at the

16   time, 63 miles per hour could be a reference to 9 ounces

17   of cocaine, but I'm not sure.  People will use code words,

18   and 6 plus 3 will equal 9, 9 ounces of cocaine.  But I do

19   not know exactly what quantity they are referring to.

20   Q    All right.  And Government's Exhibit 13.  Can you

21   identify that call for the Court?

22   A    Yes, ma'am.  Session number 5406, date 9/22/2014,

23   time 18:47.  It's a conversation between Andrew Carter and

24   Kenya Mitchell.

25       (Audio recording played for the Court)

1    Q    All right.  Kenya Mitchell makes a reference to "Pea

2    Head", referring to an individual, correct?

3    A    Yes, ma'am.

4    Q    "Sending money for one too."  Was Pea Head identified

5    in the course of this investigation as well?

6    A    Yes, ma'am.

7    Q    And he is also a customer of Andrew Carter's?

8    A    Yes, ma'am.

9    Q    And this conversation follows a similar pattern of

10   several that we've listened to and others that we haven't

11   listened to where they're arranging to meet for delivery

12   of cocaine in exchange for money?

13   A    Yes, ma'am.  In fact, this conversation occurred --

14   or this transaction occurred at 1569 Georgia Avenue in

15   which we identified the mother-in-law as Nanette Turner.

16   We surveiled her from leaving 1569 Georgia Avenue and

17   traveling to 2907 Carter Street.  I will note that when we

18   did a search warrant in November of 2012, we located

19   Nanette Turner at what I previously referred to a Kenya

20   Mitchell's trap house located at 2907 Wilton Avenue.

21   Q    So on the date of Government's Exhibit 13, that call

22   that took place on September 22nd, 2014, this drug

23   transaction took place at Ms. Carter's residence?

24   A    Yes, ma'am.

25             MS. BOWEN:  All right.  That's all the direct

```
 1    questions I have for Agent Luke at this time.
 2            THE COURT:  All right.  Before we begin cross
 3    let me take a poll here, see where we are.  I won't hold
 4    you to this, but I just want to get an idea, see what kind
 5    of break we might take.
 6        Ms. Bowen, do you have any other witnesses currently
 7    you've planned other than Agent Luke?
 8            MS. BOWEN:  Not currently, Your Honor.
 9            THE COURT:  And, Mr. Guzman, do you plan on
10    calling witnesses?
11            MR. GUZMAN:  Your Honor, I have two short
12    witnesses.
13            THE COURT:  Mr. Brimberry?
14            MR. BRIMBERRY:  Not at this time, Your Honor.  I
15    mean, I don't plan on calling any right now.  It can
16    always change.
17            THE COURT:  I understand.
18            MR. BRIMBERRY:  No, sir.  No, sir, I don't.
19            THE COURT:  All right.  Well, I'll see if
20    counsel has any -- I'm going to take at least a five, ten
21    minute break.  We're almost at noon.  Y'all may know me
22    from past experience.  I'm happy to plow along, but I
23    don't want to torture anybody, so if y'all would like to
24    take a lunch break, we can do that now.  Anybody have an
25    opinion?
```

1          MS. BOWEN:  I have no objection to a lunch

2    break.  (Recording unintelligible) defense counsel.

3          MR. GUZMAN:  Your Honor, I think we can just

4    kind of push on through.  If we can have just maybe about

5    a five, ten minute break, and then we can -- I can be

6    ready for my cross.

7          THE COURT:  All right.

8          MR. GUZMAN:  And then just go on through.

9          THE COURT:  Well, let's do that.  It's -- looks

10   like six or seven minutes until noon.  Let's break until

11   noon, and then we'll come back with cross, and we'll plan

12   on just going ahead.  That suit everybody?

13         MR. BRIMBERRY:  Yes, sir.

14         THE COURT:  All right.  Let's break for about

15   seven minutes.

16      (Recess)

17      (Defendants present)

18         THE COURT:  All right.  Just for planning

19   purposes, so everybody knows -- we don't have Mr.

20   Brimberry, do we?

21         UNIDENTIFIED:  He's right there.  He's going to

22   get him.

23         THE COURT:  Okay.  Thank you.

24      All right.  So everybody knows, here's -- here's the

25   plan.  We'll finish the evidence and the closing remarks

1    and then the Court will take its lunch break while it

2    deliberates.  So that will give everybody time to go to

3    lunch then.

4         All right.  So I believe now we're on the cross

5    examination of Agent Luke.  We'll sustain the order on the

6    calendar.  Mr. Guzman, any cross examination on behalf of

7    Sarah Carter?

8              MR. GUZMAN:  Yes, Your Honor.

9                    **CROSS EXAMINATION**

10   **BY MR. GUZMAN:**

11   Q    All right.  Good morning, Agent Luke.  Right?

12   A    Yes, sir.  That's correct.

13   Q    I just have a few questions for you.  First, I wanted

14   to ask you, I think you testified on direct about

15   something that occurred on June 2nd where there's a phone

16   call that had been intercepted between Mr. Carter and

17   Sarah Carter where Sarah Carter was in her yard.  Can you

18   tell me what -- what year that was?  Was that this year or

19   last year?

20   A    It was this year.  It was a Tift County Jail

21   conversation between Maurice Todd Carter, not Andrew

22   Carter, but -- but Andrew Carter and Sarah Carter were on

23   the other end of the phone.

24   Q    All right.  Okay.  And what you -- you mentioned that

25   there were people coming in, stopping and coming in; is

1    that correct?

2    A    Yes, sir.  In particular, there was a white female

3    who had arrived during -- during the time of this call.

4    Q    Okay.  And I think you'd mentioned, and you mentioned

5    it several times, and Ms. Bowen asked you about this, was

6    that when you heard the sound that you said, like -- kind

7    of what we -- we saw on this video --

8    A    I believe so.  Yes, sir.

9    Q    -- kind of like a beating --

10    A    Yes, sir, I believe so.

11    Q    -- something like that?  All right.  So I believe you

12    stated that it was your experience or based on your

13    experience and -- that that was a sound made in the --

14    that you hear in the manufacture of crack cocaine?

15    A    Yes, sir.  Not to sound like a smart aleck, but we

16    had not received any evidence of them making and baking

17    goods or a cake.  So that's the only thing I'm left to --

18    left to believe was going on.

19    Q    All right.  And that's what I was going to ask you,

20    it's just -- it absolutely -- what you're saying is that

21    it just could not be anything other than what we saw on

22    this video, that is, someone making, like, a cookie of

23    crack cocaine?

24    A    It could be -- it could be something else, but with

25    the nature of the call, the conversations in the

1    background, and the foot traffic, and telling them to come

2    back, that's what leads me to my opinion.

3    Q    Okay.  All right.  Now, just so I -- just to make

4    sure what you're -- so what you're saying is that it's

5    most likely that it would be that?

6    A    That's correct.  Yes, sir.

7    Q    All right.  And when Ms. Sarah Carter is talking

8    about a circle, it absolutely has to be the circle or

9    cookie, the shape that the crack cocaine comes out of

10   whatever container it happens to be in; is that correct?

11   A    Is your question a circle is how only crack cocaine

12   can be made or in reference to the call itself?

13   Q    In reference to the call itself.

14   A    Yes, sir.

15   Q    All right.

16   A    Based on the calls surrounding that call and just in

17   totality of this investigation, yeah, I believe it has to

18   be crack cocaine.

19   Q    All right.  And then I believe as part of the

20   evidence that was obtained at Ms. Carter's home, there was

21   some packaging materials.  For example, you called them

22   packaging materials.  I might call them, like,  a food

23   saver bag or a sandwich bag or something like that, right?

24   A    Yes, sir.  Multiple purposes can be used for flip and

25   fold sandwich bags.

1    Q    Okay.  But in this particular instance you mentioned

2    that, hey, this -- this is for packaging materials, for

3    packaging things, like, cocaine or any other drugs that

4    might be in that particular residence; is that correct?

5    A    That's right.  It can be used for packaging material.

6    Q    All right.

7    A    Now, was there a note beside it, this is only for

8    drug packaging, no, sir, there was not.

9    Q    Okay.

10   A    It's based on the evidence that we received or seized

11   and (recording unintelligible) confessions.

12   Q    Okay.  Now, as far as the surveillance, you mentioned

13   continuous surveillance.  Can you give me the dates on

14   that again?  I wasn't able to get the dates.

15   A    For a large majority of 2014.  Without my case file

16   in front of me I can't tell you the exact dates.

17   Q    I think you mentioned six to eight months?

18   A    Yes, sir.

19   Q    So the majority of that was in 2014?

20   A    Oh, yes, sir.

21   Q    All right.  Now, I believe you also mentioned that

22   there were some packages in -- within that surveillance,

23   you saw packages being exchanged.  Now, I didn't hear you

24   mention that there were packages being exchanged from

25   Sarah Carter to another individual.

1    A    Yes, sir.  My testimony was it was Andrew Carter

2    exchanging packages to other individuals.

3    Q    Okay.  And once again these -- I believe you

4    mentioned that these would in all likelihood be cocaine or

5    drugs, illicit drugs?

6    A    Yes, sir.

7    Q    Correct?  So it couldn't have been anything else in

8    your opinion except these illicit drugs, correct?

9    A    Or payment --

10   Q    Money?

11   A    -- based on -- based on what I know in this

12   investigation.  Yes, sir.

13   Q    Ill gotten gains of some sort?

14   A    That's correct.

15   Q    All right.

16   A    However, there were times where we saw firearms.  At

17   least one time we saw a firearm being transferred.  So I

18   guess it could be on at least one occasion where it was

19   not drugs or money.

20   Q    Okay.  But none of these exchanges actually involved

21   Sarah Carter, correct?

22   A    There were -- when I talked about these exchanges,

23   the majority of the large transactions of cocaine was

24   occurred -- was conducted by Andrew Carter and other

25   individuals.  Sarah  Carter would contact Andrew Carter

1    and say, hey, AJ is in the yard waiting on you or so and

2    so is here.  So the majority of the individuals in the

3    yard are conducted by Andrew Carter.

4    Q    Okay.

5    A    If that answers the question.

6    Q    And what I -- what I mean by that is physically you

7    did not see Sarah Carter make any physical exchanges with

8    --

9    A    I think there's one exchange that I can remember

10   during the course of the wire intercept where there was

11   information where she was providing cocaine to another

12   party.

13   Q    Okay.  So on one occasion?

14   A    That I can recall right now, yes, sir.

15   Q    All right.  All right.  I think you also mentioned on

16   direct that there were some customers that were -- or

17   alleged customers, individuals, that were stopped and had

18   cocaine or money on -- on their person; is that correct?

19   A    That's correct.

20   Q    And presumably this would have been done after these

21   individuals went to the house at 1569 Georgia Avenue?

22   A    That's correct.

23   Q    All right.  So these weren't confidential informants,

24   correct?

25   A    That's correct.

1    Q    These were just individuals that you happened to

2    observe going to that house, correct?

3    A    That's correct.

4    Q    All right.  So you didn't search them prior to them

5    going to the house, correct?

6    A    That's correct.

7    Q    All right.  All right.  So I watched the video, and I

8    just wanted to make sure.  You mentioned -- I think Ms.

9    Bowen asked you about this cup that was being used, and

10   she said this is, like -- this would be a can, kind of

11   like what Sarah -- Ms. Carter was talking to -- is it

12   Maurice Carter or Andrew Carter, but you're not alleging

13   that that in particular was the -- the cup or whatever

14   that was taken --

15   A    No, sir.  That was in 2012.

16   Q    Okay.

17   A    The call was in 2014.

18   Q    You were just using that as an example of what a can

19   could be, correct?

20   A    That's correct.

21   Q    And as part of your search warrant at 1569 Georgia

22   Avenue, there were several firearms that were found

23   actually within in the home, and I just wanted to go

24   through those with you.  First, there was a Ruger 9 mm

25   pistol, and I believe that was found -- it wasn't found in

1    Ms. Carter's room, maybe it was the three-year-old's room,

2    if I'm correct?

3    A    Yes, sir.  That's correct.

4    Q    All right.

5    A    It was in a pair of woman's jeans.

6    Q    All right.  And that was actually -- that was found

7    wrap -- you said wrapped up in a pair of women's jeans?

8    A    Yes, sir.

9    Q    Okay.  And was that found, like, in a drawer, in

10   closet?

11   A    I think it was in a drawer, but I was -- we did eight

12   search warrants on this date, so I was not there, but I

13   believe it was found in a drawer.

14   Q    All right.  And then there was a Glock, a .40 caliber

15   (recording unintelligible) 40 S&W found; is that correct?

16   A    I don't know about a S&W, but a .40 caliber Glock

17   handgun that was found, yes, sir.

18   Q    All right.  And that particular Glock, where was that

19   found?

20   A    It was in Kayla Carter's room.

21   Q    All right.  And then there was another 9 mm pistol.

22   I forgot the brand, it starts with an "M" I think.

23   A    Masterpiece.

24   Q    Masterpiece.  All right.  And that was found where?

25   A    In Kayla Carter's room.

1    Q    Also?  All right.  Then I believe you mentioned there

2    were -- are those the only firearms?  No.  There was a

3    Marlin rifle.  I'll get to that one in just a second.  All

4    right.  So those were -- besides the Marlin rifle, those

5    were the three firearms, four firearms total that were

6    found in -- in the house during the search, correct?

7    A    Yes, sir.

8    Q    All right.  So there was an empty rifle magazine.  I

9    believe you spoke about that, saying that that's an AR-15?

10   A    It was a .223 caliber --

11   Q    Okay.

12   A    -- which is commonly shot with an AR-15-type weapon.

13   Q    All right.  And an AR-15 is simply the civilian

14   version of the M-16, correct?

15   A    That's correct.

16   Q    All right.  So we're talking about a semi-automatic

17   rifle, correct?

18   A    Yes, sir.

19   Q    All right.  Not fully automatic?

20   A    No, sir.  Not that I'm aware of.  I mean, it could be

21   a magazine for anything.  A magazine does not, itself -- I

22   don't think the difference between a semi-automatic

23   magazine and a fully automatic magazine; however, the

24   AR-15 that we recovered in this investigation I believe it

25   was a semi-automatic weapon.

1    Q    Okay.  Now, I'm glad you mentioned that as far as the

2    magazine because the .223, it's a rifle round, correct?

3    It's used in a multiple -- multiple different types of

4    weapons, correct?

5    A    Yes, sir.

6    Q    Different rifles?  It could be a bolt-action rifle or

7    it could be a semi-automatic rifle, correct?

8    A    That's correct.

9    Q    All right.  In fact, are there not -- there are, in

10   fact, bolt-action .223 rifles that people use for hunting,

11   correct?

12   A    That's correct.

13   Q    All right.  Now, the pistol magazine you said was an

14   empty pistol magazine.  What kind of magazine was that?

15   A    A .40 caliber.

16   Q    Okay.  All right.  Did that not fit the Glock?

17   A    I do not -- the summary does not indicate that, and I

18   could physically see if it fits, but at the time I can't

19   -- I don't know.

20   Q    All right.  So the -- Now, let's go to the Marlin

21   rifle.  Are we talking about, like, a .22 caliber Marlin

22   rifle?

23   A    The report, when I reviewed it (recording

24   unintelligible) did not indicate which caliber.  Now, it

25   would be on the evidence receipt, but I didn't check, but

1    it was a type of rifle.

2    Q    Okay.

3    A    It was .22.  It's a common Marlin-brand rifle, but

4    I'm not sure what the caliber of this rifle was.

5    Q    All right.  Now, I imagine that all of these weapons

6    were taken into evidence, correct?

7    A    They were.

8    Q    All right.  So Ms. Carte would not have possession of

9    them if she were released on bond, correct?

10   A    Not of those weapons, no, sir.

11   Q    All right.  I want to ask about the -- the statement

12   that you claim Ms. Carter made.  You said it was voluntary

13   statement.  Can you -- was -- did you take that statement?

14   A    I did.

15   Q    All right.  And where was that statement taken?

16   A    At the Tift County Sheriff's Office.

17   Q    All right.  How did Ms. Carter end up being at the

18   Tift -- Tift County Sheriff's Office?

19   A    I believe her and her daughter-in-law or Lataris

20   Waters drove.  I don't know if they rode together or drove

21   separate.

22   Q    All right.  And why -- why did they go there?

23   A    Because I asked them to come here.

24   Q    Okay.  And after this particular statement she was

25   allowed to leave; is that correct?

1    A    That's correct.

2    Q    All right.  And when was that?  When did you actually

3    take that statement?

4    A    I think October the 1st, but it's the date after

5    September 25th, 2014.

6    Q    Okay.  So I think you've also testified about that

7    Ms. Carter picked up was it -- was it Andrew Carter that

8    she picked up when the police were looking for him or

9    something like that?

10    A    She was going to pick him up.

11    Q    Okay.

12    A    We have a small window of information, but that was

13    what the calls reflected.

14    Q    All right.  Now, can you -- can you tell the Court --

15    of course, I've not heard the calls, so I --

16    A    Yes, sir.

17    Q    -- I don't know, can you tell the Court was this

18    something that Andrew Carter specifically said, the police

19    are after me, come and get me or was it more like, hey,

20    maw, can you come and get me?

21    A    We don't have whatever conversation was between

22    Andrew Carter and Sarah Carter.  The only thing we have is

23    a recap of the events that occurred to -- that are being

24    told to Maurice Todd Carter, who is in jail.

25    Q    Okay.  So you don't know what was actually said to

1    Ms. Carter?

2    A    I do not.

3    Q    All right.  Does anyone in -- would anyone know?  I

4    mean, are there any recordings --

5    A    Sarah Carter would know.

6    Q    Besides Ms. Carter?  In law enforcement?

7    A    Andrew Carter would know.

8    Q    Okay.

9    A    I mean, yeah, there are several jail recordings that

10   would indicate a window between multiple people.  Is every

11   conversation recorded that occurred around this event, no,

12   sir.

13   Q    Okay.  All right.  So you can't say for certain that

14   Ms. Carter was aware that the police were actually

15   searching for Andrew Carter during that period of time?

16   A    I believe the statements are the police are after

17   Poppa, he ran off into the woods, or something to that

18   effect.

19   Q    Well, who said that?

20   A    That's a call  made to Maurice Todd Carter.  It's

21   either from Kayla Carter or Sarah Carter talking to

22   Maurice Todd Carter.

23   Q    But you don't know who actually made the call?

24   A    Not without reviewing.  I mean, we've got hundreds,

25   if not thousands, of calls in this investigation.

1    Q    Okay.  So then we get back to you don't know if it

2    was actually Sarah Carter who may have made that statement

3    or not, correct?

4    A    It's one of them.  Yes, sir.  But I can't say without

5    reviewing my case file at this time, no, sir.

6    Q    Okay.  The home at 1569 Georgia Avenue, have you done

7    any research as far as how Ms. Carter actually obtained

8    that house?

9    A    How she obtained it?

10   Q    Yes.

11   A    I do not know how she obtained it, no, sir.

12   Q    Okay.

13           MR. GUZMAN:  I don't have anything further.

14           THE COURT:  All right.  Before I get to Mr.

15   Brimberry, let me clear up something real quick.

16       Agent Luke, the Marlin rifle, where was that found in

17   the house?

18           WITNESS LUKE:  It was in Sarah Carter's bedroom,

19   same location as the cocaine.

20           THE COURT:  And the two magazines, were where

21   they found?

22           WITNESS LUKE:  They were in Kayla Carter's room.

23           THE COURT:  All right.  Mr. Brimberry, cross

24   examination?

25           MR. BRIMBERRY:  Yes, sir, Your Honor.

1                          CROSS EXAMINATION

2    BY MR. BRIMBERRY:

3    Q    Agent Luke, my name is Mark Brimberry.  We've met

4    before somewhere.

5    A    We have, sir.

6    Q    Yeah.  You mentioned something a while ago that

7    there's hundreds, if not thousands, of telephone calls --

8    excuse me -- recorded on this investigation.

9    A    Yes, sir.

10   Q    And of those hundreds, if not thousands, telephone

11   calls during -- that were taken down during this

12   investigation, how many of those calls would you say made

13   reference to Mr. Mitchell?

14   A    I have no way to put a figure on it.

15   Q    Then you know Mr. Mitchell, who I'm talking about?

16   A    Yeah.  Well, let me say this.  Right now I cannot put

17   a figure on it.  I think there's over 6,000 communications

18   intercepted or 6,000 different sessions, and right now I'm

19   not sure how many of Kenyatta Mitchell was.  I mean, it's

20   documented, but I can't give you a number.

21   Q    Yes, sir.  And when you make reference to these

22   recorded phone calls are you -- are you beginning at the

23   time frame of January 1st, 2013, or are you going back to

24   2012, 2011, or what period of time?

25   A    I'm referring to Tift County Jail phone calls.  I

1    believe they began in December 2013, and then in 2014.

2    Q    How many times have you executed a search warrant at

3    Mr. Mitchell's residence?

4    A    What do you consider his residence?

5    Q    Well, I tell you what, how many times have you

6    targeted a place that you felt Mr. Mitchell would and

7    could be found for the express purposes of executing a

8    search warrant?

9    A    Yes, sir.  In 2012, I executed three search warrants:

10   one at his mother's residence, one at his drug

11   distribution point or trap house, and one at his residence

12   of 2907 Carter Street.  In 2014, I executed a search

13   warrant at what I refer to as his residence of 2907 Carter

14   Street and then in December 12, 2014, a search warrant was

15   executed at another trap house that I considered

16   associated with Kenyatta Mitchell.

17   Q    And each one of these incidents that you just now

18   testified about, he never tried to run, did he?

19   A    Yes, sir.

20   Q    Which time?

21   A    Well, on the September 25th, 2014, he was there prior

22   to us -- to us getting there and he was not there when we

23   served the warrant.

24   Q    Did you see him run?

25   A    I did not see him run.

1    Q    Okay.  But that's your explanation of running?

2    A    Yes, sir.

3    Q    Okay.  And any instances where he was somewhere at

4    one moment and an hour or so later he's -- you know, he's

5    run off from that area?

6    A    I can't recall.

7    Q    The instances where he was present when you arrived

8    with the search warrant in hand, did he take off and run

9    from your presence?

10   A    I don't believe I've ever served a search warrant on

11   him personally.  He has never been at the location when I

12   served the warrant.

13   Q    And at the conclusion of each search warrant that was

14   executed at these various locations you never found any

15   firearm in this residences, did you?

16   A    I believe we found ammunition in 2012, but we did not

17   find a firearm.

18   Q    You believe you found ammunition.  Expressly -- tell

19   me exactly what type of ammunition.

20   A    I can't tell you without looking in my case file,

21   sir.

22   Q    Is it logged in, into evidence?

23   A    It would be.

24   Q    And you say you think you did, you can't under oath

25   say you know you did?

 1     A     That's correct.

 2     Q     And during your investigation you haven't learned of

 3     any other addresses that he's known to reside at that

 4     would be outside of the Court's jurisdiction, correct?

 5     A     Not that I'm aware of.

 6     Q     I'm sorry?

 7     A     Not that I'm aware of.

 8     Q     In fact, as the bail report indicates he's, to your

 9     knowledge, is a life long resident of the area?

10     A     I hadn't reviewed the bail report, but I don't know

11     of him living anywhere else.

12     Q     And I know -- a lot of -- you know, earlier you said

13     hundreds to thousands, and a while ago you said 6,000, but

14     if you look at the names in the indictment, what we heard

15     today was recordings that you say were between one of

16     these individuals in the indictment, Sarah -- Sarah

17     Carter.  You have characterized one of these conversations

18     or some of these conversations as implicating Mr.

19     Mitchell.  If you look through the indictment are there

20     any other individuals named in this indictment that you

21     can say have also implicated Mr. Mitchell?  And if you

22     would like I can show -- I can hand up --

23     A     Can you repeat your question?

24     Q     Are there any other names listed in this indictment

25     that have implicated Mr. Mitchell?

1    A    Are you speaking of direct statements or are you

2    speaking of intercepted communications?

3    Q    Both.

4    A    Yes.

5    Q    Would you like to see the indictment to refresh your

6    recollection of the names or could you testify directly

7    without seeing them?

8    A    Well, I know there's conversation between Andrew

9    Carter and Jose Martinez in reference to Kenyatta

10   Mitchell.

11   Q    Do you they say Kenyatta Mitchell or --

12   A    They say Chop.

13   Q    Do you know a tattoo artist named Chop?

14   A    I do not.  Should I?

15   Q    I was asking you the question.  Who else in this

16   indictment?

17   A    Has implicated Kenyatta Mitchell?

18   Q    Yes, sir.

19   A    I can't recall of anybody else.

20   Q    Would it assist you to review the indictment to --

21   A    Sure.

22        MR. BRIMBERRY:  May I approach, Your Honor?

23        THE COURT:  You may.

24   A    There are several names in this indictment.  We have

25   intercepted (recording unintelligible) this indictment

1    except for one.  Some of these people in this indictment

2    are couriers for Andrew Carter that have delivered

3    cocaine.  Return implication to me would imply a direct

4    statement by them (recording unintelligible).

5    Q    Yes, sir.

6    A    Okay.  During my interviews, Andrew Carter is the

7    only one who gave a direct statement against Kenyatta

8    Mitchell.

9    Q    Do you have any recollection of any interceptions

10   implicating Mr. Mitchell?

11          MS. BOWEN:  Objection, Your Honor.  I think Mr.

12   Brimberry has asked this question three or four times now,

13   and Agent Luke has answered it three or four times now.

14          MR. BRIMBERRY:  Well, three or four different

15   ways.

16          THE COURT:  All right.  Well, let's do this,

17   Agent Luke, if you'll give Mr. Brimberry's copy of the

18   indictment back to him.

19          WITNESS LUKE:  Yes, sir.

20          THE COURT:  And I'm going to let you have the

21   Court's copy, so we can get Mr. Brimberry to the podium

22   and --

23          MR. BRIMBERRY:  Yes, sir.

24          THE COURT:  -- you may ask your next question.

25   BY THE WITNESS, CONTINUED:

1    A    If the question is intercepted communications?

2    Q    Yes, sir.

3    A    All right.  To my best recollection those intercepted

4    communications were Kayla Carter, Diamond Carter, and

5    Sarah Carter are being instructed to pick up and deliver

6    items to Kenyatta Mitchell's residence.  There's also

7    conversation between Jose Martinez and Andrew Carter

8    discussing Chop.

9    Q    Okay.  Do you know if any of these discussions

10   actually materialized?

11   A    Yes.

12   Q    Was that through independent surveillance?

13   A    Yes.

14   Q    And was this surveillance video taped?

15   A    Photographs.  There probably are some videotapes, but

16   the majority will be photographs.

17   Q    Were these packages that were transferred ever

18   secured by the government for independent testing and

19   analysis?

20   A    We recovered $225,000 on September 25th, 2014.

21   According to the intercepts a portion of this currency was

22   provided by Chop.  Now, when packages are being delivered

23   by couriers of this organization to Kenyatta Mitchell's

24   residence, we did not secure  those items.

25   Q    Now, you mentioned a large sum of money a second ago,

1    and I asked you about recovering firearms during the

2    execution of search warrants.  Likewise, have you

3    recovered any sums of money, let's say in excess of $100,

4    during the execution of any of these search warrants of

5    Mr. Mitchell?

6    A    No, sir.

7    Q    Have you taken any steps to subpoena bank records, if

8    there are any out there, that would belong to Mr.

9    Mitchell?

10   A    No, sir.

11   Q    Have you pulled his credit report to see his then

12   current financial status --

13           MS. BOWEN:  Objection, Your Honor.  I think

14   we're getting a little far afield of the detention

15   factors.

16           MR. BRIMBERRY:  May I be heard, Your Honor?

17           THE COURT:  Now, let me digest that for a

18   minute.  All right.  Mr. Brimberry.

19           MR. BRIMBERRY:  If there's a large sum of money,

20   if -- there's testimony a while ago that several search

21   warrants were executed on Mr. Mitchell, and if, during the

22   execution of these search warrants, each time or every

23   other time, every third time a large sum of money was

24   recovered, well, you know, that would make him a candidate

25   as being for a flight risk.  Likewise, if a credit report

1    was pulled and examined and a quick glance sees that --

2    takes him $12,000 a month to service his bills that have

3    been reported, you know, to the credit reporting agency

4    that he's current on but they're still on your credit

5    report --

6              THE COURT:  All right.  I follow you.  I'll

7    allow it.

8    BY THE WITNESS, CONTINUED:

9    A    I have not received his credit report.

10   Q    Have you made any attempt to see what his financial

11   status is?

12   A    I typically run people through the Department of

13   Labor to see if they're employed.  I cannot say if I have

14   or have not in this case.

15   Q    And I take it you haven't spoken to any of his

16   children's mothers to learn that he's current, although

17   struggling, and doing the best he can to make sure child

18   support is current?

19   A    I don't have any knowledge.

20   Q    The items that you testified that were recovered from

21   persons other than Mr. Mitchell, the Carters and whatnot,

22   and the Martinez that was -- I think he was apprehended

23   back in September -- September 26th maybe, did any of

24   these items recovered from them either -- you know,

25   whether it be a search incident to arrest or an executed

1    search warrant, did you find any items that would belong

2    to -- that could definitely be said, oh, this belongs to

3    Mr. Mitchell, be it his driver's license, wallet, any

4    other document, anything showing that Mr. Mitchell had

5    possessions in these other individual's houses?

6    A    I have recovered drug ledgers which would indicate

7    Chop receiving quantities of cocaine, but I did not

8    recover any identification or property that I'm aware of

9    that was at anybody else's house.

10    Q    All right.  These drug ledgers, does it say Chop or

11    does it say Mitchell?

12    A    I think it says Chop or CH.

13    Q    What does CH stand for, if you know?

14    A    To me it stands for Chop, but I don't know.

15    Q    And you're the head of this investigation, correct?

16    A    I'm one of the lead agents on it, yes, sir.

17    Q    Now, during the search -- I keep getting back to

18    these searches of Mr. Mitchell's locations, you never

19    found any stolen items in his possession, did you?  TVs --

20    A    I can't recall.  I can't recall.  I don't -- not that

21    I recall.

22    Q    Did you ever find any of Mr. Mitchell's fingerprints

23    attached to anything removed from the Carters' residences

24    or any of the other residences?

25    A    Not that I recall.

1    Q    And I assume that these telephone conversations that

2    are made from the jail, I assume they're still being

3    recorded?  If you can tell me that, I don't know if you

4    can tell me that.

5    A    I would assume that the jail system is still

6    recording phone calls, yes, sir.

7    Q    And nobody has notified you to say, look, we have a

8    problem on our hands.  This Mitchell fellow you brought up

9    here, he's making phone calls and trying to intimidate

10   witnesses?

11   A    I have not brought Mitchell to any jail, and I do not

12   which holding cell that he is in right now.  So, no, I do

13   not know of any calls, but I have not listened to any

14   calls.

15   Q    But you have been contacted by law enforcement saying

16   that we a potential problem of this particular Mitchell --

17   A    No.

18   Q    -- fellow threatening or intimidating witnesses?

19   A    I have not.

20         MR. BRIMBERRY:  May I have one quick moment with

21   my client, Your Honor?

22         THE COURT:  Certainly.

23   (Defendant Mitchell conferred with counsel)

24   Q    Based upon your experience that you've testified

25   about in investigations, obviously you're POST certified.

1    When did you receive your POST certification?

2    A    December of '06.

3    Q    Okay.  And you testified earlier that approximately 5

4    to 15 kilos were being moved every other week?

5    A    Yes, sir.

6    Q    At 5 to 15 kilos being moved allegedly by Mr.

7    Mitchell?

8    A    Well, he's part of the conspiracy.

9    Q    How many kilos do you attribute to Mr. Mitchell as

10   being moved every other week?

11   A    Well, I can't put a figure on it.  Based on what

12   Andrew Carter tells me, he's receiving a half kilogram at

13   a time.  We have coded language which is to prevent us

14   knowing exactly what's occurring.  Based on prior

15   interviews that I conducted with individuals that I've

16   explained, I would say multiple kilograms, but I cannot

17   put a figure on (recording unintelligible) particular.

18   There's multiple customers in this organization.  Kenyatta

19   Mitchell was one but of many customers or Kenya Mitchell.

20   Sorry.

21   Q    What's the profit margin would you say on a half a

22   kilo being moved in the fashion that you've testified that

23   it was moved in?

24   A    Well, it depends.  It depends on how much you're

25   breaking it down, how small you're breaking it down, or if

1    you're selling it wholesale.  The more times you break

2    down or make a smaller quantity of cocaine out of a larger

3    quantity, you have more chances to get caught because

4    you're conducting more transactions versus one single

5    transaction where if you buy a kilo or 1/2 a kilogram of

6    cocaine would cost $15,000, you may only make 100 to 500

7    dollars off of that sale.  There are some of the calls we

8    listened to that was a profit margin of $25 for an ounce

9    of cocaine.

10   Q    And if you testified to it earlier I missed it and I

11   apologize, but did y'all make any stops while a buy house,

12   as I call them -- Do you know what a buy house is?  That's

13   where people sell --

14   A    I think I referred to it as a trap house.

15   Q    Trap house.  Okay.  One in the same.  Did you -- how

16   many stops of individuals after making a fresh purpose

17   (sic) at the trap house did y'all conduct stops on?

18   A    Well, I testified in reference to Terrence Davenport

19   or Terrence Robinson.  There were several.  I can't

20   recall.  Some of them happened in 2012.  Without reviewing

21   my case file to give you the exact names.

22   Q    Okay.  And any of those individuals specifically

23   mention Mitchell's name?

24   A    Yes, sir.  When Terrence Daven -- Terrence Robinson

25   -- I think his middle name is Davenport.  When he was

1    interviewed, he indicated he purchased 1/2 a kilogram

2    fifteen times.  Nine ounces approximately fifteen times

3    and 4 ounces approximately fifteen times in the year of

4    2010 from Kenya Mitchell.

5    Q    And this Davenport fellow who was giving you this

6    information, was he being currently charged with a drug

7    offense?

8    A    Yes, sir.  He was.

9    Q    And so he gave this statement to you shortly after he

10   was charged?

11   A    He was interviewed by other law enforcement officers

12   and given by the statement.  I do not recall the substance

13   of that statement, but this was during his prosecution

14   phase.

15   Q    And I'm not sure if you've had time to do it yet, but

16   you -- you retrieve or someone associated with you in the

17   government retrieved Mr. Mitchell's telephone, cell phone,

18   when he was picked up Friday?

19   A    We recovered a cell phone when he was arrested on

20   Friday, yes, sir.

21   Q    And have you had a chance to go through that cell

22   phone?

23   A    No, sir.

24   Q    But it is being sent off for forensic --

25   A    We will apply a search warrant for it; however, if he

1   wants to give consent, I'll be glad to provide you with a

2   form.

3   Q    And, again, Friday he -- when you showed up -- were

4   -- did you personally show up to take Mr. --

5   A    I did not.

6   Q    But you're not aware of anyone making the comment

7   about Mr. Mitchell attempting to bolt out the back door or

8   climb out a window or hide in the attic?

9   A    He was hiding in the closet.

10  Q    In his bedroom?

11  A    He was hiding in the closet.  I can't say --

12  Q    Which --

13  A    -- where, but I know he was hiding in the closet.

14  Q    And how do you know that?

15  A    From the officers who arrested him.

16  Q    Which officer told you that?

17  A    I do not recall.  Probably GBI agent there, which was

18  Eric Schwalls.

19  Q    Eric Schwalls?

20  A    Yes, sir.

21  Q    And he told you that during the course of his

22  employment for the government?

23  A    Yes, sir.  He was hiding in the closet.

24  Q    Was that entrance into the house videotaped?

25  A    No, sir.  I don't believe so.

1          MR. BRIMBERRY:  I have nothing further, Your

2     Honor.

3          THE COURT:  All right.  Redirect?

4          MS. BOWEN:  Yes, Your Honor.

5               **REDIRECT EXAMINATION**

6     BY MS. BOWEN:

7     Q    Agent Luke, you and other law enforcement agents

8     listened to telephone calls among these individuals,

9     namely for our purposes today, Sarah Carter and Kenya

10    Mitchell from August 29th to September 28th, and, as

11    you've testified, conducted surveillance for six to eight

12    months in 2014.  Now, speaking specifically of Sarah

13    Carter, did you hear or gather any evidence of her talking

14    about or performing in enterprise baking, hunting, or

15    making sandwiches?

16    A    No, ma'am.

17    Q    Now, but you did gather evidence that these innocuous

18    items were being used for the purposes of distributing and

19    manufacturing cocaine and crack cocaine?

20    A    Yes, ma'am.

21    Q    Specifically the June 2nd, 2014, call that Mr. Guzman

22    asked you about.  I just want to make sure I flip there,

23    so I get it correctly.  You describe what would be,

24    perhaps, a typical encounter that took place at 1569

25    Georgia Avenue where a customer arrives, walks into the

1    residence, and is told that she'll have to come back in 15

2    minutes?

3    A    Yes, ma'am.  Based on our surveillance, we would see

4    people coming and leaving, staying in short durations, and

5    that would match.

6    Q    And that beating noise that we heard in Government's

7    Exhibit 7 was similar to what is also heard on that

8    recorded jail telephone?

9    A    Yes, ma'am.

10   Q    Now, none of these facts, the calls, the statements

11   made by individuals, the surveillance, the stops, the

12   recorded jail calls, and lots of other evidence, they're

13   not viewed in isolation; is that correct?

14   A    That's correct.

15   Q    And, in fact, the calls, Government's Exhibit 2 and

16   3, specifically make reference to Sarah Carter in

17   Government's Exhibit 2 assisting Andrew Carter in

18   manufacturing a quantity of cocaine based upon your

19   training and experience with the reference "bring me that

20   can and swiff", and Government's Exhibit 3 when she's

21   talking to her son, again, Andrew Carter about making that

22   circle and the amount that it would take to do so, that 12

23   grams, that is in there as well towards the bottom of the

24   conversation and the price, which you've previously

25   testified to, is a common street value for half of a

1    street ounce which is 12 grams?

2    A    Yes, ma'am.

3    Q    And ultimately we have crack in her house which she

4    claimed?

5    A    Yes, ma'am.

6    Q    Now, I think you previously testified, to be clear I

7    want to separate out in this enterprise, this business,

8    family business if you will, there are two different types

9    of transactions that are taking place.  There are larger

10   level transactions; is that correct?

11   A    Yes, ma'am.

12   Q    And then there are smaller, 20 pieces, I think you

13   referred to them, transactions that are taking place?

14   A    Yes, ma'am.

15   Q    Now, these larger transactions would take place at

16   1569 Georgia Avenue, which is Ms. Carter's residence?

17   A    Yes, ma'am.

18   Q    And she would be there?  Sometimes?

19   A    Sometimes she would be, yes, ma'am.

20   Q    Yes.  And then there would also be this daily

21   frequency, hand to hand street level, 20 crack rock

22   distribution?

23   A    There would be --

24   Q    And 15 --

25   A    -- (Recording unintelligible) traffic, yes, ma'am.

1   Q    I'm sorry to speak over you, Agent Luke.  And 1569
2   Georgia Avenue was the den of distribution if you will, it
3   was their flagship store in their enterprise?
4   A    All the locations --
5        MR. GUZMAN:  I'm going to object to the
6   questioning.  You know, I thought it was going to end as
7   far as the leading questions, but now we're just getting
8   to a series of leading questions.  I'm going to object to
9   that.
10       MS. BOWEN:  I'll rephrase.
11  BY MS. BOWEN, CONTINUED:
12  Q    How would you characterize the use of 1569 Georgia
13  Avenue within the context of this case?
14  A    Yes, ma'am.  They were four residences that the
15  Carters had control of during this investigation that we
16  targeted.  One was in Cook County, two were in Coffee
17  County, one was in Tift County.  The majority of the
18  transactions that Andrew Carter did at one residence
19  occurred at 1569 Georgia Avenue, and he would direct
20  people to travel to this residence to conduct drug
21  transactions.
22  Q    As well as the daily foot traffic took place there?
23  A    Yes, ma'am.
24  Q    And how would you describe Sarah Carter's role, just
25  so we're clear, in regards to that supply to that daily

1    foot traffic?

2    A    Yes, ma'am.  As we have seen in the calls she would

3    indicate there's people waiting on me, they've already

4    started, they've already started to come here.  Her role

5    was a street level distribution, and she was also a

6    courier for the organization, being instructed to go to

7    people's houses to pick up items or transport items.

8    Q    And, in fact, you testified on direct to a September

9    20th, 2014, call when Kayla brought out a straight drop

10   piece, it weighs like 29 grams cut off into 20s for her

11   mom?

12   A    Yes, ma'am.  That is the call.  And we later say

13   Kayla leave 1569 Georgia Avenue, travel to 1211 CS Powell

14   or 1215 CS Powell.  They're about two miles apart.  And

15   get out with an item in her hand.

16   Q    I believe Mr. Guzman asked you about the interactions

17   you would have with customers leaving the residence after

18   acquiring cocaine.  I think two of those were in April of

19   2014 and one was in September of 2014.  Now, these

20   intercepts that took place where you hear the deal being

21   arranged, you also had the benefit of either talking to an

22   individual that might have been involved in that purchase

23   after the purchase was made or other interviews that would

24   corroborate what was her on the phone call?

25   A    Yes, ma'am.

1    Q    Now, beyond the recorded jail calls -- Before I ask

2    you that question, while Maurice Carter was incarcerated

3    between December of 2013 and June 2014 at the Tift County

4    Jail was it common that he would call either 1569 Georgia

5    Avenue or I guess at that time it would be 6147 Futch

6    Road, and there would be several members of the family

7    there, so there may be several of them on the phone with

8    him at the same time?

9    A    Yes, ma'am.

10    Q    So Kayla and Sarah and Diamond could all be there and

11    they'd pass the phone around and be talking to him

12    together?

13    A    Yeah.  Or Lashonda or -- who is Maurice Todd's --

14    Maurice Todd Carter's wife or Lataris, who is Andrew

15    Carter's wife.  Multiple people could occur -- could be

16    intercepted on one conversation.

17    Q    Okay.  So whether or not Kayla Carter or Sarah Carter

18    made reference to picking up Andrew Carter while he was

19    attempting to elude the police while they were searching

20    for him on that date, there were also interceptions made

21    specifically where Sarah Carter was speaking and would

22    advise Andrew Carter of deputies, their location, so that

23    he could take an alternate route --

24    A    Yes, ma'am.

25    Q    -- is that correct?  The gun that was found in Ms.

1    Carter's bedroom.  It was how far, approximately, away

2    from the crack cocaine?

3    A    Five feet.

4    Q    And the guns that were in Kayla Carter's room, were

5    they in a safe that was locked?

6    A    They were in an unlocked safe.

7    Q    And the firearm that was found in the child's room,

8    do you know how old that child is?

9    A    Three years old.

10   Q    Let's talk about Mr. Kenya Mitchell.  I want to clear

11   one thing up right now.  This picture, Government's

12   Exhibit 14, that is taken from Government's Exhibit 7,

13   which is the video that you have previously narrated for

14   us, if you will, regarding Mr. Mitchell's manufacturing of

15   crack cocaine on November 8th, 2012, this is a still shot

16   from that video; is that correct?

17   A    Yes, ma'am.

18   Q    And is this individual here in the courtroom today?

19   A    Yes, ma'am.

20   Q    Will you, please, point him out for us?

21   A    He's at the defense table in the orange and blue

22   jumpsuit.

23   Q    All right.

24        MS. BOWEN:  So will you, please, let the record

25   reflect that Mr. Mitchell has been identified as the

1    individual wearing the orange jumpsuit and the denim

2    jacket?

3              THE COURT:  The record so reflects.

4    BY MS. BOWEN, CONTINUED:

5    Q    Now, the information you had at this time, in 2012,

6    was he then known as Chop as well?

7    A    He was.

8    Q    Now, this is in 2012.  We have a video of him

9    manufacturing and selling crack, search warrants follow,

10   both at this residence, 2907 and then 2907 Wilton Avenue

11   you find items related to manufacturing, distributing

12   drugs.  Time goes on, 2013, investigation continues.  Then

13   we have another search warrant in 2014, more items

14   relating to drug trafficking?

15   A    Yes, ma'am.

16   Q    Did Mr. Mitchell have opportunity to stop, when he

17   was put on notice by these search warrants, distributing

18   drugs?

19   A    Yes, ma'am.  In fact, I spoke with Mr. Mitchell in

20   2012 after the search warrant.  Him and his attorney at

21   the time came to my office and I provided him with a --

22   it's referred to as a target letter.  The letter basically

23   states that in the future you will be indicted by a

24   federal grand jury, and I did provide that to him.  And I

25   showed him some of these photographs, I believe some of

1    these same photographs, from these buys to advise him of

2    his criminal activity.

3    Q    Now, I think Mr. Brimberry asked you about his

4    residences in this community.  He has numerous residences;

5    is that correct?

6    A    He does.  I know he stores cars at his father's house

7    located in Chula, Georgia.

8    Q    And he uses at least two, if not more, of these

9    residences in the course of his drug trafficking

10   activities?

11   A    Yes, ma'am.

12   Q    Now, as far as Mr. Mitchell's involvement in this

13   conspiracy, while he may only be named in Count One, his

14   -- Let me ask you it this way, how would you characterize

15   his involvement with this conspiracy?

16   A    Yes, ma'am.  Kenya Mitchell was one of the

17   individuals who was obtaining the larger amounts of

18   cocaine.  We had people who called Andrew Carter for

19   anything from a 40, which is a $4 quantity of cocaine, to

20   a kilogram of cocaine.  Usually they were around the 1 to

21   9 ounce, 4 ounce, area.  Kenya Mitchell was one of several

22   customers who were obtaining the larger amounts based on

23   his terms that he was using, and then based on -- we would

24   intercept phone calls between Jose Martinez and Andrew

25   Carter where Andrew says, "I've got to hit that 36 from

1    Kenya or Chop."  He refers to him as Chop.  And which it

2    would be later, they were trying to gather up their money

3    so it could be sent to Atlanta for more cocaine.

4    Q    And just to make sure it is absolutely clear, when

5    Chop would call and be identified on, I think, it's

6    Government's Exhibits 8 and 9 by Andrew Carter, the

7    individual who would either show up or to whose house

8    Sarah Carter, Kayla Carter would travel would be a

9    location either lived in or utilized by the defendant in

10   the jumpsuit and the jean jacket, Mr. Kenya Mitchell?

11   A    Yes, ma'am.  Usually we could only see a vehicle, and

12   those vehicles would be later seen at his residence, and

13   then when actual couriers were transporting narcotics or

14   picking up money from his residence, we would observe him

15   going to 2907 Carter Street.

16   Q    You talked about getting 1/2 a kilo from Andrew

17   Carter based upon Andrew Carter's own statement

18   implicating Mr. Mitchell as one of his customers.  You

19   also testified about a Lamar Patterson, and you indicated,

20   I believe, that three to four years prior to his arrest,

21   which is in February 2012, that Mr. Mitchell was obtaining

22   1/2 a kilo over 50 times.

23   A    Yes, ma'am.  That's what Mr. Patterson said.

24   Q    And, by my math, that's 25 kilos?

25   A    Yes, ma'am.

1   Q    Now, Mr. Brimberry also asked you about firearms.

2   Now, it's true there were no firearms in his house?

3   A    That's correct.

4   Q    But there were a series of phone calls, May 9th

5   through the 10th, jail calls, when Mr. Maurice Carter was

6   incarcerated there at Tift County about Mr. Mitchell,

7   cocaine, and a firearm?

8   A    Yes, ma'am.  Robert, who I think is Billings, was

9   going to ask for a firearm.  I don't think he ever

10   received it, but he went to Chop to ask for a firearm.

11   Q    Based upon your training and experience, is it

12   typical that when one is dealing drugs or involved in drug

13   activity that there is often an intersection between guns,

14   drugs, and violence?

15   A    Yes, ma'am.  Typically drug dealers or people who

16   engage in this kind of activity will maintain firearms,

17   either they receive them as payment for cocaine or they

18   have them for protection.  And it's not protection from

19   law enforcement usually, it's protection from robberies.

20   These kind of individuals are subject to robberies because

21   when they know that they some -- at times will have large

22   portions of cash on their person and will be less likely

23   to report it to the police just because they're involved

24   in illegal activity.

25   Q    Somewhat similar to the murder that took place this

1    year of Tyler Johnson?

2    A    Yes, ma'am.

3          MS. BOWEN:  That's all the redirect I have, Your

4    Honor.

5          THE COURT:  Mr. Guzman, any recross?

6          MR. GUZMAN:  Very briefly.

7                    **RECROSS EXAMINATION**

8    **BY MR. GUZMAN:**

9    Q    Agent Luke, since you talked about it on -- on

10   redirect, I want to ask you about this Marlin rifle again.

11   You can't say for sure that it's a .22 caliber?

12   A    I cannot without reviewing my report.

13   Q    All right.  But you're familiar with Marlin rifles?

14   A    I am.

15   Q    And typically if it were a .22 -- let's say if it

16   were a .22 caliber, you'd be looking at, like, a tubular

17   magazine that would hold a certain number of .22 caliber

18   bullets, something like that, if it were, in fact, a .22?

19   A    I think a tubular magazine could be maintained on a

20   lot of Marlin rifles, to include a .30-30.  But in this

21   case, if we're saying for instance, this rifle is a .22,

22   there could be a tubular magazine one it.

23   Q    Okay.  And that particular type of rifle -- I mean,

24   are you familiar with -- well, you know -- I withdraw

25   that.

1    A    I am.

2    Q    All right.  So you mentioned also that during this

3    time when Andrew Carter was running or attempting to run

4    from the police that Sarah and Kayla could have been on

5    the phone together, they could have shared the phone.

6    And, just to clarify, I suppose that's a possibility, but

7    you didn't actually see that occurring on this particular

8    occasion, correct?  A

9    A    I did not see it, I've heard it.

10   Q    Huh?

11   A    I heard it.  I've listened to jail phone calls.

12   Q    I'm talking about on this particular occasion when

13   you're talking about --

14   A    I did not see them down there at Futch Road if that's

15   your question.

16   Q    Okay.  So you can't say that whoever was talking

17   about Andrew Carter being on the run, you can't say it was

18   Sarah Carter, you can't say it was Kayla Carter, correct?

19   A    There are recorded jail phone calls and there's

20   several people involved in those jail recorded calls on

21   May the 9th and 10th where they're talking about this

22   occurrence.  Some of the calls are Sarah Carter, some are

23   other members of the family like Kayla Carter.

24   Q    So that would be, no, you can't remember?

25   A    Right.  Right.  I can't 100 percent say without

1    playing the phone call for the Court.

2    Q    Okay.  All right.  And then I think along very close

3    in time to the question that you were asked by Ms. Bowen

4    about that particular episode, you were asked about

5    whether Sarah Carter had, I guess, warned Andrew Carter

6    about Tim the police officer, the local police officer,

7    being out on the corner, kind of how to avoid Tim --

8    A    This was during the wire intercept.

9    Q    Okay.  So that particular conversation or those

10   conversations where Sarah Carter may or may -- we don't

11   have them, but let's say -- let's say they exist, that

12   particular conversation or conversations did not occur at

13   the same time that Andrew Carter was running from the

14   police; is that right?

15   A    No.  Their criminal activities occurred over a period

16   of time.

17   Q    And so those particular conversations where you were

18   talking about where Sarah Carter may or may not have --

19   let's say -- like I said, let's assume that she made these

20   statements regarding Tim, the local police officer, were

21   at other times and were not connected actually to the time

22   that Andrew Carter was running from the police on that

23   occasion that you talked about earlier, correct?

24   A    That is correct.

25   Q    All right.

1             MR. GUZMAN:  That's all.

2             THE COURT:  Any recross, Mr. Brimberry?

3             MR. BRIMBERRY:  Yes, sir, briefly, please, Your

4     Honor.

5                   **RECROSS EXAMINATION**

6     **BY MR. BRIMBERRY:**

7     Q    All right.  Agent Luke, you testified earlier that

8     quite a few search warrants were executed on the various

9     properties, and without trying to specify the property

10    I'll just use it generically, various properties that you

11    contend are connected to Mr. Mitchell.  You recall

12    testifying about those search warrants?

13    A    Yes, sir.

14    Q    How many family members did you encounter in these

15    various houses when you were executing this search

16    warrant?

17    A    Mr. Mitchell?

18    Q    His father?

19    A    How many family members of who?  Mr. Mitchell?

20    Q    I'm sorry.  Mr. Mitchell.  Yes, sir.  That would be

21    -- I'm sorry.  I took it for granted.

22    A    All right.  You told me not to get particular.

23    Multiple search warrants --

24    Q    You came across various family members?

25    A    Two, three.  Three maybe.  Three.

1    Q    Okay.  All right.  And isn't it common that you have

2    gathered -- from the knowledge of the experience you have

3    in this field, isn't it common for -- when someone gets

4    caught with a gun that's located during the execution of a

5    search warrant, isn't it common to point the finger at

6    daddy or the granddaddy or grandmomma, that's their gun?

7    Isn't that a common practice?

8    A    People can say that the gun belong to other people.

9    Do they commonly say that it belongs to granddaddy or

10   daddy?  Are we speaking of the Carters' guns?

11   Q    I'm speaking of -- generically, drug dealers -- could

12   you say drug dealers typically have a firearm and then you

13   named a specific, good reasons to have a firearm.

14   A    Right.

15   Q    You went down the list of specifics.  Likewise, isn't

16   it common for a person to say, well, that ain't my gun,

17   that's grandaddy's gun?

18   A    They will say somebody else had ownership of the

19   weapon.  I --

20   Q    And furthermore --

21   A    I understand where you're going, but they would

22   indicate, no, it's not my weapon, it's Joe Joe's or my

23   father's or my momma's or Timmy's.

24   Q    Okay.  And notwithstanding the fact that there's

25   persons other than Mr. Mitchell in these locations, people

1     that he could point the finger to, you still found no

2     firearm, correct?

3     A     Well,  we found a firearm at 2907 Wilton Avenue,

4     which was his trap house.  In November of 2012, we found a

5     Judge firearm.  Now, based on my interviews at the time,

6     they indicated the gun was not his, it was Cornelius

7     White's, aka, known as C. White.  So that statement of we

8     didn't find any guns at any of his houses associated with

9     him would not be correct, but we did locate a firearm.  I

10    did not mention it because I didn't think it belonged to

11    him at the time.

12    Q     And you still don't think it belonged to him, do you?

13    A     Based on the evidence I have right now, no, sir.

14    Q     And none of his prints were retrieved from that

15    firearm, were they?

16    A     Not that I recall.

17    Q     And at the conclusion of each of these search

18    warrants that we've testified that you executed or have

19    personal knowledge of them being executed where Mr.

20    Mitchell is the target, you never charged with Mr.

21    Mitchell with any offense, correct?

22    A     I have charged him with an offense.

23    Q     During -- at the conclusion of the search warrants?

24    A     We're here in court today.

25    Q     I'm talking -- with the exception of the reason we're

1    here today.  You testified about these previous search

2    warrants, none of those generated charges against Mr.

3    Mitchell, did they?

4              MS. BOWEN:  Your Honor, I don't know how it's

5    relevant if he was charged or not.  The fact of the matter

6    is, is that we've seen the video of what he was doing.

7    What ultimately happened with that will be included in the

8    bail report or not.

9              MR. BRIMBERRY:  The reason I -- the reason

10   that's relevant, Your Honor, is the Assistant US Attorney

11   was trying to make a point about Mr. Mitchell continuing

12   to engage in criminal activity notwithstanding various

13   warnings he had received from the government.

14             THE COURT:  I'll allow it.

15   BY MR. BRIMBERRY, CONTINUED:

16   Q    He was never charged in these various search warrants

17   that were executed?

18   A    If you're asking me was he charged in 2012, no, sir.

19   Q    With the exception of this current search warrant

20   then, all of the other ones he was never charged with,

21   correct?

22   A    Well, there are two series.  There's one in 2012 and

23   one in 2014.

24   Q    Okay.  Not to beat a dead horse, but maybe I'm a

25   little confused.  How many search warrants did you testify

1   you executed against Mr. Mitchell?

2   A    Yes, sir.

3   Q    How many?  How many?

4   A    There were three search warrants in 2012 on --

5   Q    Okay.

6   A    -- locations subject with him.  There was one in 2014

7   or two in 2014, one in September and one in December.

8   Q    Yeah.  Okay.  And none of them yielded criminal

9   charges?

10  A    Against him?  Again, we're here in court --

11  Q    I understand that one, but, yeah, the previous ones?

12  A    As I'll say again, 2012, I did not arrest him.

13  2014, I did arrest him.  That's why we're here.

14  Q    And you executed how many in 2014?

15  A    Total or on Mr. Mitchell or --

16  Q    On Mr. Mitchell.

17  A    Two.

18  Q    Okay.  So the other one you didn't arrest him on?

19       MS. BOWEN:  Your Honor, he's answered this

20  question four times.  Objection.

21       THE COURT:  Well --

22       WITNESS LUKE:  I think I can clear it up, Judge.

23       THE COURT:  All right.  Well, you take a stab at

24  it then.

25  BY THE WITNESS, CONTINUED:

1    A    Mr. Mitchell was arrested on December the 12th, 2014.

2    I served a search warrant on September 25th, 2014, at 2907

3    Carter Street.  He was not arrested at the time.  I have

4    the ability to arrest people whenever I want to.  In this

5    particular case, based on if there's probable cause, I

6    arrested him pursuant to a Grand Jury indictment.

7    Q    Okay.  And you've never charged Mr. Mitchell ever

8    with obstruction of an officer against you, correct?

9    A    I have not, no, sir.

10          MR. BRIMBERRY:  I have nothing further, Your

11   Honor.

12          THE COURT:  All right.  Let's see, Ms. Bowen,

13   may we excuse Agent Luke?

14          MS. BOWEN:  Yes.

15          THE COURT:  All right.  Agent Luke, before you

16   step down, let me just --

17       (Recording unintelligible)

18          THE COURT:  Yes, thank you.

19       A housekeeping measure, Mr. Lawrence, do you have

20   Exhibits 14 through 24?

21          MS. BOWEN:  Your Honor, here are the remainder

22   of the exhibits.

23          THE COURT:  All right.  Those were admitted,

24   right?

25          MS. BOWEN:  They are.

1                THE COURT:  All right.  So that means if I get

2      those, I've got the exhibits?

3                MS. BOWEN:  These are the disks.

4                THE COURT:  All right.  All right.

5         And I had one question, I'm sure it's in my notes

6      somewhere.  What was the date of Exhibit 7, the videotape?

7      Do you remember?

8                WITNESS LUKE:  Would that be manufacture of the

9      crack cocaine?  Is that -- it has to be that.  November

10     the 8th, 2012.  If that's the --

11               THE COURT:  The video we showed --

12               AGENT LUKE:  -- manufacture of the crack

13     cocaine.

14               THE COURT:  The one we showed today?

15               AGENT LUKE:  Yes, sir.

16               THE COURT:  November 2012?

17               AGENT LUKE:  November the 8th, 2012.

18               THE COURT:  All right.  All right.  Thank you,

19     Agent Luke.  You may step down.

20         Now, finishing with Agent Luke took longer than the

21     Court anticipated, it usually does, and the Court is in

22     need of a break so I can give my full attention to what's

23     to come.  So it's 1:15.  We haven't broken for lunch, so

24     let's break now, and --

25         Well, first of all, I'll ask you, Ms. Bowen, has the

1    government rested now?

2                    **GOVERNMENT RESTS**

3            MS. BOWEN:  Yes, Your Honor, subject (recording

4    unintelligible).

5            THE COURT:  All right.  The government has

6    rested.  So we'll start with the -- any evidence on behalf

7    of defendants and closings, but we'll go ahead and take

8    our break now.  It's 1:15.  We'll break until 2:30.  So

9    we'll be in recess until 2:30.

10        (Recess)

11        (Defendants present)

12            THE COURT:  All right.  Agent Luke, if you will

13    retake the stand, and the Court will remind you, you're

14    still under oath.  And, Mr. Guzman, you can cross examine.

15            MS. BOWEN:  Your Honor, I believe we closed the

16    evidence prior to lunch concluding and cross examination

17    --

18            THE COURT:  Yes, pardon me.  Pardon me, Agent

19    Luke.

20            MS. BOWEN:  Respectfully, Your Honor.  I just

21    want to --

22            THE COURT:  Yes.  We don't want to --

23            MS. BOWEN:  Agent Luke has been on the stand

24    quite a while.

25            THE COURT:  He has.  9:30.

1        Okay.  So that brings us to Mr. Guzman.  Any

2    witnesses on behalf of your client?

3            MR. GUZMAN:  Well, Your Honor, I had some

4    witnesses earlier this morning, prior to the break.  I see

5    that they haven't returned from the break, so -- Are they

6    --

7        (Recording Unintelligible)

8            MR. GUZMAN:  Okay.  It seems that they might be

9    coming up now.

10           THE COURT:  All right.

11           MR. GUZMAN:  So I will have some witnesses in a

12   few minutes, as soon as they make it up.

13           THE COURT:  We'll be at ease for a couple of

14   minutes --

15           MR. GUZMAN:  Yes, sir.

16           THE COURT:  -- to give them time to get up.

17           MR. GUZMAN:  I do have a proffer that -- if you

18   want to take some time to listen to my proffer, I can do

19   that now.  That will just take a few minutes.

20           THE COURT:  That's fine.  All right.  You may

21   proceed.

22           MR. GUZMAN:  Okay.  Of course, Your Honor, this

23   is information that myself, my office, our investigator

24   has -- we have gleaned from our investigation.  Of course,

25   I know that you've got the Pretrial Services Report, so

1    I'm going to try to avoid information that is, you know,

2    basically a duplicate.

3        Let's see.  My client, Ms. Carter, she has five

4    siblings.  She also is the mother of five children, Mose

5    Gammage, Toby Smith, Andrew Carter, Todd Carter, and Kayla

6    Carter, and she is the grandmother of eight children

7    total, living in the Omega, Georgia, area.  And she has

8    daily contact with five of those eight.  The youngest is

9    two weeks old.  Ms. Carter has an eleventh grade education

10   from Tift High School.  She did earn her GED.  She does

11   have high blood pressure and diabetes, which are

12   controlled with medications.

13       Now, she -- I know in the Pretrial Services Report it

14   does tell you that she was employed with Heatcraft Air

15   Conditioning for about 15 years, and she stopped -- she

16   ended that employment to take care of her mother.  What is

17   not in the Pretrial Services Report is that Ms. Carter has

18   been the primary caregiver for James Stokes, who's 87

19   years of age, and has been the primary caregiver for James

20   Stokes for the last nine years.  She is one of the -- she

21   was, at the time, she was out, the only person who was

22   capable of taking care of him.  I believe that Kayla

23   Carter is currently kind of taking her place and taking

24   care of Mr. Stokes, but she doesn't have -- clearly

25   doesn't have the experience that Ms. Carter does.

1        Ms. Carter is also responsible for managing three

2    rental properties that she rents.  One of them is on

3    Georgia -- well, two of them are on Georgia Avenue.  One

4    is for $350 a month and the other is for $700 a month.

5    There's one on Hilltop Circle that she rents for $400 a

6    month.

7        And as far as a bond, Your Honor, she does have a

8    small amount of money that she could place towards a

9    secured bond, that is approximately $500.

10       Now, we also spoke to an individual named Robert

11   Stokes, who does live in Omega, Georgia.  He is Ms.

12   Carter's brother.  And he's a 25 year -- he's retired 25

13   year air captain.  He's currently a part-time adjunct

14   computer system instructor for Moultrie Technology

15   College.  He's also a part-time Tift County court bailiff.

16   He's an elder for Short Street Christian Church in Tifton,

17   Georgia, and he does have a home in San Antonio, Texas,

18   and a home in Omega.  The only reason he's not here today,

19   Your Honor, is because he's actually visiting his home in

20   Omega -- I mean, in Texas, but we have been in touch with

21   he.

22       He lives about a quarter mile away from his sister,

23   Ms. Carter.  He sees her every other day.  And they --

24   basically, he told us that they depend on Ms. Carter and

25   he depends on Ms. Carter to take care of their uncle.  She

 1   does a great job of taking care of him because nobody else
 2   apparently has the time.  He says that he's never seen her
 3   with -- with a weapon or in possession of drugs, and he
 4   does not believe she would be a flight risk because she
 5   has spent her entire life in Omega and because of her
 6   family ties.  He would also agree to be a third party
 7   custodian to make sure she has a ride to and from court
 8   when required.
 9        And so, like I said, if -- if he were here, if he
10   were in the State, he would be here.  I'm very confident
11   of that, but he's in Texas, and that's the only reason
12   he's not here.
13             THE COURT:  It's going to be hard to give her a
14   ride from Texas.
15             MR. GUZMAN:  Right.  He's just visiting, Judge.
16   I mean, he actually lives -- the majority of the time he
17   lives here.  He's just -- he just happens to be over there
18   at this moment in time.
19        But I see that -- Ah.  I see that the family is here
20   now, so I have -- I have some witnesses I can call.
21             THE COURT:  All right.  You may call your first
22   witness.
23             MR. GUZMAN:  All right.  Thank you, Your Honor.
24   I will call Barbara Walker.
25             UNIDENTIFIED:  She's (recording unintelligible).

 1              MR. GUZMAN:  I'll call Jimmy Walker.

 2              THE COURT:  Good afternoon, Mr. Walker.

 3              MR. J. WALKER:  I'm good.  How are you doing,

 4    sir?

 5              THE COURT:  I'm well.  If you would try to stay

 6    within about four, six inches of that microphone, it will

 7    pick you up.

 8              MR. J. WALKER:  Okay.  All right.

 9         *(Transcriber's note:  I did not hear the witness*

10    *being sworn on the recording)*

11         **JIMMY LEE WALKER, DEFENDANT S. CARTER'S WITNESS**

12                    **DIRECT EXAMINATION**

13    **BY MR. GUZMAN:**

14    Q    Now, would you give us your full name?

15    A    Jimmy Lee Walker.

16    Q    All right.  And where do you live?

17    A    Gainesville, Florida.

18    Q    All right.  And what do you do for a living?

19    A    I retired from electrician at IBEW.

20    Q    All right.  Now, do you know Sarah Carter?

21    A    Yes, my sister.

22    Q    All right.  And do you know where she lives?

23    A    Yeah, in Omega.

24    Q    Have you ever been to her home?

25    A    Yes.  Yeah.  That's the family home.

1   Q    All right.  All right.  And where is that?

2   A    In Omega.

3   Q    All right.  Is that 1569 Omega --

4   A    Yeah.

5   Q    1569 Georgia Highway?

6   A    Georgia -- Yeah, Georgia Avenue.

7   Q    Georgia Avenue.  All right.  So have you ever been --

8   you've been in that house, of course, right?

9   A    Yeah.  Oh yeah.  Right.

10  Q    Have you ever seen -- have you ever seen Ms. Carter

11  with a gun or --

12  A    No.  No.  No.  Only kind of weapon I've seen her with

13  is in the kitchen with a the knife cutting up chicken or

14  something like that.

15  Q    All right.

16  A    That's the only thing.  I'm serious.

17  Q    Now, are you aware of any weapons being in the home?

18  A    Yeah.  When her husband was living.

19  Q    All right.  And when did her husband die?

20  A    I can't -- I really don't know to be honest with you.

21  But I don't know.  (Recording unintelligible).  He died

22  this year, I think it was this year.  I'm not for sure

23  though.  But, you know, he had those guns --

24  Q    Okay.

25  A    -- and stuff.  He used to hide them, you know, but he

1    -- he had them in -- when you come in the house, he'd have

2    them on the table, and she always tell him you need to

3    move that gun and stuff.  I remember her telling him

4    (recording unintelligible) on that -- on that -- one of

5    them big guns, some big one.  I don't know which one it

6    was.

7    Q    Well, how many guns did you see?

8    A    I seen him with two.

9    Q    All right.  And do you remember -- can you describe

10   them?  Can you tell us what they look like?

11   A    Yeah.  That one I just describing, that big one.  I

12   think he called it a .40, whatever that .40 means.  I

13   think it might be a Glock .40.  I'm not for sure.  And

14   then had a little pistol, pistol shotgun.

15   Q    Okay.  Now --

16   A    Sawed off.

17   Q    All right.  Now, do you know what happened to the

18   weapons after he died?

19   A    No.  No.  To be honest with you, I sure don't know.

20   Q    Okay.

21   A    I really don't.

22   Q    Now, you mentioned something about him hiding the

23   weapons.  What do you mean he would hide these guns?

24   A    He would get the guns because he would think somebody

25   going to break in on him or something like that, and he

1    would hide them, and she don't be knowing where -- you

2    know, where it at because she don't (recording

3    unintelligible) killed with it anyway, you know what I'm

4    saying.  And so -- so he -- you know, he might take them

5    and put them in the bathroom and stuff, on top of the

6    shelves, you know, something like that.

7    Q    Now, do you think that Ms. Carter would be a danger

8    to the community if she were released?

9    A    Oh, no.  She -- shoot, no, man.  You go around there

10   and ask them old people about her, she takes them to the

11   -- to the doctor and stuff, and plus, you know, she takes

12   care of the house and the home with my uncle and stuff.

13   And everybody -- they couldn't say nothing bad about her.

14   Q    Now, let me ask about -- about your uncle.  You're

15   talking about Mr. Stokes?

16   A    Yes.

17   Q    James Stokes?

18   A    Uh-huh.

19   Q    Is she the primary caregiver?

20   A    Yeah.  Yeah.  Oh, yeah.  She -- basically she's the

21   -- she replaced our mom because everybody comes to her,

22   her family comes to her and stuff.  She take care of --

23   tries to take all the business and stuff.  And she just --

24   just --

25   Q    How long has she been caring for Mr. Stokes?

1    A    Oh, man, I don't know.  Good lord.  She was taking

2    care of him while my Mom and Daddy was living.

3    Q    Was she taking care of --

4    A    Yeah.  Yeah.

5    Q    -- your mom?

6    A    Yeah.  She was taking care of them, but my mom was

7    helping out also, you know what I'm saying, because my

8    sister, she worked a little bit and stuff.

9    Q    Okay.

10   A    But after they got sick real bad, she had to stop

11   working.

12            MR. GUZMAN:  That's all I have.

13            WITNESS J. WALKER:  Okay.

14            THE COURT:  All right.

15            WITNESS J. WALKER:  Step down?

16            THE COURT:  Not quite yet, Mr. Walker.  Let's

17   see if the government has any questions for you.

18            MS. BOWEN:  Yes, I do, Your Honor.

19                    **CROSS EXAMINATION**

20   **BY MS. BOWEN:**

21   Q    Good afternoon, Mr. Walker.

22   A    Good afternoon.

23   Q    Are you related to an Anthony Walker?

24   A    Yes.

25   Q    And was he not prosecuted federally?

1    A    Yeah.

2    Q    And was he not indicted on a similar case pertaining

3    to a wire tap involving large amounts of narcotics?

4    A    Yeah.  As far as I heard.

5    Q    And when he was going to be arrested, he, in fact,

6    ran, fled --

7              MR. GUZMAN:  Your Honor, I'm going to object --

8    A    I don't know about that.

9              MR. GUZMAN:  Unless there's some sort of

10   connection that I'm not aware of here, it's not relevant

11   and it's not even relevant to anything I asked.

12             MS. BOWEN:  May I respond, Your Honor?  Mr.

13   Guzman has asked several questions about Mr. Walker's

14   opinion as to the character and reliability of Ms. Carter

15   in the community as is she a danger, have you ever seen

16   her with any guns, how would she act if she were released

17   on bond; so the credibility of this witness is directly an

18   issue.  So once we have established both his relationship,

19   which he's already acknowledged, Anthony Walker, and some

20   additional facts relating to that case and the conduct

21   that occurred during that case, which I will be brief, it

22   does go to the weight which the Court should give the

23   testimony from this witness, which is directly relevant to

24   the Court's consideration of the factors in 18 USC 3142.

25             THE COURT:  All right.  Ms. Bowen, I'll give you

1    a little leeway, but so far, I don't really know much

2    about the relationship with the witness and Mr. Anthony

3    Walker, but I'll --

4            MS. BOWEN:  I'll ask him that, Your Honor.

5    BY MS. BOWEN, CONTINUED:

6    Q    How are you related to Mr. Anthony Walker?

7    A    He's my nephew.

8    Q    All right.  And he's your nephew and we've

9    established that he was prosecuted federally.  Did he flee

10   to Jacksonville where he remained for two years?

11   A    Not as I know of.  Because see --

12   Q    I'll ask you another question.  If you don't know,

13   you don't answer.

14   A    Okay.  I don't know.  I don't know.

15   Q    When he was eventually apprehended, he had $1 million

16   in a semitruck?

17   A    I don't know that either.

18   Q    All right.

19   A    I'm serious.  I heard that he had a bunch of money.

20   Q    You heard he had a bunch of money and that he was

21   prosecuted federally on a wire tap case as well involving

22   large amounts of drugs?

23   A    Uh-huh.  I heard something like that, yes.

24   Q    All right.  You testified that you had been in, what

25   you termed, the family home, 1569 Georgia Avenue many

1    times?

2    A    Oh, yeah.  Oh, yeah.

3    Q    So you've been in the room where Sarah Carter sleeps?

4    A    Yeah.

5    Q    And used to sleep --

6    A    I would sleep down the hall myself.

7    Q    Okay.  And Kayla Carter resides there?

8    A    Yeah.  Uh-huh.

9    Q    And Diamond Carter resides there?

10   A    Yeah.  Uh-huh.

11   Q    And Kayla Carter's three-year-old son resides there?

12   A    Yeah.  But after she had the baby, it was -- I don't

13   think we've slept in the house since then.  We came and

14   kept going on to Pensacola or somewhere, to my

15   sister-in-law's.

16   Q    So you haven't been to her house in three years?

17   A    Oh, I've been there, but I haven't slept over.

18   Q    Okay.  So these are, what, short visits?

19   A    Yeah.  Yeah.

20   Q    And not spend the night?  Okay.

21   A    I always do a short visit.

22   Q    So it's limited interaction because you're passing

23   through, as you've said, on your way back to Florida?

24   A    Yeah.  Sometimes like that, also.  Yeah.

25   Q    All right.  You testified on direct about two

1    firearms, one you referenced as a .40, I think referring

2    to a Glock.

3    A     Yeah.  Yeah.  Uh-huh.  I believe that's what it was.

4    Q     And one you referred to a pistol-type shotgun.

5    A     Shotgun, yeah.  Uh-huh.

6    Q     All right.  Are you aware that a pistol-type shotgun

7    was not recovered?  There were, I believe, four firearms

8    recovered during the execution of the search warrant on

9    September 25th, 2014, but there was not a pistol-type

10   shotgun?

11   A     Okay.  But that's the one I remember.

12   Q     That's fine.  I understand that.  But it was not

13   there on September 25th, 2014.  Now, the .40 caliber style

14   Glock that you reference, are you aware that that firearm

15   was actually in -- recovered in Kayla Carter's bedroom in

16   an unlocked gun safe?

17   A     No.  I didn't know that.

18   Q     Now, I think we've -- or rather you have testified

19   about Andrew Carter, Sr.  Are you aware that he and the

20   Carter family were close family friends with Tyler

21   Johnson?

22   A     I don't know Tyler Johnson.  Who is Tyler Johnson?

23   Q     Okay.  Let me ask you this, did you attend the

24   memorial services for Mr. Andrew Carter, Sr.?

25   A     Yeah.

1    Q    Did you have an opportunity to look at the funeral

2    program?

3    A    I probably did, but I can't recollect any of it.

4    Q    Okay.  Well, Mr. Tyler Johnson was listed as a close

5    family friend of the Carter family in that program.  Do

6    you recall that?

7    A    Who is this Tyler boy?

8    Q    Okay.  If you don't know --

9    A    Has he got a nickname or something?

10   Q    I'm not aware of his nickname, but we'll move on.

11   A    I don't know who it is.

12   Q    You mentioned and testified that Sarah Carter

13   replaced, I think, you said your mother?

14   A    Yeah.  Yeah.

15   Q    And she, quote, if I can quote you, takes care of all

16   the business?

17   A    Yeah.  She take care of all the business, and just --

18   she take care of the household.  You know, she --

19   Q    So that's a yes?

20   A    Yes.

21   Q    So other members of the family like Andrew Carter,

22   Maurice Carter, Kayla Carter, Diamond Carter, Lataris

23   Waters, they look to Sarah Carter for direction?

24   A    On certain things, yeah.

25   Q    Okay.  Are you also aware -- I mean, you've known

1    her, I guess, her -- her whole life --

2    A    Whole life.

3    Q    You've known Ms. Carter her whole life?

4    A    Yeah.  I know her.  Yeah, we was raised up together.

5    She's one year younger than -- I mean, older than me.

6    Q    Okay.  Are you aware that she was arrested in 1996

7    for purchase, possession, or control of a drug, marijuana,

8    possession less than one ounce and commercial gambling?

9    A    In '96?

10   Q    Yes.  Are you aware of that?  Well, you knew her in

11   '96, didn't you?

12   A    Yeah.  But '96, now, I was up the road, up north,

13   working.  See I stayed on the road a lot working.

14   Q    And you're still on the road a lot, I take it?

15   A    No, no.  I done retired now.

16   Q    But you do travel because you live in Florida, so

17   you're not here?

18   A    Yeah.  But I goes up there to Pensacola to see my

19   sister-in-law, me and my wife and kids sometimes.

20   Q    All right.  Are you also aware that she was arrested

21   in 1997 --

22   A    No.  They didn't tell me about that one though.

23   Q    I'm sorry?

24   A    They didn't tell me about that.

25   Q    Okay.  So on these visits this never came up that she

1    was arrested again in 1997 for marijuana possession less

2    than one ounce?

3    A    No.  I didn't know about that one either.

4    Q    All right.  And 1998, purchase, possession, control

5    of a drug and marijuana possession less than one ounce,

6    are you aware of that?

7    A    No.

8    Q    All right.  So --

9    A    Are you sure -- you sure it wasn't her husband that

10   did that?

11   Q    Yes, Mr. Walker.  These are arrests of Ms. Sarah

12   Carter, which you don't have any knowledge about?

13   A    I don't know.  I don't know.  No.

14   Q    But your testimony is you know her very well?

15   A    Oh, yeah, that's right.  I do.

16   Q    Okay.

17   A    But you -- you can't know everybody to the utmost

18   now, you know.

19   Q    Right.

20   A    You know.

21   Q    That's very true, Mr. Walker.  Now, you mentioned

22   that you had not spent the night in the last three years.

23   How many times have you been to 1569 Georgia Avenue?

24   A    (Recording unintelligible).

25   Q    In the last three years?

```
1    A    In the last three years?  I don't know.  Let me see.

2    I don't really know.  I don't know.  You'd have to ask my

3    wife, now.  She might have a good knowledge of that.

4    Q    Let me help you out.  Is it less than five times, is

5    it more than five times?

6    A    Yeah, more than five times I believe.

7    Q    Is it less than ten times, is it more than ten times?

8    A    I don't know.  I don't think it's more than ten

9    times.

10   Q    So less than ten times in three years?

11   A    Yeah.  Yeah.  Probably so.

12   Q    Okay.  So you were not aware of the daily occurrences

13   and goings on of what happens at 1569 Georgia Avenue?

14   A    No.  No.  Not all -- not all the time.  No.  No.  No.

15   Because I got my own company to worry about.

16   Q    Thank you, Mr. Walker.

17             THE COURT:  All right.  Any redirect?

18             MR. GUZMAN:  No, Your Honor.

19             THE COURT:  All right.

20        Mr. Walker, let me ask you this.  You said you

21   remembered two firearms from when your sister was married

22   to her late husband.  Remember that?

23             WITNESS J. WALKER:  Say that again.

24             THE COURT:  You told me about two weapons --

25             WITNESS J. WALKER:  Oh, yeah.  Yeah.  Uh-huh.
```

1    Yeah.

2              THE COURT:  -- that her -- that her husband had?

3              WITNESS J. WALKER:  Yeah.  Yeah.  Uh-huh.

4              THE COURT:  Those were ones you remember seeing?

5              WITNESS J. WALKER:  Right.  Yeah.  Uh-huh.

6              THE COURT:  Do you know of any other weapons

7    that her husband had?

8              WITNESS J. WALKER:  Oh,  probably so.  It's one,

9    I forgot what it was, but he sold it.  I know that, know

10   that much.

11             THE COURT:  Okay.  Did you know of any that he

12   had not sold other than those two you told the Court

13   about?

14             WITNESS J. WALKER:  Well, see the one -- that

15   pistol grip one, now, y'all got to find that or whatever.

16   I don't know what happened.  He probably sold that one.

17   The only one I remember real good is that -- is that .40

18   because he was crazy about that .40.

19             THE COURT:  Do you know where he kept his

20   weapons in the house?

21             WITNESS J. WALKER:  No.  Now, when he had it in

22   the front, his little sit down, he had it right up there.

23   You know, if people come in, you know, I guess trying to

24   be impressive I guess.  But other than that, you know,

25   somebody be wanting to touch it, he don't let nobody touch

1    it and stuff.  That's his pride and joy I guess.

2              THE COURT:  All right.  Thank you, Mr. Walker.

3    You may step down.

4              WITNESS J. WALKER:  Okay.

5              THE COURT:  Mr. Guzman, you may call your next

6    witness.

7              MR. GUZMAN:  Your Honor, Ms. Carter will call

8    Barbara Walker.

9              THE COURT:  Afternoon, Ms. Walker.

10             WITNESS S. WALKER:  Hi.

11             THE COURT:  You may proceed.

12             MR. GUZMAN:  Yes, sir.

13        **BARBARA WALKER, DEFENDANT S. CARTER'S WITNESS, SWORN**

14                   **DIRECT EXAMINATION**

15   **BY MR. GUZMAN:**

16   Q    Will you give us your full  name?

17   A    My full name is Barbara Jean Walker.

18   Q    And where do you reside?

19   A    I reside in Gainesville, Florida.

20   Q    And do you know Sarah Carter?

21   A    Yes, I do.  I've known Sarah for about 35, 36 years.

22   She's my sister-in-law.

23   Q    And what do you do for a living?

24   A    I'm retired right now, but I worked with the State of

25   Florida for 32 years, which I'm retired from.  I did child

1    abuse investigation cases, and I worked with Gainesville

2    Police Department on certain issues involving abuse.

3    Q    All right.  So have you ever been to Ms. Carter's

4    house --

5    A    Yes.

6    Q    -- in Omega, Georgia?

7    A    Yes, I have.

8    Q    And how many times would you say that you've been

9    there in total?

10   A    Oh, my God.  Several.  I mean, I can't really count

11   because I'm always on the highway.  I'm always stopping

12   through there.  Sometimes I stay the night at her house,

13   sometimes I stay the night at the hotel, so a number of

14   times.  I can't really tell you.  I mean, because I travel

15   back and forth through Georgia going to Pensacola, so, I

16   mean.

17   Q    Do you know her husband?

18   A    Her ex-husband?  Yes.  I did know him.

19   Q    All right.  And what happened to him?

20   A    He passed away.

21   Q    Do you remember when he passed away?

22   A    Not exactly because I've been sick back and forth and

23   my mind sometimes forget stuff, but I think maybe last

24   year some time.

25   Q    Did you ever see -- have you ever seen Ms. Carter

1   with a firearm?

2   A    No.  She's afraid of firearms.  She don't -- she --

3   she didn't want it in her house at all when -- you know,

4   when we talked, conversated about, so he did keep it hid,

5   whatever.  I remember seeing something big one time, what

6   it was, I can't tell you, and I know he had it, put it

7   somewhere in the room under the bed, only thing I can say.

8   And she wasn't there when he did it.

9   Q    Can you -- I know you say you can't tell us exactly

10  what it is, but can you give us a general description of

11  what you saw?  The firearm that is.

12  A    The only thing I know, I have a .38 myself, so I can

13  tell you what a .38 look like, but that gun was a little

14  bigger, so I can't really tell you.

15  Q    Could you say if it looked like a rifle or did it

16  look like a shotgun?

17         MS. BOWEN:  Objection, Your Honor.

18  A    I think he had a rifle on the side of the bed one

19  time, and he pushed it up under the bed.  And he had

20  another gun.  Now what kind that was, I really don't know.

21         MS. BOWEN:  Objection, Your Honor.

22  A    I know it was long.

23         MS. BOWEN:  Mr. Guzman was asking her about a

24  pistol.  She said it was like a. 38, then he said --

25         WITNESS B. WALKER:  No.

1          MS. BOWEN:  -- something about rifle.

2          WITNESS B. WALKER:  No.

3          MS. BOWEN:  And he's leading her --

4          THE COURT:  Wait just a minute.

5          MS. BOWEN:  -- to respond in regards to a rifle,

6   so I'm objecting to the form of the question, that it's

7   leading.

8          WITNESS B. WALKER:  Can I say something, Judge?

9          THE COURT:  Well, Mr. Guzman will ask you

10  another question --

11         WITNESS B. WALKER:  Okay.

12         THE COURT:  -- and you'll be able to clear it

13  up.

14         MS. BOWEN:  And I believe she's already answered

15  this question that she does not know.  I think she

16  testified to the fact that she's been ill and her mind is

17  forgetful and she does not recall clearly what type of

18  firearm it was, so any further questions beyond it looks

19  something like a .38 I have is beyond the scope of her

20  personal knowledge even further.

21         MR. GUZMAN:  It's a wonderful argument for

22  weight of the evidence.

23         MS. BOWEN:  She can't testify to what she

24  doesn't know, Your Honor.

25         THE COURT:  Ms. Bowen, your objection is noted.

1    I think Mr. Guzman is probably going to clear this up with

2    her now as far as what she remembers.

3         Mr. Guzman, do you have another question for the

4    witness?

5              MR. GUZMAN:  Yes, Your Honor.

6    BY MR. GUZMAN, CONTINUED:

7    Q    I think you mentioned or you began to mention

8    something about a firearm that Mr. Carter had hidden under

9    the bed or attempted to hide under the bed.  Can you

10   describe that firearm?

11   A    It was long because my father had a double barrel

12   shotgun, so I know what a shotgun, rifle almost look

13   alike, and it was that length.

14   Q    All right.

15   A    So whether it was a shotgun or a rifle, BB gun, I

16   know it was long.  And the other one was bigger than my

17   .38, which looks to be about this big, so as far as the --

18   I didn't actually see it, look at it, hold it.  I knew

19   that he had it.

20   Q    And what -- what bedroom exactly did you see him

21   hiding that --

22   A    It was --

23   Q    -- that firearm?

24   A    -- his bedroom.  When you walk in the side door.

25   Q    Is that the same -- is that Ms. Carter's bedroom?

1    A    Yeah.  That's where they slept at.  Yeah.

2    Q    All right.  Now, could you tell us do you have an

3    opinion as to whether or not Ms. Carter would be a danger

4    to others or to the community in general if she were

5    released?

6    A    No.  I do not because ever since I've known her, her

7    mother, and when I came to meet them, they have people in

8    and out they house all the time.  They do a lot of

9    cooking.  They feed -- she feed everybody just about in

10   the neighborhood on Sunday.  They come in and have all

11   kind of dinners.  People stop by.  They ask for food.

12   Even when I'm there, I am a caterer, professional baker.

13   When I visit, I bring in goodies, and people come in and

14   out to taste my food.  So, I mean, she take the old people

15   to the doctors.  She helps see about the kids.  No.  I

16   don't think she would be no flight risk at all.

17   Q    How about a danger to the community?

18   A    And she wouldn't be a danger.  She's scared of guns.

19            MR. GUZMAN:  That's all I have.

20            THE COURT:  All right.  Cross examination?

21            MS. BOWEN:  Yes, Your Honor.

22                    **<u>CROSS EXAMINATION</u>**

23   **BY MS. BOWEN:**

24   Q    Well, you testified to, I believe, Andrew Carter, Sr.

25   hiding, as you termed it, a gun you said was -- your .38

1    is this big, and the gun you said was this big

2    approximately under the bed; is that correct?

3    A    Yes.

4    Q    Were you present when this happened?

5    A    I was walking through the house to go from the room

6    to the front room, and I saw it.

7    Q    And when was this?

8    A    Maybe about six, seven months before he died.

9    Q    Okay.  And how long has he been deceased?

10   A    I think maybe a year.

11   Q    All right.  And this is the one firearm that you have

12   seen?

13   A    I said two.  I didn't say one.  I said a double

14   barrel shotgun and a rifle, similar.  It looks alike, the

15   length.  I saw him put that under the bed.  He had a

16   bigger gun than mine, which I say is a .38.  So he has --

17   My daughter do have a larger gun.  I don't know what type

18   of gun it is, but I know it's bigger than a .38, so I

19   don't know.  I'm not into guns yet, but I'm learning, so.

20   Q    Okay.  Where did you see that firearm?

21   A    In his bedroom.

22   Q    That he shared with Ms. Sarah Carter?

23   A    Yes.  And I think when he passed away she probably

24   didn't never go in there and get them out.

25   Q    So she didn't sleep in her bedroom?

**R. Darlene Pino**
**United States Court Reporter**
**(229) 343-7550**

1    A    Yeah.  She slept in there.  I sleep in mine.  But I

2    don't go under my bed and pull out stuff if I'm in --

3    trying to be in mourning of my husband.  I don't take away

4    nothing that was there.

5    Q    Now, I want to establish a context for how frequently

6    you've been to 1569.  I think you said that you're always

7    on the road, up and down the interstate.  Now, your

8    husband testified that he has been there less than ten

9    times in three years and never spent the night during that

10   time.  I'm assuming that you travel together?

11   A    Not always.  I don't always travel with my --

12   Q    Okay.

13   A    -- husband, which I'm quite sure you don't either.  I

14   travel a lot by myself and with him, but I do come

15   through.  I spend the night, I stay at hotels, and

16   sometimes I don't.  I can't give you specific dates and

17   times.

18   Q    That's fine.

19   A    Unless you want me to pull my gas receipts, and then

20   I can tell you when --

21   Q    We don't --

22   A    -- I stayed and when I didn't.

23   Q    Ms. Walker, we don't need to go that --

24   A    Okay.

25   Q    -- in depth.  But like I asked your husband, is it

1    less than five times, is it more than five times?

2    A    It's more than -- more than that with me.

3    Q    Okay.  Is it less than ten times, is it more than ten

4    times?

5    A    More.

6    Q    Is it less than 15 times, is it more than 15?

7    A    Ten or more.  I can't be specific.

8    Q    All right.  So somewhere around ten.  And have you

9    spent the night?

10   A    Yes, I have.

11   Q    All right.  You have -- every time?

12   A    Not every time.

13   Q    Okay.  So in three years, ten or so times,

14   occasionally spending the night out of ten times, you are

15   not familiar then with the daily occurrences and going on

16   of Sarah Carter at 1569 Georgia Avenue?  Is that correct?

17   A    How could I if I don't live there, not there every

18   day.

19   Q    Thank you, Ms. Walker.

20   A    Thank you.

21   Q    That's exactly what I'm asking you.  Now, you

22   mentioned the firearm underneath the bed and that you also

23   saw the handgun that you testified to being bigger than a

24   .38, but you don't know what it was.  Approximately I

25   think you said six months before he died --

1    A    Before he got sick and went to the hospital.

2    Q    Yes, ma'am.  Are you aware that on September 25th,

3    2014, there was a quantity of cocaine and crack cocaine

4    found on Ms. Sarah Carter's nightstand?

5    A    No.

6    Q    Okay.  She's your sister?

7    A    She's my sister-in-law.

8    Q    Your sister-in-law.  And there was the firearm still

9    in that room?

10   A    I'm assuming it would be.  I didn't check.

11   Q    Okay.  So let me ask you this, were you also aware

12   that there were additional firearms found in Kayla

13   Carter's room in an unlocked safe?

14   A    Hearing the testimony that's been in here, I'm aware

15   of it now --

16   Q    But prior to court today --

17   A    -- (recording unintelligible)

18   Q    -- you had no knowledge?

19   A    Prior to that, no knowledge of guns in her room or

20   her child's room.

21   Q    All right.  Did you also know, and I think you've

22   just alluded to it, about the Ruger that was in the three

23   year old's room?

24   A    I don't know nothing about a gun in his room.

25   Q    Okay.

1  A    You just said that, not me.  I heard other people --

2  Q    If your answer is no --

3  A    -- (recording unintelligible) -- No.

4  Q    -- that's all I'm asking, Ms. Walker.

5  A    No.  No.

6  Q    Because what I want to establish here is your only

7  knowledge of what happens at 1569 seems to be two guns

8  that you really can't describe that you saw, I think, once

9  approximately a year and a half ago; is that correct?

10  A    (No audible response).

11  Q    All right.  And I think you testified that you worked

12  for DFACS for the State in some capacity on behalf of

13  children?

14  A    Yes.

15  Q    And I think you testified that you did this for 30

16  years?

17  A    Thirty-two to be exact.

18  Q    Thank you, ma'am.  Thirty-two years.  Now, during the

19  course of this 32 years would you conduct home

20  inspections?

21  A    Yes, I would.

22  Q    And you would --

23  A    Only if I'm called out to do it.

24  Q    Certainly.  And if it arose in a case and you had to

25  go and do a home inspection, you would walk around the

1    house, you would look at the living conditions, you would

2    look at the items in the house, and then you would write a

3    report, render opinion on the safetyness of that house for

4    a child.  Is that correct?  Is that a fair statement?

5    A    (No audible response).

6    Q    Okay.  So would you, harking back to that great deal

7    of experience, 32 years, consider a house out of which

8    cocaine was being sold on a daily basis, in which crack

9    cocaine, about 2 grams, was found a firearm in the room

10    with the crack cocaine, two guns in an unlocked safe, and

11    a loaded weapon in a child's bedroom, would you consider

12    that to be a safe environment for a three-year-old child?

13    A    If I saw it with my own eyes, I would consider it.  I

14    didn't see it.  I don't know --

15    Q    I'm only asking about based upon your experience --

16    A    I'm just telling you I can't answer that yes or no.

17    Q    Well, I think you can because based upon your

18    experience, which you testified to on direct when asked by

19    Mr. Guzman, and rendering your opinion about the fitness

20    of Ms. Carter for bond you rely on your 32 years of

21    experience with DFACS.  So based solely upon that

22    qualification, would you consider that a safe environment

23    for a three year old?

24    A    I can only answer this, ma'am.  If I saw it with my

25    own eyes, then I could make an evaluation and a statement.

1    I'm going by your word, and you're not proven guilty --

2    you guilty until you proven --

3    Q    That's not what I'm asking you --

4    A    Okay.

5    Q    -- Ms. Walker.

6    A    So I can't really answer that (recording

7    unintelligible).

8    Q    So then you would consider a house with crack cocaine

9    being sold out of daily, crack in it, and four firearms

10   unsecured, unsafe, with a three year old safe after

11   working for DFACS for 32 years?  Is that your response?

12   A    If I have evidence.  You haven't shown me any, so I

13   can't make a judgment on that.  Sorry.

14   Q    So you're not going to answer the question?

15   A    No, I'm not.

16   Q    Are you also aware that there were a number of stolen

17   TVs and that one of the stolen guns was in Ms. Carter's

18   house?

19   A    No.  Not until you just said it, and I heard it in

20   court.

21   Q    Are you also aware that she has three prior arrests

22   in relation to drugs?

23   A    No, I'm not.

24   Q    So since 1996 to the current date, none of this

25   information has come up?

```
 1    A    This to me is irrelevant.  I wouldn't tell her my

 2    personal information, so why would she tell me hers?

 3    Q    But yet you're vouching to her --

 4    A    I'm vouching that she would be a good candidate to be

 5    released on bond, to take care of her house and her uncle.

 6    I cannot tell you that -- about the drugs.  I don't know

 7    about that.  That's what you're saying.  He's saying he

 8    got the evidence.  Show it to me.

 9    Q    Well, that's not the way this works, Ms. Walker.

10    A    Well, that's the way I'm going to answer it, Miss.

11    Q    All right.

12              MS. BOWEN:  That's all I have.

13              THE COURT:  Mr. Lawrence, I think we lost the

14    witness's microphone.

15         All right.  Any redirect, Mr. Guzman?

16              MR. GUZMAN:  No, Your Honor.

17              THE COURT:  All right.  Ms. Walker, thank you,

18    ma'am.  You may step down.

19              WITNESS B. WALKER:  You're welcome, Judge.

20              THE COURT:  Mr. Guzman, any further witnesses on

21    behalf of Sarah Carter?

22              MR. GUZMAN:  No, Your Honor.

23              THE COURT:  You rest?

24              **DEFENDANT S. CARTER RESTS**

25              MR. GUZMAN:  I rest subject to argument.
```

1          THE COURT:  All right.  Mr. Brimberry, any

2    witnesses on behalf of Mr. Kenya Mitchell?

3          MR. BRIMBERRY:  Yes, sir.  I think I really

4    wasn't planning on it, but I think, according to the

5    statute, I have to call, I need to put up some evidence,

6    so I do call Ms. Mitchell.  She's present.

7          THE COURT:  Good afternoon, Ms. Mitchell.

8          MS. S. MITCHELL:  Good afternoon.

9          THE COURT:  You'll have to get a little closer

10    to that microphone.  There you go.

11          MS. S. MITCHELL:  Okay.

12          THE COURT:  All right.  Mr. Brimberry.

13          MR. BRIMBERRY:  Thank you, Your Honor.

14    **SHELETHA MITCHELL, DEFENDANT K. MITCHELL'S WITNESS, SWORN**

15                   **DIRECT EXAMINATION**

16    **BY MR. BRIMBERRY:**

17    Q    For the record, my name is Mark Brimberry.  For the

18    record, please state your name.

19    A    Sheletha Gem Mitchell.

20    Q    Okay.  I'll cut to the chase.  Are you Mr.

21    Mitchell's, my client's mother?

22    A    Yes.

23    Q    Okay.  And where do you live?

24    A    2904 Southern Avenue, Tifton, Georgia.

25    Q    Where does he live?

```
 1    A    2907 Carter Street, Tifton, Georgia.

 2    Q    How close to you do you live from him?

 3    A    (Recording unintelligible) right across the road from

 4    each other.

 5              THE COURT:  Let me get you to back up just a

 6    little bit.  That's good.

 7    Q    Have you ever seen your son -- Well, how often do you

 8    see your son?

 9    A    Every day.

10    Q    Have you ever seen him with a firearm?

11    A    No.

12    Q    Have you ever known him to own a firearm?

13    A    No.

14    Q    Would you ensure that he came to court if notices

15    were sent instructing him to be in court?

16    A    Yes.

17              MR. BRIMBERRY:  I have nothing further, Your

18    Honor.

19              THE COURT:  All right.  Any cross?

20                       CROSS EXAMINATION

21    BY MS. BOWEN:

22    Q    Good afternoon, Ms. Mitchell.

23    A    Afternoon.

24    Q    As his mother, I think it's fair to assume you are

25    very familiar with Mr. Kenya Mitchell?
```

1   A    Yes, ma'am.

2   Q    And as you've previously testified just on direct,

3   you live in close proximity to him?

4   A    Yes, ma'am.

5   Q    So then you are familiar with his criminal history?

6   A    Yes, ma'am.

7   Q    So you are aware that he has been arrested before in

8   connection with trafficking drugs or possessing drugs?

9   A    I ain't never know about trafficking but I know

10  possession.

11  Q    Okay.  Have you ever seen him with cocaine?

12  A    Marijuana.

13  Q    Okay.

14  A    Smoking it.

15  Q    But, in fact, don't you make or have made deliveries

16  --

17  A    No, uh-uh.  Uh-uh.  No, ma'am.

18  Q    Okay.

19  A    No, ma'am.  No.

20  Q    Well, let's walk through this just a minute here

21  because your son was distributing and manufacturing

22  cocaine in 2002 [sic], 2013, and 2014.

23  A    Uh-huh.

24  Q    And I want to talk to you about an incident that

25  happened on October 30th, 2012.

1    A    Uh-huh.

2    Q    You delivered a quantity of crack and powder cocaine

3    to him at 2907 Carter Street; isn't that correct?

4              THE COURT:  Ms. Mitchell, before you answer,

5    ma'am, while you're not a named defendant in this case,

6    the Court feels compelled to advise you that you do have a

7    Fifth Amendment right against self-incrimination.  So if

8    Ms. Bowen asks you questions, or any lawyer, that you

9    believe may incriminate you --

10             WITNESS S. MITCHELL:  Uh-huh.

11             THE COURT:  -- and subject you to charge of some

12   crime --

13             WITNESS S. MITCHELL:  Uh-huh.

14             THE COURT:  -- you can plead the Fifth Amendment

15   and not answer that question.

16             WITNESS S. MITCHELL:  Well, I plead the Fifth

17   because I don't know what she talking about.

18             THE COURT:  Well, you'll have to deal with it

19   with each question.  The Court just wants to make sure you

20   understand your rights.

21             WITNESS S. MITCHELL:  Okay.

22             THE COURT:  All right.

23             MR. BRIMBERRY:  Your Honor, may I please

24   instruct my witness to answer yes or no instead of uh-huh

25   and uh-uh?  Just --

1         THE COURT:  Yes.

2         MR. BRIMBERRY:  It's a lot easier to follow the

3    transcript.

4         THE COURT:  Yes.  If you will, ma'am, if you

5    answer a question, if you'll say yes or no so we can make

6    sure we understand.

7      All right.  You may proceed, Ms. Bowen.

8         MS. BOWEN:  All right.

9    BY MS. BOWEN, CONTINUED:

10   Q   Ms. Mitchell, to be clear, it is your testimony that

11   you have not made deliveries of cocaine or controlled

12   substance on behalf and for and to your son, Kenya

13   Mitchell; is that correct?

14   A   I plead the Fifth because I don't remember that.

15   Q   So that -- Okay.  Plead the Fifth.

16        MS. BOWEN:  I have nothing further for this

17   witness; however, Your Honor, I think in light of her

18   testimony, I would like to put up Agent Luke to rebut her

19   testimony because I think the defense is relying upon her

20   credibility to establish that this defendant is not a risk

21   to the community.  However, in light of the fact that I

22   can put forth evidence, testimony, here today that that

23   buy that you have previously heard testimony about was

24   mentioned on direct by Agent Luke that October 30th, 2012,

25   the three cookies of crack cocaine and I think it was 28

1     grams of powder was actually delivered to his house by his

2     mother.  So I think her testimony should either be

3     stricken in its entirety or I should be allowed to call

4     Agent Luke to rebut because I think it completely removes

5     any credibility of her testimony.

6            THE COURT:  Well, before you make that decision,

7     of course, you know, if you feel the  need to put on

8     rebuttal the Court will let you do that.  But so that

9     we're all on the same page, my understanding of the direct

10    testimony of the witness is that she had not seen her son

11    with any firearms, with any guns, and that she would

12    ensure that he came to court.

13           MS. BOWEN:  Yes, Your Honor.

14           THE COURT:  And that's all that I got out of the

15    direct.

16           MS. BOWEN:  Yes, Your Honor.  And then on cross

17    I asked her about if she was aware with the criminal

18    history relating to drugs of her son if she had ever seen

19    him with cocaine and if she'd ever made any deliveries for

20    her son of cocaine to him, specifically in regards to the

21    October 30th, 2012.  I think it directly relates as the

22    government's argument and position will be that dealing

23    drugs, in his case over a three year period, if not

24    longer, is a direct threat to this community.  I believe

25    she is being put forth as a character/credibility witness

1    to do as Your Honor has just said, to ensure that he

2    doesn't have guns, doesn't get guns, doesn't use guns, and

3    will come to court, and, therefore, the Court can weigh

4    the weight, if it should be allowed to remain in at all,

5    with and against the testimony that will be offered by

6    Agent Luke that she, in fact, has worked with her son in

7    the distribution of cocaine by delivering it to him.

8        I don't think that it would be suitable to rely on

9    her to say that she is going to ensure that he acts in an

10   appropriate manner when we have testimony or we can put

11   forth testimony that she is, in fact, colluding with him

12   in his business.

13           THE COURT:  All right.  Ms. Bowen, I think

14   you're going to the next step, and my point of reiterating

15   the direct was to signal you that the only evidence that

16   has come in from her on direct were those three specific

17   points.

18           MS. BOWEN:  Yes, sir.

19           THE COURT:  And on cross the only thing I got

20   was she had seen her son possess drugs, but was unaware of

21   distribution.  And then she pled the Fifth regarding her

22   involvement.

23           MS. BOWEN:  Yes, Your Honor.

24           THE COURT:  So we have a very limited testimony

25   that she's offered.

1          MS. BOWEN:  Yes, sir.  Because I cannot compel

2     her to answer that she, in fact, participated in this

3     October 30th, 2012, buy.  I've posed the question to her,

4     she has refused to answer as she is entitled to do

5     pursuant to her Fifth Amendment right.  I believe she

6     answered my question about seeing her son with drugs by

7     saying she's seen him with marijuana; however, this buy

8     was cocaine and crack cocaine which goes directly to the

9     heart of this conspiracy.  So I had asked her the

10    questions which go to the evidence that I want to elicit;

11    however,  she has answered no to the cocaine, yes to

12    marijuana, but that's not relevant to the inquiry.  She's

13    pled the Fifth as to the October 30th, 2012, and those are

14    the questions that are relevant to the evidence that I

15    wish to elicit for the government's argument.

16          THE COURT:  Let me hear from Mr. Brimberry.

17          MR. BRIMBERRY:  I purposefully kept the direct

18    limited and I think any questions going outside my limited

19    presentation of direct evidence would be well outside the

20    scope of the direct, which would be inappropriate I think,

21    Your Honor.  The fact that she says I plead the Fifth

22    because I don't know nothing about that, you know, that

23    could be taken several ways, but she -- the fact that she

24    takes that position doesn't open up a can of worms when

25    she pleads the Fifth because she don't know nothing about

1    that, doesn't open up a can of worms to let us go on a

2    three day cross examination and a presentation of another

3    case, another trial, which has never materialized.

4             MS. BOWEN:  This is not an attempt to go after

5    Ms. Mitchell.  I'm trying to illuminate for the Court her

6    veracity and her credibility as a witness.  If Your Honor

7    is going to rely upon her and her statements that she can

8    get him here to court and he doesn't have any guns and

9    he's not a danger to the community, then Your Honor --

10            THE COURT:  Well, she didn't say he wasn't a

11   danger to the community, Ms. Bowen.

12            MS. BOWEN:  And I guess I'm getting ahead of

13   myself because I'm anticipating that the argument of the

14   defense is going to be because we haven't seen Mr.

15   Mitchell with a firearm and because his momma says he's

16   not -- she's not seen him with one, and he's not going to

17   get one, and, therefore, he's not a danger to the

18   community.  However,  the danger to the community is that

19   he is dealing dope in the Middle District of Georgia, and

20   he has been doing so from 2012 to 2014, and Your Honor

21   cannot -- you should at least hear credible evidence that

22   perhaps she is being less than truthful or she is

23   recalling events differently.  It will be very short, it

24   will be a very brief.  And, of course, you are the

25   ultimate trier of fact, you can take it for whatever

1    weight you want, but you (recording unintelligible) the

2    witnesses in this case.

3              THE COURT:  All right.  Ms. Bowen, I think I've

4    heard your argument over and over again.  I don't find it

5    persuasive at all.

6              MS. BOWEN:  All right.

7              THE COURT:  Is there any redirect, Mr.

8    Brimberry?

9              MR. BRIMBERRY:  No, sir, Your Honor.

10             THE COURT:  All right.  Thank you, Ms. Mitchell.

11   You may step down.

12        Ms. Mitchell, before you leave, we need you to spell

13   your name, please.  You can just stand right there and

14   spell it if you would.  Your first name.  I'm sure we got

15   the Mitchell.  Spell your first name.

16             WITNESS S. MITCHELL:  S-H-E-L-E-T-H-A.

17             THE COURT:  Start again.  I'm sorry.

18             WITNESS S. MITCHELL:  S-H-E-L-E-T-H-A.

19             THE COURT:  Did you get that?

20             LAW CLERK:  Yes, sir.

21             THE COURT:  Thank you, Ms. Mitchell.

22        All right.  Mr. Brimberry, any further evidence on

23   behalf of Mr. Mitchell?

24             **DEFENDANT K. MITCHELL RESTS**

25             MR. BRIMBERRY:  No, sir, Your Honor.

**R. Darlene Pino**
**United States Court Reporter**
**(229) 343-7550**

1            THE COURT:  All right.  Can we go to closings

2     now?

3            MS. BOWEN:  Certainly, Your Honor.

4            THE COURT:  All right.  Ms. Bowen, you still

5     have the burden even though the presumption's in play.

6     Would you like to reserve?

7            MS. BOWEN:  I would.

8            THE COURT:  All right.  Then that brings us

9     back, Mr. Guzman, closing remarks of behalf of Sarah

10    Carter.

11           **DEFENDANT S. CARTER CLOSING ARGUMENT**

12           MR. GUZMAN:  Your Honor, I just want to start

13    off by saying that Ms. Sarah Carter, she is -- she is far

14    from being a mastermind in this particular case or really

15    any other particular -- any other case.  Ms. Carter is a

16    59 year old woman who has resided in Omega, Georgia, for

17    at least -- well, her entire life.  She was born there.

18    And she has resided at 1569 Georgia Avenue since at least

19    1974, so that's -- if my math is correct, that's about 40

20    years.

21        Now, one thing that I want to  mention also is to

22    start off is as far as the government's witness was Agent

23    Luke.  Went into a lot of opinion evidence, which, you

24    know, you -- you took and you listened to, and I think

25    it's one of these -- one of these times when if you were,

1    for example, to ask a carpenter how to solve a problem he

2    would probably say, well, use a hammer and some nails; and

3    if you ask a surgeon, he might say, well, let's use a

4    scalpel.  So I think what's happening here or at least

5    with some of the evidence is that you have an individual

6    who has been working in law -- in law -- well, at least

7    with the GBI, it appears, for about eight years, perhaps

8    in law enforcement for a little bit longer, and everything

9    looks like a drug deal, everything looks like a drug case,

10   everything.  I mean, from the sound that could be someone

11   baking a cake or stirring coffee to a circle exists to

12   packaging material when it could just be a food saver bag.

13       Of course, you hear the evidence, and I'm just

14   arguing weight of the evidence here, that's all it is,

15   it's already introduced.  Because one of the factors that

16   you have to take into account under 3142 is, of course,

17   strength -- strength or weakness of the case.

18       Let me find my 3142.  There are several -- of course,

19   several, what I call the G factors because there's in

20   3142G, and I know the Court is very much aware of them,

21   but it's the weight of the evidence against a person is

22   one of those factors.  And we've here for about -- well,

23   since 9:30.  I don't know how many hours it's been.

24   Pretty much almost on strength of the case is what it

25   looks like to me.  There is -- there was -- there was some

1    testimony regarding danger to the community, but I think

2    the majority is strength of the case.

3         Fortunately for my client that is not the only factor

4    that you have to look at.  There are several other

5    factors: the nature and circumstances of the offense,

6    history and characteristics of the person.  So I'm going

7    to talk about some of those other factors, and in context

8    of flight risk and danger to community.  Now, I understand

9    that the government is not moving for detention based on

10   flight risk as far as my client is concerned; however, I'd

11   just like to address those very briefly, just in case the

12   Court was considering that.

13        As far as flight risk, of course, we know she's 59

14   years old.  She's recently widowed, at least in the past

15   year.  She's a life time resident of Omega.  Actually was

16   born next door to her current residence is my

17   understanding from my investigation.  She has the five

18   siblings, five children, eight grandchildren.  She doesn't

19   have a passport.  You'll see that in the Pretrial Services

20   Report that she does not have a passport and has not

21   actually traveled outside of the country.  She is also

22   indigent, so even if she did have a passport, I don't

23   think that she would get very far.  And you also have that

24   she's been a caregiver for James Stokes, who is her uncle,

25   for about nine years.  He's 87 years old, and she's been a

1   caregiver for him for that period of time.

2          She also has three rental properties that she takes

3   care of, and she has plenty of family support.  I mean,

4   you have behind me her two individuals.  Of course,

5   Barbara Walker and Jimmy Walker, but Melissa Gammage is

6   also here, Joann Zorn, Toby Smith is here.  And you heard

7   from Barbara Walker who is -- or is retired and used to

8   work as a child abuse investigator and you also heard from

9   Jimmy  Walker who's a retired journeyman -- journeyman and

10  electrician.

11         I also gave you evidence or at least a proffer from

12  Robert Stokes, who does live in Omega, just happens to not

13  be there today.  But does live there, lives very close to

14  Ms. Carter.

15         Now, I want to get to danger to the community or

16  danger to others in the community.  And I think in the

17  last exchange that you had with Ms. Bowen I think it's

18  very telling that the essence of the danger to the

19  community that the government is arguing is that she's

20  dealing dope.  I don't think that it's because of firearms

21  because, well, the firearms are no longer there.  The

22  firearms have been, of course, taken into evidence.  So

23  that's the essence is that, oh, she's dealing dope so

24  she's a danger to the community.  Well, here's the thing,

25  every drug case -- and the government can say that about

1    every drug case.  You've got to have more than that.

2    Dealing dope.  Okay.  All right.

3         So then the government attempts to go into and got in

4    a little bit of evidence regarding this -- this murder

5    that occurred across the street involving someone who Ms.

6    Carter happens to know and who is a friend of the

7    family's.  And I think that's just, frankly, a desperate

8    attempt to show that Ms. Carter is a danger to the

9    community when there's no connection other than -- not

10   even a familial connection, it's a friend, who happened to

11   be living at one of her rental houses.  And, in fact, I

12   think the evidence was that other individuals committed

13   this particular -- that particular murder, and if the

14   government's argument is that, hey, whenever there is drug

15   trafficking, there are drug dealers, and then there's drug

16   crime, there's drug violence.  Again, you can say that

17   about any drug case that the government brings before you.

18   There's got to be more.

19           THE COURT:  Was there not a drug connection to

20   the murder victim from allegedly the Carter family

21   supplying him with drugs?

22           MR. GUZMAN:  Well, Your Honor, of course, that

23   would be --

24           THE COURT:  I'm not sure.  I'm asking.

25           MR. GUZMAN:  I -- I --

1           THE COURT:  Probably got it in there somewhere.

2           MR. GUZMAN:  I think that the -- I think the

3    government attempted to make that connection.  I thought

4    that I objected prior to that question being answered.

5           THE COURT:  He was distributing for Andrew

6    Carter, Tyler Johnson, was the testimony I thought.

7           MR. GUZMAN:  Okay.  Well, once -- once again,

8    not Sarah Carter, talking about another individual named

9    Andrew Carter.

10       So although there may be a tenuous connection between

11   individuals certainly, you know, if one of my neighbors

12   was murdered across the street I might have some sort of

13   connection with that individual, and I would hope that a

14   court wouldn't take that into consideration when it's --

15   you know, if I were arrested and were looking for a bond.

16   So I would say that that connection right there was very

17   tenuous, and the Court should give that particular

18   connection no weight whatsoever.

19       I want to show you what is actually happened.  I want

20   to show you -- give you some concrete evidence, and what I

21   mean by that is look at the Pretrial Services Report, look

22   at her criminal history.  Now, I know that Ms. Bowen did

23   bring up these misdemeanor marijuana possession charges.

24   And, by the way, she also has a driving while license

25   suspended back from 2000, which is 14 years ago, but we

1    have some apparent -- some arrests from, let's see, 18

2    years ago, one arrest, and we don't know what the

3    disposition is of course.  It's a misdemeanor marijuana

4    possession.  And a 1997 arrest for misdemeanor marijuana

5    which we don't know the disposition of.  And then a 1998

6    misdemeanor marijuana which looks like was nol prossed.

7        You know, like I said, Judge, I  mean so really the

8    only significant -- not even significant, the only

9    criminal history that you have to look at as far as Ms.

10   Carter is concerned is a driving while license suspended

11   back from the year 2000, which is 14 years ago.  She has

12   nothing recent.  Nothing of any significance in any of her

13   criminal history, so that's actually -- that's something

14   that's tangible, that's something that you can look at and

15   say, hey, this is history and character -- characteristics

16   of the defendant or this is part of her history and

17   characteristics.  Of course, she has no criminal history.

18       So although the government has put up some evidence

19   regarding strength of their case and without saying that

20   it's strong or weak, one way or the other, there are these

21   other factors, and this is one of those other things that

22   you can take a look at.

23       The other thing is I think you can look to ties to

24   the community itself also to show that there is no danger

25   to the community.  Just the fact that she has so -- so

1    much -- or so many family members, so many friends who

2    live there.  You heard evidence from Barbara Walker and

3    Jimmy Walker saying she would not be a danger to the

4    community, she wouldn't be a danger to anyone in the

5    community.

6        And there's some -- I know there's some mention about

7    guns, and we've talked about these guns, and there were

8    four guns found in the house.  The reason I was asking

9    about the rifle itself, the Marlin, which is the only

10   firearm that was found in Ms. Carter's room, is because I

11   -- besides the fact that just about anyone who's bought a

12   gun has probably bought a Marlin .22 caliber, tubular

13   magazine.  We don't know what kind of Marlin rifle it was,

14   but it could have been a .22, it could have been a .30-30

15   lever action.  I don't know, we don't know, and the thing

16   is I don't know who actually put it there.  The only

17   evidence that you have before you is Barbara Walker's

18   evidence that she saw something that appeared to be a

19   rifle or a shotgun that was long placed under the bed by

20   Ms. Carter's deceased husband.  That's the evidence that

21   you heard today.  That's the only evidence, as far as why

22   that gun might actually be there.  There are three other

23   firearms that were found in someone else's bedroom that --

24   one of which sounds like could have been the .40 caliber,

25   which could have been Ms. Carter's husband's firearm.

1        So that's the only reason I wanted to introduce that

2   evidence, so you can look and see that perhaps this is a

3   -- this is a situation where she isn't out arming herself

4   in order to defend herself because she's a drug dealer or

5   something to that effect.  This is simply a matter of a

6   woman who had a husband who had firearms.  He died about a

7   year ago, a little bit more than a year ago, and he left

8   those firearms.  You even heard evidence that he would

9   hide them, so there might be firearms hidden around in the

10  house that she's not even aware of.

11       THE COURT:  All right.  Mr. Guzman, let me -- I

12  don't always do this, but -- and I hate to take you off

13  your game and you can get back to it.

14       MR. GUZMAN:  Yes, sir.

15       THE COURT:  But let me tell you what I'm

16  wrestling with.

17       MR. GUZMAN:  All right.

18       THE COURT:  And that might help you focus.

19  Right or wrong is what I'm focusing on.

20       MR. GUZMAN:  Yes, sir.

21       THE COURT:  All right.  So we've had testimony

22  that this is the family home.  I know your client has

23  lived there for 40 years.  She is 59 years old and looking

24  after her uncle.  I don't have any testimony about how she

25  supports herself, where money's coming from.  I do have

1    testimony there were four firearms found, drug residue,

2    and actually 2 grams in her bedroom, which I would grant

3    you is not a -- I think Agent Luke would agree, is not a

4    distributor quality, it's more of a user quality.  The

5    investigating agent has described her as a street level

6    distributor.  We've got a lot of traffic coming in and

7    out, we've got these phone calls.

8        As you stated, I get the same argument from the

9    government in these drug cases almost all the time.  You

10   can't stop it, Judge, by giving bond.  Here I not only

11   have the drug problem, I've got firearm problem too.  So

12   I've got guns and drugs.  Not only that, but I've got them

13   in this house where your client has lived for 40 years and

14   apparently is the matriarch.  And I understand the guns

15   are distributed in the house.  Am I to believe that she

16   didn't know about the Masterpiece 9 mm pistol and the

17   Ruger 9 mm pistol?  Where did they come from?  There's an

18   explanation.  Granted maybe the deceased husband left the

19   Marlin rifle and the .40 caliber pistol, but what about

20   these other two?  And guns and drugs and apparently being

21   sold out of this house.  I know you know the government,

22   what they're going to argue is, Judge, if you give her

23   bond the same thing is going to be happening next week out

24   of this house, that's where they're selling the drugs.  So

25   help me there.  What am I missing?

```
 1          MR. GUZMAN:  Well, Judge, I think maybe we can

 2    go to -- how that can be addressed would be with the types

 3    of conditions perhaps that you would place if she were

 4    released.  I don't know if that would answer your

 5    question, but as far as I don't -- I don't know where the

 6    other two firearms came from.  I have -- if I'd had

 7    evidence to show you, Judge, I certainly would have given

 8    it to you.  Now, I want you to know, you mentioned that

 9    you didn't have testimony about income.  She does have

10    some rental income, and I think that's in the Pretrial

11    Services Report, but I think I mentioned it in my proffer.

12          THE COURT:  You're right.  There is.  There is

13    that.

14          MR. GUZMAN:  But as far as your -- your concern

15    regarding the guns and the drugs, so I don't know where

16    the other two firearms came from.  The only thing I can

17    tell you is that Mr. Carter did have firearms and it

18    appears that he did hide firearms.  That's the best

19    evidence that I can give you today.

20        As far as what -- what can you do in order to prevent

21    this from happening again or continuing, what I would

22    suggest are conditions specifically tailored to Ms.

23    Carter.  What would those conditions be?  The probation

24    officer can certainly go and visit her at the house.  You

25    can have -- you can even have monitoring, some sort of
```

1    electronic monitoring, which I know that the Courts don't

2    use that often here.  I've heard that it's used quite

3    often in other Districts, but it's just not -- not here.

4    That's certainly a condition that you can consider.  Drug

5    testing.  And I did -- I did mention this Robert Stokes

6    who would be willing to act as not only an individual who

7    will bring Ms. Carter to court, but who could certainly

8    make sure that she reports to probation and could report

9    to the Court and he would be willing to do that.  So I

10   believe that he would be willing to do that, Your Honor.

11       So that's -- among other conditions that I'm probably

12   missing, that's the only thing that I can think of for you

13   to address this particular issue.  I just -- perhaps I'm

14   not being as imaginative as I could be regarding the

15   conditions.  But I know that there are conditions that you

16   can place on her, perhaps even that she -- you know, she

17   reports -- I don't know -- does the probation office here

18   in Albany, like, is this the closest, would this be the

19   closest probation office or would it be in Valdosta?

20       THE COURT:  It would be one or the other.  But

21   the dilemma that we're both talking about is one that I --

22   I face often, and I just throw it out there because the

23   government always argues that, Judge, you can't stop her

24   selling drugs from her house.  And even if we drug test a

25   defendant, a lot of -- as you know, a lot of the

1    distributors aren't users themselves anyway, so a drug

2    test is not necessarily going to find drugs in the house.

3          MR. GUZMAN:  Right.  And I think -- I think one

4    other -- one other thing that you can consider is, of

5    course, I'm certain that if Ms. Carter were released, I'm

6    sure that local law enforcement would probably pay a

7    little bit closer attention to that particular house.  And

8    you and I both know having recently worked on a revocation

9    case that a revocation could be effected rather -- rather

10   quickly.  And Ms. Carter just isn't going anywhere.

11      So I think with reporting, with monitoring or -- not

12   necessarily electronic monitoring but monitoring by the

13   probation office, and then monitoring by the local police

14   because if she were released, like I said, I'm pretty sure

15   that they would pay attention to her house very closely,

16   and I think that would be the best -- the best combination

17   of conditions to address the issues that you bring up or

18   that you raise.  That's the only thing I can think of

19   anyway.

20          THE COURT:  All right, Mr. Guzman.  Thank you,

21   sir.

22          MR. GUZMAN:  Thank you.

23          THE COURT:  Mr. Brimberry.

24      And of course this -- for the record, this argument

25   is behalf -- on behalf of Kenya Mitchell.

1              **DEFENDANT K. MITCHELL CLOSING ARGUMENT**

2              MR. BRIMBERRY:  Yes, sir, Your Honor.  May it

3     please the Court.  To begin with I do think there are some

4     conditions that could be placed on a bond on the defendant

5     that would reasonably assure his attendance to court and

6     also the safety of the community.  His mother testified

7     briefly.  The thrust of her testimony is that he is not a

8     danger to the community.  There is no guns in his

9     possession that she's ever seen.  She testified he doesn't

10    own a gun.  They live across the street.  Now, I take it

11    that's in close proximity.  She sees him every day.  The

12    Pretrial Services Report indicates he's a lifelong

13    resident of Tift County.

14             We all heard the evidence, but what I think is really

15    telling is, you know, the evidence, it really does not

16    lend itself to a matter of opinion as to whether or not

17    something happened.  What I'm getting to is this, Mr.

18    Mitchell is minding his own business, and obviously -- I

19    think it goes without saying, he wasn't given advance

20    notification that a search warrant was going to be

21    executed on him or his residence.  No guns were ever found

22    that -- I think the testimony was one gun was found one

23    time, but don't you know that if Agent Luke remotely

24    thought that it had some association with Mr. Mitchell,

25    don't you know that Agent Luke would have charged him,

1    would have charged Mr. Mitchell with possession of that

2    firearm by a convicted felon.

3        You look on his -- his criminal history.  There's a

4    lot of -- you know, there was one what I consider to be a,

5    you know, pardon my language, but a damning felony, that's

6    the possession of cocaine, it's not trafficking.  That's

7    some time ago.  There has not been -- if you look on

8    there, you will not see any probation revocation hearings.

9    You know, the ones to me that would cause concern for the

10   Court would be the ones who get out on probation and then

11   the next thing you know about every six or eight months

12   they're being dragged back into the court for a probation

13   revocation hearing.  There is not a single probation

14   revocation on this history.  Nor, which I think is

15   telling, is there a single failure to appear.  So we know

16   -- and the testimony is that he will be -- he will come to

17   court and he's not a danger to the community.

18       In these snapshot moments, slices of time, which the

19   government were able to capture when they executed these

20   search warrants, these slices of time never captured a

21   person who is a danger to the community.  They didn't have

22   to chase him down.

23       And when you go to the weight of the evidence, Your

24   Honor, you know, we're here for activities that began,

25   supposedly, on January 1st, 2013.  You know, we -- for

1    whatever reason a video was introduced that was taken not

2    quite a year earlier.  But we're here on the evidence that

3    was presented to the Court dealing with January 1st, 2013,

4    up through I think October 2014.  And when you isolate it

5    and look at the weight of that evidence, I think it's

6    sufficient -- I don't think it's sufficient for the Court

7    to say there are no conditions that I can impose to

8    reasonably ensure that Mr. Mitchell will come to court and

9    will not be a danger to the community.  I think he

10   qualifies for a bond.  There's plenty of conditions you

11   can place on him.  And I'd ask Your Honor to please set a

12   bond for Mr. Mitchell.  Thank you.

13           THE COURT:  Thank you, Mr. Brimberry.

14       And Ms. Bowen.

15                **GOVERNMENT'S CLOSING ARGUMENT**

16       MS. BOWEN:  Thank you, Your Honor, for your time

17   and attention.  I can tell from your questions and

18   comments that you have been paying attention.  I know that

19   we have been in here for a long time, and it's not my

20   intention to be contentious for contentiousness sake.

21       I believe during the dialogue between Your Honor and

22   Mr. Guzman there was a reference to arguments that are

23   frequently made by the government.  I, in this case and in

24   all my cases, I look at the merits of each defendant, and

25   you will find as you will be presiding over a few more

1    detention hearings in this case that I have looked at

2    Sarah Carter and I have looked at Kenyatta Mitchell.  I've

3    looked both at their history and I have looked at their

4    role in the instant case before Your Honor.  And it is my

5    position that in connection with a rebuttable presumption

6    that each of these individuals is a danger to our

7    community.

8         Now, I'm not arguing that they are a flight risk.  In

9    fact, I think their rootedness in our community, their

10   persistence in our community, makes them all that more

11   dangerous.  That you have a woman who has resided in a

12   home since, I think, 1974, and out of that home she is

13   running a den of distribution.  I believe Mr. Walker, if

14   you credit his testimony, even though he has been to her

15   home less than ten times in three years and not spent the

16   night there, that people in the family look to her to take

17   care of business.  And, Your Honor, I put to you that the

18   limited number of calls that I introduced to you,

19   Government's Exhibit 1 where she's calling Andrew and

20   asking about Joe, where's Joe, and that Joe's on a plane.

21   You heard Agent Luke testify that during the context of

22   that call it was a time in the investigation when Joe,

23   referring to Jose Martinez, was out in Texas attempting to

24   cultivate a new source of cocaine so that they could have

25   multikilogram quantities of cocaine flowing in to Tifton

1   and its surrounding areas for the Carter/Martinez

2   organization.  So Ms. Carter was in the know and she was

3   participating actively in this conspiracy at that high

4   level.

5        You also see that daily foot traffic.  Now, that may

6   seem innocuous, a 20 rock, a 20 rock there, but when you

7   have the level and the pattern of activity that Agent Luke

8   testified to, that even just the snapshot in time of

9   January 1st, 2013, through October 28th, 2014, that we've

10   captured for Your Honor that you have a daily frequency of

11   numerous individuals coming to her house to acquire crack

12   cocaine.  That's a danger to our community.  In fact,

13   Agent Luke testified to a September 20th, 2014, call, but

14   I believe Your Honor will recall it where Kayla was taking

15   out a 21 gram straight drop piece, cut up into 20s for

16   mom.  So not only was she involved in the higher level

17   operation of this conspiracy, drug trafficking

18   organization, but she was running the den of distribution

19   at 1569.

20        Even more concerning to the government is the

21   intersection between guns and drugs.  Now, I guess both by

22   themselves, guns -- well, not both.  I mean, drugs are --

23   these drugs are illegal.  Guns can be innocuous, but here

24   the connection between the dangerousness I think is

25   highlighted by the fact that at least one of these guns is

1   stolen.  And we heard Agent Luke testify that individuals

2   who use smaller amounts, 20s of crack, will sometimes

3   trade stolen items such as the TVs that were found at her

4   residence when they arrested her on December 12th, 2014,

5   for crack.  But you have these items, these guns, the one

6   in her bedroom five feet away from the crack on her night

7   stand that she claimed.  You have the other two in an

8   unlocked safe and you have the other one in a child's

9   bedroom.  A three-year-old child is living in this house.

10       Now, it's not just that a three-year-old child is

11   living in this house with two other women who are not

12   involved in this conspiracy.  What you have is three adult

13   women who are actively participating in a conspiracy to

14   distribute and acquire and manufacture large quantities of

15   illegal substances in this community.  And I think it's

16   even more underscored when you look at the murder that

17   occurred this year of Tyler Johnson.

18       Now, I think the argument of defense counsel for Ms.

19   Carter is that this is to be disregarded.  However, Your

20   Honor, it puts an exclamation point on what happens when

21   guns and drugs mix.  So as Agent Luke testified, this was

22   a rental house that was owned and that is owned I believe

23   still by Ms. Sarah Carter.  Is catty-corner close.  This

24   is a close neighborhood.  It's not one of those

25   neighborhoods where, you know, the next house is like

1    yards and yards that way.  This is a small community where

2    people know what's going on in that community.  It's a

3    catty-corner house.  And, in fact, Tyler Johnson is a

4    close personal friend of the family.  He's listed so in

5    the funeral program for Andrew Carter, Sr.  He's one of

6    two people Agent Luke testified that was listed so, and he

7    is supplying, dealing cocaine, crack cocaine that is being

8    supplied to him by Andrew Carter and the Carter drug

9    trafficking organization of which Ms. Carter is a

10   participating member.

11        And then you have the circumstances of his death.  It

12   wasn't that he died in a car crash.  He died in a

13   drug-related incident.  So some people wanted his dope, he

14   didn't want to sell to them.  What did they do?  They come

15   back with guns, they shoot him through the door, and he's

16   dead.  That highlights in bold caps the danger to our

17   community.

18        Now, defense counsel describes her as a woman who has

19   become widowed and he had some guns.  To accept that

20   assertion is to ignore all of the evidence that has been

21   admitted here today before Your Honor, which you have

22   taken notes on it, which you have listened to.  It ignores

23   the calls.  It ignores the crack that she claimed that was

24   found in her house.  It ignores her statement to Agent

25   Luke that she has never driven her son anywhere when, in

1    fact, the calls, Government's Exhibit 4 and 5 and 6 and
2    the pole cam surveillance from that day indicate that she,
3    in fact, did do so.  And it ignores, as we've been talking
4    about, the guns that were found in her house.
5        So the guns show that she is, as Your Honor said, a
6    matriarch in this drug trafficking organization, and it is
7    her conduct which earns her detention because there are no
8    conditions that can satisfy and moot her danger to this
9    community because, in fact, if you were to do as Mr.
10   Guzman suggested and put on an EM or a leg monitor at her
11   house and, you know, ask the local law enforcement to
12   drive by a couple more times, she's dealing out of her
13   house, Your Honor.  She's got guns and drugs at her house.
14   So I think we're just making it easier for her to do
15   exactly what she was doing.  We're localizing her to the
16   scene of the danger to the community.
17       So she's not a flight risk, but she is a danger to
18   our community, and for that reason you should deny bond as
19   to Ms. Sarah Carter.
20       Now, I'd like to switch gears and talk about Mr.
21   Kenya Mitchell.  Now, the testimony of his mother I will
22   not reiterate my position.  I think Your Honor is clear on
23   my position or the government's position regarding the
24   weight of that evidence.  I think you can look at his
25   criminal history and see that he has a lengthy involvement

1    with controlled substances.  Even beyond that, you heard

2    extensively, we went over it laboriously the search

3    warrants that were executed in 2012 on his two residences.

4    Actually I believe there were three residences in which

5    there was a search warrant executed.  And again in 2014.

6    And he was in possession of drugs and drug paraphernalia.

7         Now, this gun that defense counsel for Mr. Mitchell

8    mentioned, I didn't ask him about it because, as Agent

9    Luke testified, someone else claimed it.  So the

10   government is not attempting to attenuate or stretch the

11   evidence.  What the evidence is, is that Mr. Kenyatta

12   Mitchell -- excuse me -- Mr.  Kenya Mitchell was

13   manufacturing and distributing drugs in 2012, in 2013, and

14   in 2014.  In fact, Your Honor saw on Government Exhibit 7

15   him doing so.  It's a great video of this defendant taking

16   the powder cocaine and making it into a perfect circle of

17   crack cocaine.

18        And his -- Well, before I talk about his conduct in

19   this, I think the quantity -- I think Mr. Brimberry on

20   cross asked him, well, how much are we talking about here.

21   I would refer Your Honor to Agent Luke's testimony in

22   regards to Lamar Patterson that prior to his arrest he had

23   been providing him for a certain period of time 1/2 a kilo

24   50 times, and that worked out to 25 kilos.  So in that

25   year alone, 25 kilos in addition to Andrew Carter's

1    statement that he had been providing him with 1/2 a kilo,

2    we're talking about a large quantity of cocaine that Mr.

3    Mitchell was acquiring from the Carter DTO and then

4    supplying to other customers here in our community.

5         So for all those reasons I also think that Mr.

6    Mitchell is a risk to this community because of his past

7    conduct, because of his history relating to drug or

8    alcohol abuse, because of his criminal history, and the

9    nature and seriousness of the danger to the people in this

10   community as I think I have probably labored over enough,

11   so I believe Your Honor is clear on my position, and with

12   that, I will sit down.

13        THE COURT:  All right.  Thank you, Ms. Bowen.

14        And the Court thanks counsel and witnesses.  We have

15   been here a long time.  I feel like we've tried the case.

16   Of course, we haven't and that's not our purpose today.

17        But I would like some time.  I've heard so much, I

18   want to go through these exhibits and put it all together.

19   So let's see.  It's about 5 until 4.  I imagine it will

20   take me 30 minutes to go through everything and make a

21   decision.  So why don't we recess until 4:25.

22        (Recess)

23        (Defendants present)

24        THE COURT:  All right.  It's been a long day.

25   But the Court has considered everything presented to it

1    and weighed the evidence and the law and the arguments.

2        Let me first explain legally what statute we're

3    traveling under.  It's called the Bail Reform Act.  And

4    under that law passed by Congress, if the government

5    charges someone with what's called a ten-plus year drug

6    offense -- In other words, it's a drug offense and the

7    sentence could be ten years or more.  -- then in these

8    detention hearings, the government enjoys what's known as

9    a rebuttable presumption.  So before we even had any

10   evidence today, there was a presumption in play that there

11   were no conditions the Court could set to reasonable

12   assure the safety of the community and each defendants'

13   reappearance in court.  Now, that presumption can be

14   overcome, and today I find that it's been overcome.

15       Now, first of all, the government did not pursue the

16   argument that either defendant was a flight risk, so

17   that's out of the equation.  So what we're focusing on is

18   whether the Court can set conditions to reasonably assure

19   the safety of the community.

20       I believe each defendant, through testimony of

21   witnesses, overcame that presumption because it only takes

22   some evidence to overcome the presumption and to then push

23   the  Court into considering certain factors enumerated in

24   the statute.  I would note with Ms. Carter I thought the

25   presumption was clearly overcome as to dangerousness.  As

1   to Mr. Mitchell, I was a little more concerned.  I thought

2   it was a closer call as to whether the presumption had

3   been overcome.  There was testimony from the mother that

4   she had not seen Mr. Mitchell with any weapons and that he

5   would return.  She did not opine as to whether he was a

6   danger to the community, but in the past and consistent

7   with its history, this Court has said, well, any evidence

8   on that will overcome the presumption.  And then we kick

9   it into the factors.

10      Now, there are four factors that Congress says this

11  Court has to consider when weighing someone's release.

12  And let me be quick to point out even though we have heard

13  a lot of evidence on this case today, this Court is making

14  no determination as to anyone's guilt or innocence of the

15  charges.  That's not the purpose of this proceeding.  This

16  proceeding is simply to determine whether the Court can

17  release someone with conditions set so they're not a

18  danger to the community.  So let's talk about the factors

19  as to each defendant.

20      The first one is the nature and circumstances of the

21  offense to include whether the offense involves a

22  controlled substance, a firearm.  Well, as to Ms. Carter,

23  it involves both of those, controlled substances and

24  firearms, what she's charged with.  As to Mr. Mitchell,

25  it's the controlled substance.  The firearm is more

1    tangential.  There's some evidence of that, but he's not

2    charged with a firearm offense.  The first factor is in

3    favor of the government because of the controlled

4    substance.

5        The second factor is the weight of the evidence.

6    Now, 90 percent of what we've heard since 9:30 this

7    morning has -- has been about the weight of the evidence.

8    Though as counsel probably knows, the case law tells the

9    Court that it is to put the least amount of weight on that

10   factor compared to the other factors when it makes a

11   determination.  So it's a little ironical in each of these

12   hearings the Court always hears a lot of evidence, but

13   really it's the other factors that are more important.

14       Be that as it may, the weight of the evidence I think

15   was summed up by Agent Luke toward the end when the

16   government asked him where he thought Sarah Carter and

17   Kenya Mitchell fit in, and he testified that Sarah Carter

18   he thought was a street level distributor and that Kenya

19   Mitchell obtained larger amounts of cocaine.  That

20   evidence is basically unrefutted.  For purposes of this

21   hearing, the weight of the evidence is in favor of the

22   government.

23       That brings us to the third factor, the history and

24   characteristics of the person.  As to Mr. Mitchell, this

25   is where the Court looks at criminal history, employment,

1    et cetera.  Mr. Mitchell is not employed.  He has a prior

2    felony conviction, resulted in a 15 year sentence in a

3    state court but he did not serve.  It was a cocaine

4    possession I believe from July 2006.  Ms. Carter's

5    criminal history is more benign.  There's some marijuana

6    possessions, but nothing that concerned the Court too

7    much.  Mr. Mitchell's criminal history also included an

8    obstruction of an officer and some battery claims if I

9    remember right.

10         Ms. Carter's counsel argued that this factor would go

11   in her favor as to the family.  I spent a lot of time

12   thinking about that, whether -- which way that played.

13   That is, the fact that she's been in this house for 40

14   years and has family members that she's interacting with

15   on a regular basis, and I frankly think it kind of cuts

16   both ways.  That is, in a way that is enabling, the

17   government would allege, this drug distribution

18   conspiracy.  I think it -- the family ties, the Court has

19   no concern about flight risk, but I'm not sure that factor

20   helps her much.  And because of his criminal history, that

21   factor is against Mr. Mitchell.  It may be neutral as to

22   Ms. Carter.

23         The fourth factor is the nature and seriousness of

24   the danger to the community that would be posed by the

25   person's release.  Most of these detention hearings come

1   down to this factor, that is, if the Court releases

2   someone, and, of course, I've wrestled with it as counsel

3   could tell with my questions, are there conditions the

4   Court can set.  Well, the problem is that courts have

5   routinely said that drug distribution is a danger to the

6   community.  Take the guns out of the equation, just the

7   fact that someone is selling drugs, that's a danger to the

8   community.  And no matter what conditions I set on either

9   defendant, it would be very difficult, if not impossible,

10  to prevent anyone from selling drugs.

11       There is a fifth factor that is not enumerated in

12  3142(g), but it comes into play whenever the rebuttal

13  presumption exists, as it does in this case, and that is

14  the Court is told that it is to consider, even if the

15  rebuttal presumption has been overcome, it's a fifth

16  factor, and the Court is to consider that in weighing the

17  other factors.

18       So if those five factors, they are all in favor of

19  the government and detention with the possible exception

20  of the family of Ms. Carter.  That's my analysis of the

21  law.

22       Factually what jumps out at me is for counsel's

23  benefit, and we've sat here all day, in regard to Mr.

24  Mitchell, the prior drug felony; the prior criminal

25  history; the fact a gun, even though Agent Luke said he

1   did not link that gun to Mr. Mitchell, he did link the

2   trap house to Mr. Mitchell, and if there's a gun found in

3   the trap house, that gives the Court concern.  Of course,

4   there's another gun referenced in the phone conversation

5   from the jail between Ms. Carter and one of her sons I

6   believe where someone says, well, you can get a gun from

7   Mr. Mitchell.  There's also Agent Luke's testimony that

8   Mr. Patterson, a prior criminal defendant, has stated that

9   he was selling 25 kilos in the space of a year to Mr.

10  Mitchell.  That's a -- that's a very large amount of

11  cocaine.  Those were the key facts to me regarding Mr.

12  Mitchell.

13       As to Ms. Carter, you can tell by my questions the

14  Court was concerned about the two guns that could not be

15  explained.  Any time there's drugs and guns, the Court is

16  concerned.  It would be one thing I think with two guns.

17  I got an explanation that maybe they were left over from

18  the -- the --her deceased husband, but that still left two

19  guns that couldn't be explained, and it's still a little

20  hard for the Court to imagine for two and half years,

21  because her husband actually died in June of 2012, two and

22  a half years that guns stayed in the house without her

23  being aware of it.  There was also 2 grams of cocaine

24  found on her dresser in her bedroom.  There was testimony

25  that she was a distributor through phone calls and

1    surveillance, the steady traffic into her home on a daily

2    basis, the one conversation intercepted where she said she

3    needed something to make the circle.  It just doesn't have

4    any other relevance to the Court other than in a drug

5    framework as Agent Luke has testified to.  So those were

6    the key facts.

7         And the long and short of it is, the Court believes

8    that it is required to detain each of the defendants under

9    the Bail Reform Act.

10        Ms. Bowen, is there anything further from the

11   government today?

12            MS. BOWEN:  No, Your Honor.  Thank you.

13            THE COURT:  Mr. Guzman, anything further on

14   behalf of Ms. Carter today?

15            MR. GUZMAN:  No, Your Honor.

16            THE COURT:  Mr. Brimberry, on behalf of Mr.

17   Mitchell?

18            MR. BRIMBERRY:  No, sir, Your Honor.  Not at

19   this moment.

20            THE COURT:  All right.  Good luck to you, Mr.

21   Mitchell and you, Ms. Carter.

22        Mr. Lawrence, these are two detention orders.  Each

23   defendant will remain in the custody of the Marshal.

24   We're adjourned.

25        (Court adjourned)

**R. Darlene Pino**
**United States Court Reporter**
**(229) 343-7550**

1                          **<u>CERTIFICATE</u>**

2
        I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE
3     TRANSCRIPT OF THE PROCEEDINGS.

4


5
        /s/_____
6     R. DARLENE PINO                      JANUARY 7, 2015
      UNITED STATES COURT REPORTER
7     CB King Federal Courthouse
      201 West Broad Avenue
8     Albany, Georgia 31701

9     Phone:(229)343-7550

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25