1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF GEORGIA

3                 VALDOSTA DIVISION

4             _____

5  THE UNITED STATES OF AMERICA      )
                                     ) Case No. 7:14-CR-48-010
6       vs.                          ) Valdosta, Georgia
                                     )
7  SARAH CARTER, DEFENDANT           )
   _____)

8

9

10          MOTION TO RESCIND PLEA AGREEMENT
                          and
11                    SENTENCING

12

13

14          BEFORE THE HONORABLE HUGH LAWSON
        UNITED STATES DISTRICT JUDGE, PRESIDING
15

16                  April 13, 2016

17

18

19

20

21

22  _____

23            *DARLENE D. FULLER, USCR*
              POST OFFICE BOX 1873
24            MACON, GA  31202-1873
              (478) 752-3497
25

```
1    APPEARANCES:

2
     FOR THE GOVERNMENT:          JULIA BOWEN, AUSA
3                                 UNITED STATES ATTORNEY'S OFFICE
                                  Post Office Box 1702
4                                 Macon, GA  31202-1702

5

6
     FOR THE DEFENDANT:           KIMBERLY L. COPELAND
7                                 256 North Brunswick Street
                                  Jesup, GA  31546
8                                 (912) 530-7316

9

10   ALSO PRESENT:                JAMES L. HARDIN
                                  215-A Albany Avenue
11                                Waycross, GA  31501
                                  (912) 230-2363
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        WITNESS INDEX

2                                                      PAGE

3    **JAMES L. HARDIN**

4    Direct Examination By Ms. Copeland: ..............10

5    Cross Examination By Ms. Bowen: .................33

6    Redirect Examination By Ms. Copeland: ...........37

7

8

9            EXHIBITS IDENTIFIED DURING PROCEEDINGS:

10

11   NUMBER           DESCRIPTION                    PAGE

12   DX-1             Plea Agreement                 14

13   DX-2             Phone log                      18

14

15

16

17

18

19

20

21

22

23

24

25

1   Valdosta, Georgia

2   Wednesday, April 13, 2016

3   9:31 a.m.

4                   P R O C E E D I N G S

5          THE COURT:  Be seated, please.  Let us return now to

6   the case of Sarah Carter.  Ms. Bowen?  Ms. Copeland?

7          The latest flap in this case is a motion to rescind

8   the plea agreement.  Has the government had an opportunity to

9   receive and consider that motion?

10          MS. BOWEN:  Yes, sir, I have.

11          THE COURT:  Does the government contest the motion?

12          MS. BOWEN:  I do, Your Honor.

13          THE COURT:  All right.  Shall we proceed with a

14   hearing?

15          MS. BOWEN:  Yes, Your Honor, I believe the burden is

16   on the defendant.

17          THE COURT:  Yes.

18          MS. COPELAND:  That's correct, your Honor.  Thank

19   you, Your Honor.

20          THE COURT:  Ms. Copeland?

21          MS. COPELAND:  Thank you, Your Honor.  I'll call

22   Mr. Hardin to the stand for cross examination.

23          THE COURT:  Well, before Mr. Hardin comes, I want you

24   to give me --

25          Come on up, Mr. Hardin.

1              -- but I want you to give me a brief synopsis of what

2    you'd expect to prove and what you'd expect to show in support

3    of your motion.

4              MS. COPELAND:  Okay.  Thank you, Your Honor.  Okay.

5    What I intend for this motion to show -- this is an argument to

6    rescind the plea agreement which also rescinds the stipulation

7    as well.  That Mrs. Carter received ineffective assistance of

8    counsel is one basis, as it is also written in the withdrawal

9    of the guilty plea.  But with the motion to rescind agreement,

10   we're not actually seeking to withdraw the agreement.  And that

11   there was not a meeting of the minds that a plea agreement in

12   itself is trumped on the basis of contract law.

13             THE COURT:  Stop right there, you said you are not --

14   you are not seeking to --

15             MS. COPELAND:  Withdraw her guilty plea.

16             THE COURT:  The guilty plea?

17             MS. COPELAND:  Yes.

18             THE COURT:  You simply want to withdraw the plea

19   agreement?

20             MS. COPELAND:  That is correct.

21             THE COURT:  And what is your ultimate objective?

22             MS. COPELAND:  My ultimate objective -- you talking

23   about in the whole scheme --

24             THE COURT:  In the context of the -- you said you

25   don't want to withdraw the guilty plea.

1            MS. COPELAND:  That is correct.

2            THE COURT:  Because, I gather, the guilty plea was

3    freely and voluntarily entered.

4            MS. COPELAND:  No, it -- it was not.

5            THE COURT:  You are prepared to go forward with a

6    guilty plea that was not freely and voluntarily entered?

7            MS. COPELAND:  Well, Your Honor, the guilty plea is

8    not freely and voluntarily entered, mainly because there was

9    ineffective assistance of counsel.  And the basis of that

10   ineffective assistance of counsel has stemmed from that

11   agreement.

12           And the agreement in itself was never a meeting of

13   the mind.  When you read all components of that agreement from

14   line for line, as Mr. Hardin state for this Court, from line to

15   line, there is a lot of inconsistencies in this agreement.

16           And if we govern it by contract -- and the supreme

17   court have already asserted that a plea agreement is an

18   agreement between the government and the defendant, and those

19   plea agreements are governed by contract law.  And in saying

20   that, there was never a meeting of the minds in this agreement.

21           And as we stated in the February -- I think the

22   February 23rd hearing, Mrs. Carter had only seen this agreement

23   briefly on October 1st.  The Court addressed that issue and

24   questioned Mr. Hardin, and you asked him specifically:

25           "When was the first time you present this

1       agreement to her?"

2       And he said, "Prior to the hearing."

3       You said, "Prior to the hearing when?"

4       He say, "October 1st."

5       You asked him, "Where?"

6       "In the marshal's office."

7    That was the colloquy that you asked him concerning that plea

8    agreement.

9       He also went on to say in that instance that he spoke

10   with her briefly, because he got the agreement one or two days

11   prior to them due to be in court October 1st.  But last month

12   he state to this Court that he went over this plea agreement

13   word -- line for line over the phone.  Which is different from

14   what -- actually different from what he said to y'all on the

15   23rd.

16       The government summed up the whole thing on the 23rd

17   when she said the crux of the matter is this here.  Mrs. Carter

18   thought she was getting this and wasn't getting that.  However,

19   the problem is not that.  It's not about what the sentencing

20   is.  It's all about the fact that there was never a meeting of

21   the mind in order for her to enter the agreement.

22       Ms. Carter, when I'm talking about ineffective

23   assistance of counsel, have never had a close relationship --

24   and when I say "close relationship," I'm talking about a

25   meaningful conversation -- with Mr. Hardin concerning this

1   agreement; the backwards and forth to tell her what does the
2   stipulation mean.
3           Mrs. -- the government pointed out pointedly that
4   Mr. Hardin did a great job because he got rid of all those
5   other charges, all the other counts in the document.  But what
6   the government failed to tell you, he stipulate to the very
7   charges that he actually got rid of.
8           THE COURT:  Let me ask you -- listen, let me ask you
9   one question.  As I read your motion, you seem to be asking the
10  Court to rescind the plea agreement.
11          MS. COPELAND:  That's right.
12          THE COURT:  To leave the guilty plea intact.
13          MS. COPELAND:  That's a --
14          THE COURT:  Wait a -- just listen to me.
15          MS. COPELAND:  Okay.  Thank you, Your Honor.
16          THE COURT:  Leave the -- leave the guilty plea
17  intact, but that you want the government to be bound to agree
18  to a 5-year sentence for your client.
19          MS. COPELAND:  May I?
20          THE COURT:  In other words, you're asking the Court
21  to rescind the agreement insofar as your client is concerned,
22  but you want the government to be otherwise bound by the
23  agreement.  Am I mistaken about that?
24          MS. COPELAND:  No, Your Honor.  And let me --
25          THE COURT:  That is what you want?

```
 1              MS. COPELAND:  Your Honor, let me explain.

 2              THE COURT:  Well, just answer my question.  Is that

 3    what you want?

 4              MS. COPELAND:  Ultimately, I would like them to

 5    perform -- specifically perform in a reformation.  You are

 6    absolutely right.  What happened is this here.  You never ruled

 7    on the first motion that we filed, which was the motion to

 8    withdraw the guilty plea.

 9              THE COURT:  I understand that.

10              MS. COPELAND:  And in the alternative, since that

11    wasn't going down the right path, I filed a motion to rescind

12    the plea agreement.  In order to try to rectify some of this

13    miscarriage of justice that's been done to Ms. Carter, which is

14    no making of her own.

15              And if you ask me would I like for you to reform the

16    contract, do a reformation?  Yes.  The government made this

17    contract.  They are the maker of the contract and, therefore,

18    it should be construed against them and not Ms. Carter.

19              THE COURT:  Okay.  I understand your position.

20              MS. COPELAND:  They are the ones that --

21              THE COURT:  Go ahead with your witness.

22              MS. COPELAND:  Okay.  Thank you.

23              THE COURT:  Let Mr. Hardin be sworn.

24              COURTROOM DEPUTY:  Do you swear that your testimony

25    will be the truth, the whole truth, and nothing but the truth,
```

1    so help you, God?

2              MR. HARDIN:  I do.

3              COURTROOM DEPUTY:  Please state and spell both your

4    first and last names for the record.

5              THE WITNESS:  James L. Hardin, J-a-m-e-s,

6    H-a-r-d-i-n.

7                        JAMES L. HARDIN

8    called by Defendant at 9:39 a.m., having first been duly sworn,

9    testified as follows:

10                      DIRECT EXAMINATION

11   BY MS. COPELAND:

12   Q.   Mr. Hardin, state your full name for the record.

13   A.   I just did.

14   Q.   Okay.  And what is your occupation?

15   A.   I am an attorney.

16   Q.   Okay.  You began your representation with Ms. Carter

17   sometime before October 1st; correct?

18   A.   Sometime before October 1st.

19   Q.   So is that a yes?

20   A.   That's a yes.

21   Q.   Okay.  As part of your representation, you met with

22   Ms. Carter; correct?

23   A.   Yes, I did.

24   Q.   What was the first date that you met with her in person?

25   A.   I don't remember the exact date.  It was prior to the

1    pretrial hearing sometime in July, I believe.  Prior to that --

2    to the hearing, I made arrangements to meet with her.

3    Q.    So when you told the -- okay.  But you didn't have the

4    plea agreement in hand at that time?

5    A.    No, this was in July.

6    Q.    Okay.  And where did you meet her at?

7    A.    Here at the marshal's office.

8    Q.    In the marshal's office, okay.

9    A.    I introduced myself --

10             THE COURT:  That was July 15?

11             THE WITNESS:  If that's what the --

12             THE COURT:  Last July?

13             THE WITNESS:  Yes, sir.

14   A.    I introduced myself to Ms. Carter.  I had spoken to her

15   previously on the phone to let her know I would be meeting with

16   her prior to the hearing.  And --

17             THE COURT:  Mr. Hardin, pull that mike down a little,

18   please.  Your voice is low.

19             THE WITNESS:  I'm sorry, Judge.

20   A.    And then discussed everything about the case that I

21   understood to make sure that we were on the same sheet of

22   music.  And addressed the strategy of the case that you and I

23   had discussed.  And at the time I thought it was a very good

24   meeting.

25   ///

BY MS. COPELAND:

Q.   Okay.  So that was prior to you having the agreement;

correct?

A.   Yes.

Q.   Okay.  And you negotiate this plea in this case; correct?

A.   Yes, I did.  With your consent and supervision.

Q.   Okay.  You constantly say with my consent and with my

supervision.

A.   Um-hum.

Q.   You are aware that I was on suspension; correct?

A.   Yes.

Q.   And as such, on suspension, I had no contact with the

client; correct?

A.   You had no contact with the client, but you informed me

that pursuant to your attorney's instructions and the Bar's

rules, that you were able to be -- have an administrative role

in the office, take care of pleadings, and consult on cases,

but you were not allowed to communicate with clients.

Q.   Okay.  Now, you understood when you undertook this case

that you was responsible, you was the attorney of record?

A.   No.  I understood when I entered -- when I made the entry

of appearance in June that I was going to take the case until

you came back from suspension.

Q.   So -- so your whole role -- the whole scheme of things is

that you just hoping -- holding this case open until I got

1   back, is that what your intent were?

2   A.   No, that was your hope.

3   Q.   We're not talking about what my hope were.  I'm talking --

4   you're the one on cross examination, not I.

5   A.   Well, I am answering your question.  My goal was to

6   represent the client.

7   Q.   Okay.  And that was your duty to represent --

8   A.   Let me finish.  I want to make sure I'm perfectly clear

9   about this.  As an attorney, I have a duty to represent each

10  and every client to the best of my ability.  We all know that.

11  My goal was to effectuate the goals and the strategies and the

12  outcome that she came to expect through your initial meetings

13  with her.

14  Q.   Okay.

15  A.   In order to do that, I consulted with you throughout the

16  negotiation process and in every aspect of the case.

17  Q.   Okay.  Okay.  You constantly say about my initial

18  interview --

19  A.   Yes.

20  Q.   -- with the client.  Were you present for the initial

21  interview?

22  A.   No, you told me about it.  Actually, I believe you had two

23  meetings with her.

24  Q.   Okay.  Okay.

25            MS. COPELAND:  Your Honor, may I approach the

1   witness, please?

2           THE COURT:  Um-hum.

3   BY MS. COPELAND:

4   Q.   I am going to show you what I'm going to mark as the

5   Exhibit Number 1, Defense Exhibit Number 1.  Could you please

6   identify that document for me.

7        (Defendant's Exhibit 1 was marked for identification.)

8   A.   This says, "Plea Agreement."

9   BY MS. COPELAND:

10  Q.   Is that the plea agreement that you entered Ms. Carter in?

11  A.   It is the agreement that I reviewed with Ms. Carter.  It

12  has my initials on it, has her initials on it.  It has the

13  "Filed" stamp from the clerk's office.  It appears to be a copy

14  of the original that was filed with the clerk.

15  Q.   Okay.  Examining that plea agreement, did you discuss the

16  stipulations with Mrs. Carter?

17  A.   I did.

18  Q.   And what was -- and what did she tell you about the

19  stipulations?

20  A.   (No response.)

21  Q.   You said you discussed it with her?

22  A.   I don't understand the question.

23  Q.   You said you discussed it with her?

24  A.   Yes.

25  Q.   Okay.  And what was her responses?

1  A.    She understood.  The specific stipulations I was certain

2  to go over with her because they would have an effect on how

3  the sentencing guidelines were calculated.  And when I went

4  over these stipulations with her, I explained to her why they

5  were present; for example, the facilitation, home ownership,

6  the fact that she was a resident, homeowner, aware this

7  activity was undertaken, that type of thing.  The gun -- the

8  presentation of the gun.  The presence of the gun in proximity

9  to the drugs, that type of thing.

10 Q.    So then you discussed with her that you had these charges

11 dismissed in the indictment?

12 A.    Um-hum.

13 Q.    That she was going forward with an Information?

14 A.    Um-hum.

15 Q.    You discussed that with her as well; correct?

16 A.    I discussed with her the fact that we had gotten the plea

17 agreement down to one count of conspiracy.

18 Q.    Okay.  And did you tell her by her -- you dismissing those

19 counts and by her stipulating to those same counts, that it

20 would have the same effect as if she pled guilty to those

21 counts?

22 A.    Of course not.

23 Q.    You did not?

24 A.    No, I don't think that's a correct statement of law.

25 Q.    But you did understand it would have some purpose for

1   sentencing?

2   A.   Yes.  And I discussed that with her.  And I told her

3   how -- what -- how it would affect sentencing.

4   Q.   Okay.  And when did you have that discussion with her?

5   A.   That was on the 1st.

6   Q.   Of --

7   A.   Actually, I had a discussion with her on the phone prior

8   to the 1st.  And then I discussed it with her and showed her

9   the actual agreement, and we went through every page, and there

10  you have it.

11  Q.   Okay.  And according to my subpoena, I told you to bring

12  some documents to show me proof that you spoke with her,

13  contacted her.

14  A.   You said -- I believe the subpoena said any documents

15  pertaining to proof of contact or anything.  You have the file.

16  I have no documents.

17  Q.   Okay.  Have you had a chance to look at the -- the

18  attorney contact log for the jail?

19  A.   No, I have not.

20  Q.   Would you be surprised that your name is not on it?

21  A.   Yes, I would.

22  Q.   Did you visit her at the jail?

23  A.   I did.

24  Q.   When did you visit her at the jail?

25  A.   I'm sorry, "the jail."  Not the marshal.  No, I did not.

1    Q.   Okay.  Would you be surprised if -- if I show you the

2    phone log and you peruse it, would you be surprised that

3    your -- there is no phone contact with you?

4    A.   Yes, I would.

5    Q.   Okay.

6         MS. COPELAND:  Your Honor, I left that document --

7    that exhibit over there.  Could I go pick it up?

8         THE COURT:  Yes.

9    BY MS. COPELAND:

10   Q.   You also stated that you spoke with Mrs. Carter's son on

11   that day, as well?

12   A.   Um-hum.

13   Q.   How long was the conversation with him prior to the

14   hearing?

15   A.   I saw him before the hearing.  I saw him after the

16   hearing.  I'd spoken to Bobby 20 minutes before the hearing,

17   and we spoke for quite a while afterwards.

18   Q.   And you told the Court that you got here about an hour

19   ahead of time; correct?

20   A.   Um-hum.

21   Q.   So that was --

22   A.   Well, which hearing are you talking about?  The one in

23   Macon or the one here?

24   Q.   We're talking about the October 1st hearing.

25   A.   In Macon, yes, I did.

1    Q.   Let me get to that.

2              MS. COPELAND:  I'm going to mark this as D-2.

3         (Defendant's Exhibit 2 was marked for identification.)

4              MS. COPELAND:  Your Honor, may I approach the

5    witness?

6              THE COURT:  Yes.

7    BY MS. COPELAND:

8    Q.   I am going to show you a certified copy of the phone log.

9    And you can peruse it and tell me for the pertinent day --

10   A.   I don't understand this document.  You said phone log

11   from -- is this a phone bill?  Or is it from the --

12   Q.   From the jail.

13   A.   "From the jail"?

14   Q.   It's a certified copy of all Mrs. Carter contact at Sumter

15   County where she was held at that time.

16   A.   Okay.  So, which dates am I looking for?

17   Q.   You looking for whatever date you said you went.

18             THE WITNESS:  Your Honor, I would need a recess to

19   get through this entire stack of documents right here.

20   BY MS. COPELAND:

21   Q.   I can point --

22   A.   I would -- I am not familiar with this document.  It's --

23   Q.   Do you want me to point to the pertinent dates for you?

24             THE COURT:  I wish you would do whatever it takes to

25   move this along.  I agree with him.  You're just handing him a

1   pile of documents and asking him what they say.  He doesn't

2   know any more than I do.

3            MS. COPELAND:  Okay.

4   A.   And the other problem with the phone log, Ms. Copeland, is

5   that there's two ways to speak with detainees at that jail.

6   They will let you -- they will let you make phone calls through

7   the front, and then they will put it to the back so that

8   attorneys can have conversations.  I guess they have a back

9   room or an office, and then -- versus another phone system for

10  conversations with, like, say for example family members that

11  are routed through a different system.  So I don't know which

12  one you have.

13  BY MS. COPELAND:

14  Q.   I have all the phone records.

15  A.   But I am telling you, my testimony is -- and to be very

16  clear about this -- I spoke with Ms. Carter over the phone.

17  Q.   And that was a short conversation; correct?

18  A.   Define, "short."

19  Q.   "Short," meaning 10, 15 minutes.

20  A.   Yeah, something like that.

21  Q.   Okay.  So you didn't have an extensive conversation that

22  what you read every line for line?

23  A.   No, actually, you know, if you want to quibble with words

24  about extensive.  When I went onto -- my discussions were

25  with -- with Ms. Carter were she wanted to -- they were based

1   on -- they were founded on the information that I got from you,

2   the instructions that I'd gotten from you, the direction of the

3   case.  And so my conversations with her would start at a

4   certain point:  As was discussed with you, Ms. Carter, blah,

5   blah, blah, here we are, this is what's happened, as was

6   discussed, as was -- you know, with Copeland or whatever my

7   prior conversations were.  Here we are, this is what I've

8   gotten from the prosecutor.

9        This is what we're working on, the initial -- for

10  example -- plea agreement had four, five charges; not the one

11  charge for conspiracy.  Ms. Carter, this is where we are, this

12  is their initial plea agreement.  It's -- it's -- I'm not

13  suggesting that you accept it.  We're working on it.  I am not

14  happy with it, either.  On and on and on.

15  Q.   Okay.  Okay.  Now, you went back and forth with the

16  government concerning this plea agreement; correct?

17  A.   Yes.

18  Q.   Okay.  And you negotiated this here; correct?

19  A.   Yes.  And I kept you in the loop.

20  Q.   Mr. Hardin, we are not speaking of me.  I had no contact

21  with the client.

22            THE COURT:  Let's go on with the questions.

23  BY MS. COPELAND:

24  Q.   Okay.  You objected to these stipulation to the PSI;

25  correct?

1    A.    Um-hum.

2    Q.    But you stipulated to the very objections --

3    A.    No.  Well, here's -- that issue came up at the prior

4    hearing.  And perhaps my first objection was not artfully

5    crafted.  My amended objection went on to explain that my

6    objection was how the words -- particular words such as

7    "facilitate" was being used by the probation office in a manner

8    to mean something it didn't.  Okay.  I understand those words

9    are there.  And as I tried to explain, and I think I did a

10   better job in the second objection, was that those words were

11   being used in a manner which was not intended.  And certainly

12   not in a manner, in which I explained to Ms. Carter, which I

13   told you.

14   Q.    Okay.  So if you didn't explain it to Ms. Carter in that

15   way -- so you agree with me that there was a misunderstanding

16   with the agreement, then?

17   A.    No.  What I'm trying to tell you is, is that when I went

18   over the stipulations with Ms. Carter, they were not -- the way

19   I explained to Ms. Carter was not the way they were interpreted

20   by the probation officer.

21   Q.    And you did all this explaining on October 1st?

22              THE COURT:  Y'all are talking now about the

23   stipulations in the plea agreement?

24              MS. COPELAND:  That is correct, Your Honor.

25              THE COURT:  Okay.

1              MS. COPELAND:  Okay.

2   A.    No, I did not have a discussion with Ms. Carter on

3   October 1st about how the probation officer interpreted those

4   words because he hadn't yet done so.  That didn't happen until

5   December.

6   BY MS. COPELAND:

7   Q.    Okay.  So that was after the fact?

8   A.    Of course.

9   Q.    So when you went through the plea agreement, did you

10  explain -- discuss the quantity of drugs with Ms. Carter?

11  A.    Yes.

12  Q.    Okay.  And did you see where it says in the plea

13  agreement, Paragraph 8, there was 5 kilograms to 15 kilogram of

14  cocaine?

15  A.    There was a discrepancy in those two.  Part of it said 50

16  to 150, and I didn't catch it.

17  Q.    Okay.  You didn't catch it?

18  A.    And apparently you didn't, either.

19  Q.    Okay.  That's fair enough.  So you didn't explain that if

20  she was at the 15, what the agreement says --

21  A.    I explained to her the 50 to the 150, not the 5 and

22  whatever other to 15.

23  Q.    And you understand if it was 5 to 15 --

24  A.    It would be significantly less.

25  Q.    -- it was four points less; correct?

1    A.   Significantly, yes.

2    Q.   And then in the plea agreement, you stipulated to 50 to

3    150?

4    A.   Um-hum.

5    Q.   You didn't object to the quantity of drugs in the plea --

6    in your objections?

7    A.   No.  I mean, that was part of a negotiation.  I mean,

8    there may be a discrepancy, a typo, whatever you want to call

9    it.  But I am not going to say something that's not true.

10   Ms. Bowen and I went back and forth about quantity, and that

11   was -- that was the plea agreement.

12   Q.   That's the plea agreement that you understood; correct?

13   A.   And the agreement that I explained to Ms. Carter, yes.

14   Q.   And that was on October 1st?

15   A.   Yes.

16   Q.   And --

17         THE COURT:  Wait a minute, before you go any further.

18   You are talking now about the provisions of the plea agreement,

19   the stipulation of fact on Page 17 of the plea agreement where

20   it says, "The Government and Defendant stipulate and agree the

21   quantity of cocaine attributable to Defendant is at least

22   50 kilograms but less than 150 kilograms"?

23         MS. COPELAND:  Prior to that, I was talking about the

24   Paragraph 8 in the plea agreement, which is in front of the

25   plea agreement.  I think I left it over here.  Let me see.

1   Which tell you that Mrs. Carter conspired to at least

2   5 kilograms to 15 kilograms.  And that's on Paragraph 5 of the

3   plea agreement, which would be page --

4           MS. BOWEN:  It's Page 13, Your Honor.

5           MS. COPELAND:  Yeah.

6           THE COURT:  Page 13?

7           MS. BOWEN:  At the bottom.

8           THE COURT:  The only thing I have in my book is the

9   stipulation of fact.

10          MS. BOWEN:  I have the plea agreement here, Your

11  Honor.

12          THE COURT:  Do you?  Could I look at that, please,

13  and see what you're talking about.  All right.  Page 5.

14          MS. BOWEN:  Page 13, Your Honor.

15          MS. COPELAND:  Page 13, Paragraph 5, Your Honor.

16  Well, it is actually Paragraph 8.

17          THE COURT:  Wait a minute.  Paragraph 8?

18          MS. COPELAND:  Yes, all the way at the bottom, where

19  it says, "Overview of the Carter/Martinez Drug Trafficking

20  Conspiracy."

21          THE COURT:  All right.  Well, okay, I got that.  And

22  it says, "Defendant conspired with members of her family," and

23  so forth, "to distribute not less than 5 kilograms but not more

24  than 15 kilograms..."  Those are the words that you're talking

25  about?

1              MS. COPELAND:  That is what the agreement says, Your
2     Honor.
3              THE COURT:  And then on the last page, the numbers --
4              MS. COPELAND:  Changes.
5              THE COURT:  -- are 50 to 150.
6              MS. COPELAND:  That is correct, Your Honor.
7              THE COURT:  And what is your explanation of that?
8              THE WITNESS:  Well, if there was a typo in it,
9     Judge --
10             THE COURT:  If there was what?
11             THE WITNESS:  If there was a typo in it, the 5 versus
12    the 50.  I don't recall if we -- I don't know if we -- who
13    brought it up.  I believe it was addressed at the sentencing
14    hearing itself, but --
15             THE COURT:  Well, which was it supposed to be --
16             THE WITNESS:  Well --
17             THE COURT:  -- according to you?
18             THE WITNESS:  50 to 150.  There's --
19             THE COURT:  "50 to 150"?
20             THE WITNESS:  Yes.  Ms. Bowen -- I -- I mean, I did
21    everything I could to negotiate it lower, but that was -- the
22    prosecution was set on the 50 to 150.
23             THE COURT:  But you're telling me that the
24    negotiated -- the -- as counsel, you negotiated the numbers
25    that are recited on Page 17, "50 kilograms but less than 150."

1              THE WITNESS:  Yes, sir.

2              THE COURT:  And you also -- it is your testimony that

3     the -- on Page 13, where it says, "5 kilograms but not more

4     than 15," that is a typo?

5              THE WITNESS:  Yes, sir.  And I explained to

6     Ms. Carter that was the 50 to 150.

7              THE COURT:  Okay.  I understand your testimony.

8              Nora, hand this back to her.

9              And what is your point?

10             MS. COPELAND:  Okay.

11    BY MS. COPELAND:

12    Q.    Did you explain to Ms. Carter that that was a typo?

13    A.    (No response.)

14    Q.    Pardon me?  Did you explain to Ms. Carter that was a typo?

15    A.    I told her that it was 50 to 150, okay.  And so -- I don't

16    know what to tell you.  We were going through every page.  I

17    don't remember my every word I spoke.  But I know what I

18    explained to her, and I explained to her it was 50 to 150.  If

19    I was to tell her that, "Oh, guess what, it's 5 to 15," we

20    would not have gone forward with the -- with the plea hearing

21    because there would -- that would not be the agreement.  I

22    explained to her the agreement.

23    Q.    Okay.  But earlier today -- you testified earlier that you

24    didn't even catch the 5 to 15.

25    A.    I explained to her the 50 to 150.

1    Q.   So, in other words, when you said you went over it word

2    for word, you didn't even catch the 5 to 15.  Isn't that a true

3    statement?

4    A.   Maybe I missed it, but I went over every page.  I went

5    over every stipulation.  I went over -- Ms. Copeland, I wish

6    you were there --

7    Q.   I wish I were, too.

8    A.   -- because I went over every page.

9    Q.   If it was 5 -- if you missed it -- therefore, in looking

10   at the plea colloquy, the transcript from the Rule 11 hearing,

11   and if it's not discussed, if you missed it, you missed it;

12   correct?

13   A.   No, I didn't miss it, Ms. Copeland.  I didn't leave

14   anything out.  The numbers that I explained to her were the 50

15   to 150.

16   Q.   I understand that that was the number you explained to

17   her.

18   A.   Right.

19   Q.   But my question to you, what was in the agreement that

20   you -- if you -- you didn't see it, that's fine.

21   A.   It's the 50 to 150 that I explained to her.  It's the 50

22   to 150 that the government -- is the agreement that the

23   government and I and you reached.

24   Q.   When did I talk to the government about this agreement?

25   A.   You and I worked on this together.

1    Q.    Yeah, right.

2    A.    Yes, it is correct.

3    Q.    And I communicated with the government what the agreement

4    was?

5    A.    I communicated with the government.

6    Q.    So it was your responsibility?

7    A.    It was ours.

8    Q.    Okay.  And so I can gather that you didn't discuss the 5

9    to 15?

10   A.    There was no reason to discuss the 5 to 15.

11   Q.    Because you didn't see it?

12   A.    Because it's not part of the agreement.

13   Q.    Okay.  But you understand a written agreement trumps any

14   oral agreement; correct?

15   A.    I understand that a -- a contract is not going to be

16   thrown out because of a typo.  The question is what is the

17   understanding of the parties.

18   Q.    Okay.  And the understanding of the parties would be the

19   defendant; correct?

20   A.    50 to 150, that was the understanding.  That's what I

21   explained.

22   Q.    And you didn't write the agreement?  Did you write the

23   agreement?

24   A.    I did not type it.

25   Q.    So -- so -- so you are defending the government that it

1    was a typo?

2    A.    I'm defending the truth, Ms. Copeland.  Because I know

3    exactly the agreement that I reached with the prosecution.  And

4    I am not going to come here to court and say that I do not

5    remember in order to benefit Ms. Carter because of a typo that

6    says 5 to 15.  Ms. Bowen specifically said under any

7    circumstances no, that's not going to happen.

8    Q.    Okay.  I understand your point there.  But my question to

9    you was that you never even discussed why was it the incon- --

10   A.    Why would I discuss something that is not true?  There was

11   no truth to the 5 to 15.  The other number in there was the 50

12   to the 150.  From the beginning to end, what I explained to her

13   is that is what you're pleading to.  50 to the 150.  And the

14   reason why?  Because, as you and I discussed, the quantity of

15   the drugs involved in the conspiracy, the number -- the amount

16   of money that was involved in the conspiracy, and the activity

17   that was happening at the home.

18   Q.    Okay.  And as you and I discussed, so you say, hum.  But,

19   in other words, when you said that you went from line -- you

20   went over it line for line, word for word, that never came up?

21   A.    I am not going to sit here and make something up.

22   Q.    I am not asking you to make up anything.

23   A.    Ms. Copeland, let me finish.  I did go over everything.  I

24   don't have in my memory right now a clear recollection of a

25   got'cha moment like, "Oh, tell me that was a mistake."  But I

1    am not saying it didn't happen, either.  Because I did go
2    through every page.
3    Q.    On the October 1st here in the jury box?
4    A.    Yeah.
5    Q.    While court was going on?
6    A.    That, too.  And I specifically told Ms. Carter, do not --
7    Q.    Okay.
8    A.    Let me finish.  I specifically told Ms. Carter do not go
9    in front of the judge and say you understand something if you
10   don't.
11   Q.    And you also told her to listen to what Hidalgo says?
12   A.    What I told her was, is these are the questions that he is
13   going to ask, and you need to be clear, and you need to answer
14   him yes or no.  And if you don't understand something, you need
15   to tell him.  Because if you do not answer yes or no, or you
16   give him the indication that you are somehow confused, he will
17   not go forward.
18        And, sure enough, there was a situation as I explained in
19   the earlier hearing where the defendant had an answer other
20   than yes or no and expressed some -- expressed confusion or
21   indicated to the judge that he was -- had some confusion.  And
22   everything came to a screeching halt, and the judge wanted to
23   make sure he understood.  And I said, "That's what I mean.  So
24   if you don't understand, now is the time to say."
25   Q.    Okay.  Did you tell her that some indict- -- some of the

1    counts in the indictment would be dismissed?

2    A.   I told her she's pleading to one count.

3    Q.   Okay.  So if she's pleading to one count -- Information;

4    correct?

5    A.   Um-hum.

6    Q.   And I guess you went over the fact that she had a right to

7    be indicted by the grand jury?

8    A.   It was all in there.

9    Q.   Okay.  And that was on October 1st?

10   A.   And we specifically waived it.

11   Q.   And it was on October 1st; correct?

12   A.   Um-hum.

13   Q.   Okay.  And so in part of the plea agreement that you

14   entered her in, the negotiated plea agreement, it tells you

15   that she's going to -- that Count 12, 13 and 14 was going to be

16   dismissed as part of her agreement; correct?

17   A.   I told her everything that she was charged with except for

18   the conspiracy was going to be dismissed.

19   Q.   Okay.  So when -- when the agreement recites that, there's

20   no 12, 13 and 14 to be dismissed; correct?

21   A.   I don't know.  I don't have it in front of me.

22   Q.   Because you only pled her to one-count Information?

23   A.   One count.

24   Q.   If it's a one-count Information, there's no other counts

25   to be dismissed; correct?

1    A.    Apparently not.  But the case started out with numerous
2    counts.
3    Q.    And so -- so you did explain to her what the effect was of
4    those dismissals?  And that was the date October 1st -- let me
5    ask you this here.  How long were you back there in the
6    marshal's office?
7    A.    I don't recall.
8    Q.    Was it about 15, 20 minutes?
9    A.    I don't recall.
10   Q.    But it definitely was not an hour; correct?
11   A.    I know I was here early for an hour.
12   Q.    Oh, you was here at the courthouse early for an hour.  You
13   already told me you talked to Mr. -- Mrs. Carter son for about
14   20 minutes.
15   A.    Um-hum.
16   Q.    So that definitely would shorten the time period up that
17   you had discussions with Ms. Carter.
18   A.    When you say, "here," it was in Macon.
19   Q.    That's correct, that's what I'm talking about.
20   A.    Yes.  Right.
21   Q.    We're talking about October 1st.
22   A.    I don't -- I don't remember exactly how long I was with
23   her.  But it was long enough to go over every page.
24           MS. COPELAND:  Nothing further of this witness, Your
25   Honor.

1          MS. BOWEN:  May I ask a few questions?

2          THE COURT:  Yes.

3                          CROSS EXAMINATION

4     BY MS. BOWEN:

5     Q.   Mr. Hardin, you entered representation of Ms. Carter in

6     June of 2015?

7     A.   Yes, ma'am, that's when I made my initial appearance.

8     Q.   And due to the voluminous nature of discovery in this

9     case, the fact that it was a Title 3 investigation, you

10    requested a continuance from the July, 2015, trial calendar?

11    A.   Yes.

12    Q.   You also -- let me ask you this way.  What was your

13    strategy for resolution of this case?

14    A.   My strategy, which was founded on Ms. Copeland's strategy,

15    was to try to get the best outcome possible for Ms. Carter

16    through a plea agreement because trial would be legal suicide

17    for her because of the amount of evidence in the case and the

18    information in the statements that she had already provided.

19    The admissions that she had already made.

20    Q.   And when you say the admissions she'd already made, you

21    are referring to the proffer or the debrief statement that she

22    had made to law enforcement with her prior counsel of the

23    federal defender's office?

24    A.   Yes, ma'am.

25    Q.   When you undertook representation of Ms. Carter, was she

1    charged in the indictment with four counts against her?

2    A.    I believe so.

3    Q.    And was the first count of that indictment a violation of

4    Title 21, Section 841(a)(1)(A), which is an allegation of

5    possession with intent to distribute 5 kilograms of cocaine and

6    280 grams of cocaine base, which carries a penalty of 10 years

7    minimum up to life?

8    A.    Yes.

9    Q.    Are you also --

10   A.    I'm familiar with the (a)(1)(A) part of that statute,

11   specifically, yeah.

12   Q.    Are you also familiar that she was charged with an 18

13   U.S.C. 924(c) charge, use of a firearm in furtherance of a drug

14   trafficking crime, which carries a maximum penalty of minimum

15   mandatory term of 5 years up to life?

16   A.    Yes.

17   Q.    Was she also charged with an additional count of

18   possession with intent to distribute cocaine?

19             MS. COPELAND:  I am going to --

20             THE COURT:  Just a moment.  Yes?

21             MS. COPELAND:  I am going to object momentarily.

22   Mainly because she had -- I had him on cross, so she would have

23   him on direct.  Perhaps she should ask him what it --

24             THE COURT:  Well, you know, you did not have him on

25   cross.  You had him on direct.

1              MS. COPELAND:  I called him for purposes of cross

2      examination.  I subpoenaed him for purposes of cross

3      examination.

4              THE COURT:  Well, nevertheless, he -- you called him

5      as your witness.  You had him on direct.

6              Go ahead with your question.

7      BY MS. BOWEN:

8      Q.   And the count that we were just discussing was an

9      additional count of possession with intent to distribute

10     cocaine base in violation of Title 21, United States Code

11     Section 841(b)(1)(C) which carries a maximum term of

12     imprisonment of 20 years?

13     A.   Yeah, I believe that's correct.

14     Q.   Was she also charged with an additional count of

15     maintaining a premises for drug activity in violation of Title

16     18 -- excuse me, Title 21, Section 856, which carries a maximum

17     penalty of 20 years' imprisonment?

18     A.   Yes, ma'am.

19     Q.   Did you then undertake to negotiate a plea agreement for

20     Ms. Carter?

21     A.   Yes, ma'am.

22     Q.   And did she ultimately enter a plea into a Superseding

23     Information with a single count of possession with intent to

24     distribute cocaine and cocaine base in violation of 21 U.S.C.

25     841(a)(1)(B), which carries a maximum penalty of a minimum

1    mandatory term of 5 years up to a maximum term of 40?

2    A.    Yes, ma'am.

3    Q.    So through your negotiations and efforts to reach a

4    resolution for Ms. Carter, you obtained the dismissal of three

5    counts, one of them carrying a life sentence possible, and the

6    reduction in statutory penalty for the count to which she pled?

7    A.    Yes, ma'am, it would appear.

8    Q.    Did you go over the plea agreement with her line by line?

9    A.    I did.

10   Q.    And I believe that's in front of you as Defense Exhibit

11   Number 1.  Did you have her sign the agreement?

12   A.    Yes, I did.

13   Q.    Did you have her initial each page?

14   A.    Yes, I did.

15   Q.    Did you ask her if she had any questions?

16   A.    Yes, I did.

17   Q.    Did she have any questions?

18   A.    No.

19   Q.    Did you also inform her that if she had a question in

20   front of the judge when taking the plea, that she should ask

21   that question to you?

22   A.    Yes.

23   Q.    And that if she did not understand a question that was

24   posed to her by the Court, she should indicate that?

25   A.    Yes.

1    Q.    Did you at any point ever tell her that she should just

2    say "yes" to any question?

3    A.    No.

4              MS. BOWEN:  That's all I have, Your Honor.

5              THE COURT:  Anything else, Ms. Copeland?

6              MS. COPELAND:  Yes, Your Honor.

7                        REDIRECT EXAMINATION

8    BY MS. COPELAND:

9    Q.    And this all happened on October 1st?

10   A.    Everything that she was talking about?

11   Q.    Yes.

12   A.    No.

13   Q.    When did it happen?

14   A.    Well, she was discussing the negotiations, plea agreement.

15   Q.    You already told the Court that you got the agreement a

16   day before.  One or two days before.

17   A.    We were negotiating --

18   Q.    I am not talking about you and her communication.  I am

19   talking about the communication of you and Ms. Carter.  Not

20   anyone else in this world.

21   A.    No, actually not.  It was not October 1st because I did

22   have phone conversations with her during this time period.  So

23   it was not all on October 1st.

24   Q.    On February 23rd you said you had one phone contact with

25   her.  Are you changing that now?

```
1    A.    What are you -- on February 23rd I said I had one phone
2    call with her?
3    Q.    That is correct.  You called her one --
4    A.    I had more than -- no, I know I had more than one phone
5    call with her because I had discussed with her the first plea
6    agreement, and then as we were moving along, and then told her
7    I was going to be in court early to meet with her and had the
8    final one, the final revision, so.
9    Q.    And you also discussed on February 23rd that you had
10   discussion with her son and daughter-in-law.  Is that what
11   you're confusing that with?
12   A.    No, I am not confused.
13   Q.    Okay.  And --
14   A.    I discussed it with her as well, too.
15   Q.    But you have no contact with Mrs. Carter?  You never sat
16   down before her with that agreement until October 1st; correct?
17   A.    I think you're mischaracterizing.
18   Q.    I am not mischaracter- --
19   A.    You said, "no contact."  I just told you I spoke with her
20   on the phone.
21          THE COURT:  You're repeating yourself now.
22   A.    I spoke with her on the phone about it.  And then when I
23   came to court, had it with me.  Had the actual pages with me.
24   BY MS. COPELAND:
25   Q.    And you said you spoke with her about 10 minutes over the
```

```
 1    phone prior to that?

 2               THE COURT:  Again, you are repeating yourself.

 3               MS. COPELAND:  I understand that.

 4               THE COURT:  Well, stop.

 5               MS. COPELAND:  Okay.  Nothing further, Your Honor.

 6               THE COURT:  All right.  Anything else for Mr. Hardin?

 7               MS. BOWEN:  No, Your Honor.  Just argument.

 8               THE COURT:  Okay.  You may go down.

 9               THE WITNESS:  May I be excused, Your Honor?

10               THE COURT:  No, you may go down.

11          (Witness left the stand at 10:12 a.m.)

12               MS. COPELAND:  That's all the witnesses I'm going to

13    call, Your Honor.

14               THE COURT:  All right.

15               MS. COPELAND:  The burden is on me so she can argue

16    first.

17               THE COURT:  You go ahead.

18               MS. COPELAND:  I would like to close.

19               THE COURT:  I want you to go ahead and make your

20    argument now.

21               MS. COPELAND:  Okay.  Thank you, Your Honor.  Your

22    Honor, my premise is this here.  As I spoke earlier, I

23    understand what have transpired in these last few hearings

24    concerning Mrs. Carter representation.  The bulk of everything,

25    it appear to me from the stand, is that Mr. Hardin is shifting
```

1     responsibility.  He's shifting accountability.  Because from

2     day one when he entered this case, he entered this case in

3     hopes just -- just -- and he has stated to this Court, "I'm

4     just filling in."  That's what he did.  Just filled in.

5     Without doing the actually ground work and understanding this

6     case until it was too late.

7          I believe Mr. Hardin had a revelation of what was

8     going on in this case after the plea was entered, after he

9     start going backwards and forth with his objection.  Because

10    otherwise to object to the very thing you stipulate to wouldn't

11    make any sense.  Other than the fact that Mr. Hardin himself

12    didn't fully interpret the agreement.

13         Now of course he interpreted it but that's after the

14    fact.  Just like I told the Court previously, I went over

15    February 13th and spoke with Mrs. Carter concerning the plea

16    agreement and took it over there and went through it with her

17    at that time and tried to make her understand exactly the

18    agreement that she was under.  But that's when I got the

19    revelation that, hey, you can't agree to something after the

20    fact and you can't have a meeting of the mind after the fact.

21    It have to be a meeting of the mind during the fact and before

22    the fact before you sign the agreement.

23         The problem with this agreement, problem with this

24    case, Your Honor, is that it's just -- you said it best in the

25    February 23rd hearing.  It's messed up from first to last.  And

1    when you said that, that's -- pretty much saying she received

2    ineffective assistance of counsel, and I believe that.  And I

3    tried to do everything to clean it up.  I even tried to do

4    everything to make excuses for Mr. Hardin when I said in the

5    first hearing maybe he was overburdened.

6            But every chance he got he tried to shift it.  But

7    this is about accountability and responsibility.  And this mess

8    here is no making of Mrs. Carter.  Somehow, somewhere, she got

9    this bright idea when I saw her that day:  Oh, I signed a full

10   5-year deal.  That is not something she just made up.  That is

11   something she believed.

12           I understand that no one can promise you an ultimate

13   sentence.  That is not the crux of the matter, as Mrs. Bowen

14   have said.  The crux of the matter was that she didn't

15   freely/voluntarily enter this guilty plea.  And when I say free

16   and voluntary, she didn't understand the whole four corners of

17   the agreement that she entered in.

18           And apparently this agreement, if you read it --

19   because the written form is what controls.  Not what is said.

20   Not what -- I can say anything I want to say, and if it's not

21   in that written agreement -- on the written, the words control.

22           Now Mr. Hardin want to make excuses for the

23   government, because he government bound; that, "Oh, the

24   government made a mistake.  It was a typo."  He didn't type

25   the -- type it.  The government is the maker of this agreement.

 1    And under contract theory, they should not benefit and that

 2    Mrs. Carter should benefit from it.  And not only that; the

 3    government have already conceded that Mrs. Carter have gave

 4    substantial assistance to the government in her 5K, which she

 5    can't take back.  She already performed her part.  This

 6    contract is filled with illusion that they are going to dismiss

 7    counts, counts that was not there, because there's only

 8    one-count Information.  So if we looking at just the agreement

 9    itself --

10              THE COURT:  What about -- what about the things that

11    were -- the other counts in the indictment?  I mean, what do

12    you do with those?

13              MS. COPELAND:  She already -- in exchange of the

14    information she said that she was getting rid of -- I don't

15    even know if the indictment was ever dismissed, but they went

16    on -- the government --

17              THE COURT:  You don't deny that she was indicted on

18    the --

19              MS. COPELAND:  I don't deny that.

20              THE COURT:  Then what do you think happened to them?

21              MS. COPELAND:  Well, that indictment?  It went away.

22    She pled to one Information.  One Information.

23              THE COURT:  That's correct.  Why do you keep saying

24    that nothing was dismissed?  Why do you keep making references

25    to -- these mysterious references to these other charges?

1              MS. COPELAND:  Well, because the Information that she
2    went on is a one-count Information.
3              THE COURT:  That's correct.  And as a result -- that
4    Information came into being as a result of the negotiation
5    between Mr. Hardin and Ms. Bowen.  And the government agreed to
6    proceed on the Information --
7              MS. COPELAND:  That is correct.
8              THE COURT:  -- as I understand it, and the other
9    charges were to be or have been dismissed.  Isn't that what
10   happened?
11             MS. COPELAND:  That is correct.
12             THE COURT:  What's your argument, then?  Why do you
13   keep saying that?
14             MS. COPELAND:  My argument is this here.  At the time
15   of the agreement, that indictment was no longer in place.  What
16   was in play was the one-count Information.  So if it's the
17   one-count Information, there is no need to make reference to
18   something being dismissed that does not need to be dismissed
19   because they are not proceeding on that indictment.
20             THE COURT:  That's baloney.  Go on to something else.
21             MS. COPELAND:  Okay.  But as I stated earlier, that
22   the Court have the power to reform this contract and make them
23   specifically perform on the agreement they written.  They
24   specifically said that she would have maximum of 5 years.
25   Either -- better yet --

1          THE COURT:  Where does it say that?

2          MS. COPELAND:  It's saying -- it's in -- it's that

3     language, paragraph -- okay, let me see where it's at.  It's on

4     Page 2, "Defendant fully understands that Defendant's plea of

5     guilty as set forth in Subparagraph (A), above, will subject

6     Defendant to a maximum sentence of not less than 5 years..."

7          THE COURT:  Now, you yourself told me when you first

8     appeared that that was not right and that that was a

9     typographical error.  Do you remember that?

10         MS. COPELAND:  I sure do.  But guess what?  That's

11    what I said.  The question is this here.  What the defendant

12    understand.  The agreement is not between me or Mr. Hardin; it

13    is between the defendant and the government.  That's what I

14    surmised it to be.

15         And then when I went on -- going through this

16    agreement, I saw more things that was inconsistent.  Like the 5

17    to 15 kilograms.  Which if she conspired -- conspired, and her

18    responsibility was 5 to 15, then how could she stipulate to 50

19    to 150?  If that's what --

20         THE COURT:  A maximum term -- "a maximum sentence of

21    not less than 5 years."  It doesn't say, "5 years."  It says,

22    "a maximum sentence of not less than 5 years."

23         MS. COPELAND:  That is correct.

24         THE COURT:  "With a maximum term of imprisonment..."

25         MS. COPELAND:  Is 40.

1          THE COURT:  "...of 40."

2          MS. COPELAND:  That's correct.

3          THE COURT:  Okay.  I understand your point.  What

4    else?

5          MS. COPELAND:  Okay.  And what I'm -- my point is

6    this here, Your Honor.  That this whole case, as you pointedly

7    point out, that it was messed up from first to last.  And if

8    that's the case, we should start over new.

9          But -- and if we do start over new, the government

10   have already threatened they are not going to negotiate in good

11   faith.  That if we do start over new, so it won't be a

12   miscarriage of justice, that we start over in good faith in

13   bargaining this case and move forward.

14         THE COURT:  I can't compel the government to

15   negotiate.

16         MS. COPELAND:  I understand that.

17         THE COURT:  Well, quit talking about that.

18         MS. COPELAND:  Okay.  Well, the Court have a lot of

19   power, Your Honor.

20         THE COURT:  I do, but I don't have that one.

21         MS. COPELAND:  Okay.  And the Court can also

22   specifically perform this agreement as written by the

23   government.  And we wouldn't even have a problem, Your Honor.

24         THE COURT:  Just continue with your argument.

25   Please, ma'am, bring it to a close.

1              MS. COPELAND:  Okay.  I will.  If the Court -- the
2       Court have already said that it was inclined to sentence her to
3       12 years.  If that's -- if that's the starting point, we will
4       be fine.  And then -- and if the Court consider her 5K motion
5       after that, I think that's something that we can live with.
6       That Ms. Carter can live with.
7              And the Court -- as the Court is well aware,
8       guidelines are only advisory.  So the Court does have
9       latitude and power to do -- in that instance, to -- to rectify
10      a lot of things that have happened to Ms. Carter in this case.
11      Thank you, Your Honor.
12             MS. BOWEN:  Your Honor, the defense counsel is
13      balancing a 2-pronged request to the Court.  The first is an
14      ineffective assistance of counsel claim, and the second is a
15      motion to withdraw the guilty plea because the only way that
16      this document, which has been entered, can be modified is if
17      it's withdrawn and then reentered.
18             I am going to address the ineffective assistance of
19      counsel claim first.  Which, of course, the Eleventh Circuit
20      has considered both of these questions together in *United*
21      *States* versus *Freixas*, F-r-e-i-x-a-s.  And I have a copy here
22      for the Court.  And I have a copy for defense counsel, as well.
23      And that case is found at 332 Federal 3d 1314, and it's a 2003
24      decision.
25             And in addressing the ineffective assistance of

 1    counsel claims set forth, the Court is governed by *Strickland* v

 2    *Washington*, which is found at 466 U.S. 668, and it's a 1984

 3    decision.  And there's two prongs that the Court has to

 4    consider.  The petitioner, which of course it is her burden,

 5    must first show that counsel made errors so serious that

 6    counsel was not functioning as the counsel guaranteed by the

 7    Sixth Amendment.  If this substantial showing is made, the

 8    petitioner must then demonstrate that the deficient performance

 9    prejudiced the defense, which requires showings that counsel's

10    errors were so serious as to deprive the defendant of a fair

11    trial, a trial whose result is reliable.

12          The Supreme Court went on to say that unless a

13    defendant makes both showings, it cannot be said that the

14    conviction resulted from a breakdown in the adversary process

15    that renders the result unreliable.

16          The Court further went on to say the judicial

17    scrutiny of counsel's performance must be highly deferential

18    because retrospective evaluation of a lawyer's performance can

19    be difficult.  A court must indulge a strong presumption that

20    counsel's conduct falls within the wide range of reasonable

21    professional assistance; that is, the defendant must overcome

22    the presumption that the challenged action might be considered

23    sound trial strategy.

24          A petitioner must identify specific acts or omissions

25    that were not the result of the reasonable professional

1    judgment.  And a court should deem that these acts or omissions

2    were deficient only if they were outside the wide range of

3    professionally competent assistance.

4         Simply put, the deference afforded an attorney's

5    decision is great and the bar for proving a Sixth Amendment

6    violation is high.  In light of the strong presumption in favor

7    of competence, we have to hold that in order to prove deficient

8    performance, a petitioner must establish that no competent

9    counsel -- no other competent counsel -- would have taken the

10   action that his counsel did take.

11        Further, a petitioner must affirmatively prove

12   prejudice by showing that counsel's errors actually had an

13   adverse effect on the defense.  The defense has shown neither

14   one of these prongs.  Mr. Hardin's conduct falls within the

15   reasonable competency of attorneys.

16        Second of all, she cannot prove harm or prejudice.

17   In fact, Mr. Hardin got her benefit through her plea

18   negotiations.

19        The second thing, a withdrawal of a guilty plea is

20   governed by Federal Rule of Criminal Procedure 32(e).  And the

21   defense must show a fair and just reason to withdraw that

22   guilty plea previously entered.  Some factors to consider are

23   whether close assistance of counsel was available, whether the

24   plea was knowing and voluntary, whether judicial resources

25   would be conserved, and whether the government would be

1    prejudiced if defendant were allowed to withdraw her plea.

2          The Eleventh Circuit specifically applied this

3    framework and these factors in *United States* v *Garcia*, which is

4    also in that packet of cases I've handed to the Court and

5    defense.  And specifically in that case, the defendant advanced

6    that I thought I was going to get X amount but I received this

7    amount.  Similarly in *United States* v *Pease*, which is 240

8    Federal 3d 938, a 2001 decision, a defendant was deemed to be a

9    career offender.  That wasn't part of their negotiations;

10   however, the plea agreement was still enforced.

11         In this case, Ms. Carter had the close assistance as

12   defined by the law of Mr. Hardin.  Further, she stood before

13   Your Honor, under oath, answered every question, said that she

14   understood what she was charged with and that she was pleading

15   guilty freely and voluntarily.

16         Third, judicial resources would not be conserved.

17   It's been some time since this indictment, which was 2014.

18   It's a Title 3 investigation.  It would take a lot of judicial

19   resources to go back and start from the beginning.  And the

20   government would be prejudiced in that regard.  Therefore, I

21   don't think that Ms. Copeland has met the burden under either

22   question and the plea agreement should be enforced and we

23   should move forward to sentencing.

24         THE COURT:  Okay.  Let me ask you this.  What -- what

25   effect, if any, is the conflict in the stipulation of fact

1    between -- where the stipulation of fact in the plea agreement

2    makes -- I'm -- I'm looking at two documents and I'm having a

3    hard time finding the pages, but you understand what I'm

4    talking about.

5          MS. BOWEN:  Yes, sir, I do.  The conflict between the

6    original statement and the statement of facts?

7          THE COURT:  Earlier it says not less than 5 nor more

8    than 15 kilograms, and then at the end of the plea agreement it

9    makes reference to 50 but not less than 150 kilograms.  Without

10   any question, that is what the paper says.

11         MS. BOWEN:  That is an error, Your Honor.

12         THE COURT:  Okay.  And according to the testimony of

13   Mr. Hardin, the earlier reference to, "5 nor more than 15," is

14   a typographical error.

15         MS. BOWEN:  Yes, Your Honor.

16         THE COURT:  And that the negotiated agreement was 50

17   to 150.  But -- nevertheless, it does say those two things.  In

18   the government's view, what is the effect of that?

19         MS. BOWEN:  Your Honor, I would say that it does not

20   have an effect.  I regret that there is an error in the plea

21   agreement that I should have corrected.  I would further say

22   that when it -- the paragraph on Page 17 that you're referring

23   to, it says the attributable drug amount which went to the

24   guidelines that will be applied to Ms. Carter is the 50 to 150

25   kilograms.  That would be controlling within the document.

1          Also you've heard from Mr. Hardin, as you said, who

2     indicated that he told Ms. Carter that's what she would be held

3     accountable for.

4          THE COURT:  Okay.

5          MS. COPELAND:  May I respond to that, Your Honor?

6          THE COURT:  Yes, you may.

7          MS. COPELAND:  Your Honor, the fact is this here.

8     Between the 5 and 15, that's Guideline 30.  As opposed to 50 to

9     150 is Guideline 34.  The difference is about 4 and a half

10    years, almost 5 years' difference.

11         I understand what the government said; "We made a

12    mistake."  But it's easy for the government to say they made a

13    mistake, but they can't -- what's mind boggling, they can't

14    accept the part that Ms. Carter misunderstood.  That's the same

15    thing what they're saying:  We made a mistake, the Court should

16    look over it.

17         And what we're saying is this here.  That she didn't

18    have close -- close view with an attorney.  And I should like

19    to know what standard that Mrs. Bowen is referring to, when the

20    standards of representing a defendant in such a complex case is

21    that you go over the plea agreement by his own testimony on

22    February 23rd.  Of course, he came back today to try to fix up

23    some stuff that he -- when he was directly asked by you, he

24    told you that he first showed it to her October 1st.  That was

25    a true statement that he told you then.  Now he's just trying

1   to fix it up in order for himself.

2              But it's not about him.  But he showed this to this

3   lady the first time October 1st.  He already told you that he

4   talk -- he came to court about an hour early.  That he talked

5   to her son 20 minutes.  So that is first -- definitely

6   shortened that out.

7              THE COURT:  You're repeating your argument.

8              MS. COPELAND:  Yeah, I know I am.

9              THE COURT:  Well, I don't want to listen to a

10  repeated argument.

11             MS. COPELAND:  Okay.  No problem, Your Honor.  So

12  Mrs. Carter have received ineffective assistance of counsel and

13  that falls below the burden.

14             THE COURT:  All right.  To the extent, Ms. Copeland,

15  that you have attempted to establish that your client has been

16  the victim of ineffective assistance of counsel, I find that

17  you have failed to carry your burden for the reasons stated by

18  Ms. Bowen in the quotations that she read from that decision,

19  all of which are very familiar to me.

20             The only evidence before the Court on the question is

21  that the provisions of the plea agreement on Page 17, where it

22  says that the quantity of cocaine attributable to the defendant

23  is at least 50 kilograms but less than 150 kilograms, the only

24  evidence is that that was the negotiated agreement between the

25  defendant and the government.  There's nothing -- there is

1    absolutely no evidence before the Court that contradicts that.

2            The evidence also before the Court is that the

3    earlier reference on Page 13 of the plea agreement to

4    "5 kilograms but not more than 15 kilograms" is a typographical

5    error.  Mr. Hardin, who negotiated the agreement, acknowledges

6    that.  And the government acknowledges that.

7            The defendant's argument that the words on Page 2 of

8    the plea agreement, that the plea agreement would "subject the

9    Defendant to a maximum" of -- "maximum sentence of not less

10   than five years imprisonment, with a maximum term of

11   imprisonment of forty years," her argument that that is an

12   agreement to a 5-year sentence, that argument is completely

13   without merit.  The agreement does not say that at all.

14           The defendant appeared before this Court and entered

15   her -- and entered her plea of guilty under oath.  She told the

16   Court that she understood the charge.  She understood the

17   penalty, the proposed penalty.  The transcript is very clear

18   that she understood everything that she said.  Your argument

19   that she simply parroted the instructions of Mr. Hardin is not

20   supported by any evidence before the Court.

21           Your motion to rescind the plea agreement is denied.

22   Your motion to withdraw the plea is denied.  And we will now

23   proceed to sentencing.

24           Is there anything -- does the government have any

25   objection to the presentence report?

```
 1              MS. BOWEN:  No, Your Honor.

 2              THE COURT:  Do you have any objections to the

 3    presentence report?

 4              MS. COPELAND:  No, Your Honor.

 5              THE COURT:  Ms. Carter, I may have covered this

 6    before with you.  I have lost track of what we've done in all

 7    these hearings.  But you have had an opportunity, have you not,

 8    to examine the presentence report filed by the probation

 9    office?

10              THE DEFENDANT:  Yes.

11              THE COURT:  I didn't understand you.

12              THE DEFENDANT:  "Yes, sir."

13              THE COURT:  You have?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  And did you read that agreement?  You

16    read and write English?

17              THE DEFENDANT:  Yes, sir.

18              THE COURT:  Did you read the plea agreement?

19              THE DEFENDANT:  Yes.

20              THE COURT:  Did you understand it?

21              THE DEFENDANT:  Yes.

22              THE COURT:  All right.

23              THE DEFENDANT:  Your Honor, I --

24              THE COURT:  I'm sorry, you need to speak up.

25              THE DEFENDANT:  I ain't -- I ain't want to sign for
```

1    no -- that much cocaine and -- and that gun.  I didn't sign for

2    that.  If he had went over that to me, I would have told him,

3    oh, yeah, I got some questions.  And I don't -- I never owned a

4    gun in my life.  And all that dope?  No.  Huh-huh.

5           When he come by, he went over with me that, he

6    didn't -- huh-huh.  I wouldn't have signed for that.  I

7    wouldn't have signed for that.  He told me that whatever that

8    man in front of me, do what that man do.  Do the same thing.

9    He didn't go over it, Your Honor.  I swear for God.  He didn't

10   go over them papers with me.  He didn't.

11          THE COURT:  Well, you see one of the problems here is

12   that you told me earlier that he did.

13          THE DEFENDANT:  Earlier when?

14          THE COURT:  When you entered your plea of guilty.

15          THE DEFENDANT:  Oh, on October the 1st?  Yeah, that's

16   what he told me to say.

17          THE COURT:  Well, you know, I have a choice.  I can

18   believe what you say now or I can believe what you said

19   earlier.  The position that you take now, if accepted by the

20   Court, would just completely forego the disposition of this

21   case.  What else do you want to say?

22          THE DEFENDANT:  That's all.

23          THE COURT:  That's all?

24          THE DEFENDANT:  (Nodding head in the affirmative.)

25          THE COURT:  All right.  Do you have any objections to

1   the presentence report, Ms. Copeland?

2           MS. COPELAND:  No, I didn't file any objection, Your

3   Honor.

4           THE COURT:  All right.  Is there anything you'd like

5   to say on behalf of your client before sentence is imposed?

6           MS. COPELAND:  Yes, I will, Your Honor.

7           THE COURT:  Go ahead.

8           MS. COPELAND:  Your Honor, there's a lot of stuff

9   that's transpired in Ms. Carter case.  And the Court is well

10  aware that the guidelines are only advisory guidelines.  And we

11  know where -- according to this sentencing where she fall at.

12  And the Court have indicated that -- um, that the Court would

13  sentence her to 12 years which is 144 months, I believe.  12

14  times 12 that's 144.  But we're going to ask the Court to do --

15          THE COURT:  I have never said that I was going to

16  sentence her to 144 months.

17          MS. COPELAND:  You said 12 years, but 12 times 12 is

18  144.

19          THE COURT:  I don't recall saying that I was going to

20  sentence her to 12 years.  I have never indicated what I was

21  going to sentence her to.

22          MS. COPELAND:  Well, at sentence February 25th you

23  asked me, "What I if I give her 12 years?"  And I said -- well,

24  that was the first time that was before us.  I said, "Let me

25  discuss it with Ms. Carter," and we recessed, and you allowed

1    me to go discuss it with Ms. Carter.  And we was going to move
2    forward with the plea at that time, and that was on
3    February 25th, 2016.

4           And at that time, Ms. Carter started talking and you
5    didn't go forth with the plea.  We was there at that point,
6    juncture, to go forward with that plea at that time on the 25th
7    of February.

8           THE COURT:  Is that an accurate statement of the
9    record?

10          MS. BOWEN:  I believe you may have made some remark
11   as to possibly giving her 12 years, and did she want to
12   receive -- and we recessed and we did come back.  And then she
13   indicated that she wanted to proceed with withdrawing her plea.

14          MS. COPELAND:  No.

15          THE COURT:  All right.  Go ahead.  Well, maybe I did
16   say that, go ahead.

17          MS. COPELAND:  No, we went forward with the -- we was
18   going forward with the sentencing.  And you stopped -- that's
19   why I buy these transcripts -- you stopped the hearing and you
20   said you're not going to go forward because Ms. Carter started
21   telling you exactly what had happened.  So we didn't at that
22   time stop you.  You stopped.  Okay.  So I want to make that
23   clear.

24          But -- so we going to ask the Court, even though
25   these guidelines are advisory, we going to ask the Court to

1  stick with what he said, but do a little bit better since all

2  this stuff is in here.  All this confusion is in here.  Even if

3  the Court say I'm not going to buy your argument about what's

4  in the written form contract, but -- I understand what a

5  meeting of the mind is.

6          But I'm going to ask the Court to meet us halfway.

7  She probably had five years in her mind.  I'm going to ask the

8  Court to sentence her to eight years because -- know why?  The

9  Court got the power to do that.  In light of everything that

10  had happened in this case, that would be justice, Your Honor.

11          THE COURT:  All right.  Thank you.

12          Ms. Carter, is there anything you would like to say

13  before sentence is imposed?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  The presentence report has been prepared,

16  filed, considered and accepted, and you are adjudicated guilty

17  of Count One of the Superseding Information.  The advisory

18  sentencing range is 235 to 293 months considering an offense

19  level of 38 and a criminal history category of I.  In imposing

20  the sentence in this case, the Court has considered the

21  advisory sentencing range and the sentencing factors found at

22  18 U.S.C. 3553(a) and has made an individualized assessment

23  based on the facts presented.

24          Having considered the government's motion for

25  sentence reduction for substantial assistance pursuant to

1    U.S.S.G. 5K1.1 and 18 U.S.C. 3553(e), the Court departs

2    downward from the advisory sentencing range.  The Court commits

3    you to the Bureau of Prisons for a period of 155 months.

4             Since the sentencing range ordered by the Court is

5    within an advisory guideline range that is greater than 24

6    months, the Court is required to state the reason for the

7    sentence.  The Court imposed a sentence of 155 months based on

8    the nature and circumstances of the offense, the history and

9    characteristics of the defendant, to promote respect for the

10   law, to afford adequate deterrence to criminal conduct, and the

11   substantial assistance provided by the defendant.

12            Ms. Carter, you are to forfeit the items agreed upon

13   as a condition of your plea agreement as follows:  The real

14   property, which includes a mobile home located at 6147 Futch

15   Road, Hahira, Georgia, in Cook County.

16            A mandatory assessment in the amount of $100 is

17   imposed.  Any criminal monetary penalty ordered by the Court

18   shall be due and payable in full immediately.  Present and

19   future assets are subject to enforcement and may be included in

20   the Treasury Offset Program allowing qualified federal benefits

21   to be applied to the balance of criminal monetary penalties.

22   Fines and alternative sanctions are waived based on your

23   financial condition.

24            The prison term is to be followed by a period of

25   supervised release of five years.  You are to report to the

1    U.S. Probation Office in the district to which you are released

2    within 72 hours of release to begin service of the term of

3    supervised release, which will include the standard conditions

4    and the following mandatory conditions:

5           First, you shall not possess a firearm, ammunition,

6    destructive device or any other dangerous weapons.

7           Second, you shall cooperate in the collection of DNA

8    as directed by the probation officer.

9           And third, you shall submit to a drug test within 15

10   days of release on supervised release and at least two periodic

11   drug tests thereafter.

12          The following special conditions also apply:

13          First, you shall participate in a program of drug and

14   alcohol testing and treatment.  The probation office shall

15   administratively supervise your participation in the program by

16   approving it, administering the testing and supervising the

17   treatment.  You shall contribute to the cost of such treatment

18   not to exceed an amount determined reasonable by the court

19   approved U.S. Probation Office's Sliding Scale for Services.

20   And you shall cooperate in securing any applicable third party

21   payment such as insurance or Medicaid.

22          And second, you shall submit your person, property,

23   house, residence, vehicle, papers, computers as defined in 18

24   United States Code Section 1030(e)(1), other electronic

25   communications or data storage devices or media, or office, to

1    a search conducted by a U.S. Probation Officer.  Failure to

2    submit to a search may be grounds for revocation of release.

3    You shall warn any other occupants that the premises may be

4    subject to searches pursuant to this condition.

5              Now, Ms. Carter, you have knowingly and voluntarily

6    waived your statutory right to appeal with certain exceptions

7    as specified in your plea agreement.  If you decide to appeal,

8    you must file a Notice of Appeal with the Clerk of this Court

9    within 14 days of judgment being entered.  If you appeal,

10   you're entitled to be represented by counsel, and Ms. Copeland

11   will continue as your lawyer.

12             Ms. Carter, do you understand the sentence just

13   imposed?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Do you have any question about it?

16             THE DEFENDANT:  No.

17             THE COURT:  Do you have any objection to it?

18   Ms. Carter --

19             THE DEFENDANT:  No, sir.

20             THE COURT:  -- do you have any objection?

21             THE DEFENDANT:  No, sir.

22             THE COURT:  Ms. Copeland, do you understand the

23   sentence?

24             MS. COPELAND:  I understand, Your Honor.

25             THE COURT:  Questions or objections?

1             MS. COPELAND:  No objection, Your Honor.

2             THE COURT:  All right.  Ms. Copeland, you are to file

3     a timely Notice of Appeal or a waiver signed by yourself and

4     your client.

5             MS. COPELAND:  Okay.

6             THE COURT:  Very good.  That's all.

7             MS. COPELAND:  Your Honor, that's all I have.  May I

8     be excused?

9             THE COURT:  Yes, thank you.  Let's take a short

10    recess and then we'll go into Key.

11            MARSHAL:  All rise, court is in recess.

12        (Proceedings concluded at 10:47 a.m.)

13                        END OF RECORD

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, Darlene D Fuller, Federal Official Realtime Court

6    Reporter, in and for the United States District Court for the

7    Middle District of Georgia, do hereby certify that pursuant to

8    Section 753, Title 28, United States Code, that the foregoing

9    is a true and correct transcript of the stenographically

10   reported proceedings held in the above-entitled matter and that

11   the transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States

13

14                         Dated this 20th day of April, 2016

15

16

17                         _Darlene D. Fuller_
                           _____
18                         Darlene D. Fuller, RPR, CRR, RMR
                           NCRA No. 5803
19                         Federal Official Court Reporter
                           Georgia CCR 5641-3440-5157-6832
20                         Michigan Certification CSR-0929

21

22

23

24

25